IN THE

# SURROGATES' COURTS

OF THE

## STATE OF NEW YORK.

---

NEW YORK COUNTY—HON. ALEXANDER W. BRADFORD, SURROGATE—
December, 1857.

## DELAFIELD *v.* PARISH.

*In the Matter of Proving the Last Will and Testament of*
HENRY PARISH, *deceased.*

A mere intention to revoke a will never effectuates an express revocation.
The most satisfactory evidence that the testator had repeatedly and ex-
plicitly declared a deliberate design to annul or destroy his will pre-
viously made, would not authorize the court to reject the instrument.
A written statement to that effect, in the testator's handwriting, is not a
valid revocation, unless celebrated according to the forms prescribed by
the statute.

A legal act of revocation must be performed *animo et facto.* There must
concur both the intention and the act. Intention, or mere purpose, to
become legally operative, must be expressed in a legal way. To design
to do, and to do, are not the same. The act implies and embraces the
intention, but the mere naked intention does not include and comprise
the act.

At common law there could be a revocation of a will implied from circum-
stances.

There were two classes of such implied revocations: *First.* Such as were
declared by the law, in view of a change in the testator's circumstances,
especially his family relations, since the execution of the will, and which
effected a total revocation of the will and all its dispositions. This class
was received in consideration by the probate courts. It was accordingly
an established rule that marriage, and the birth of issue, effected an
implied revocation of a previous will.

Ultimately the birth of children (without a subsequent marriage after the will was made), in conjunction with other alterations in the testator's circumstances, was held sufficient to establish an implied revocation.

An alteration in the testator's circumstances, when that alteration did not include as one of its essential ingredients either marriage, or the birth of issue, has never been held to revoke a previous will.

*Second.* The second class of implied revocations at common law were revocations by alienation of property, or such acts of the testator in regard to his property, as indicated an intention to exempt it from the dominion of the will. These revocations were implied from the testator's dealing with the property which was the subject of testamentary gift, and their extent was consequently commensurate with the dealing. This class of revocations only affected the property devised, and did not produce a revocation of the will *per se;* and therefore such cases never came within the purview of the probate courts.

The whole subject of implied revocations in the State of New York, is now controlled by statute, and no implied revocations are admitted except those enumerated in the Revised Statutes.

The will of a competent testator stands as the reason for the act, and requires no other evidence to support it, than proof of due execution according to the ceremonies prescribed by law.

But a different degree and class of proof are required where the will has been made by the intervention of the party profiting by its provisions, and occupying relations of confidence and influence towards a testator of weak or doubtful capacity. For example, where the parties are in the relation of guardian and ward, principal and agent, trustee and *cestui que trust,* attorney and client, the court is exact and scrutinizing in its requisition of the plainest evidence of volition and capacity. Where such relations of confidence exist, and the party frames the instrument for his own advantage and benefit, every presumption arises against the transaction. In such a case, it is not necessary to prove fraud and circumvention, but the proponent must remove the suspicion by clear and satisfactory proof.

The principle involved in this rule must be considered as relating rather to the *quantum* of evidence required in such cases, than to an actual conclusion of fraud in fact.

And in its application it requires from the proponent evidence, outside of the document itself, that the contents were understood by the decedent, and were conformable to his real wishes; that the act was the result of free volition, the actual will, *voluntas ipsa,* of a competent mind—and if from any cause such proof fail, probate must be denied.

Where the testator made with due deliberation and under legal advice his will in the year 1843, whereby, after providing for his wife, and making other legacies, he made his two brothers residuary legatees, the residue at the time being small;

And subsequently in 1849, when such residue had increased very largely, and he had made no change in the will, was seized with apoplexy, and

after a partial recovery and the exhibition of some degree of intelligence, he made a codicil in favor of his wife, proved to have been conformable in a measure to intentions expressed previous to his illness;—*Held*, that such codicil should be admitted to probate.

*Held*, also, in respect to subsequent codicils, not supported by any extrinsic evidence of intention prior to his illness, which were made in favor of his wife, while he was in her charge, his faculties were enfeebled and impaired, and his power of communication and mental manifestation greatly affected, that the proof in support of such codicils was deficient, and they should be denied probate.

WM. M. EVARTS *and* FRANCIS B. CUTTING, *for Proponents.*

Henry Parish died in the city of New York on the second day of March, 1856. He left a widow, Susan M. Parish, two brothers, James Parish and Daniel Parish, and two sisters, Ann Parish and Mrs. Martha Sherman (wife of Allen M. Sherman), his heirs-at-law and next of kin.

He left a last will of real and personal estate, bearing date September 20th, 1842; a codicil executed August 29th, 1849, and republished December 17th, 1849; a second codicil executed September 15th, 1853; and a third codicil executed June 15th, 1854.

At the date of the execution of his will, Mr. Parish estimated his property at . . . . . . . . . . $732,000

His specific dispositions of property by this will were:

To Mrs. Parish . . . . . . . . . $331,000
" several namesakes . . . . . . 60,000
" acting executors . . . . . . 30,000
" his two sisters . . . . . . . 40,000
" Daniel Parish's seven children . . 70,000
" James Parish's six children . . . 60,000
" Mrs. Kernochan (his cousin) . . 10,000
" Mrs. Parish's brothers and sister . 80,000
" Mrs. Payne (Mrs. Parish's aunt) . 5,000
" Mrs. Abeel (his cousin) . . . . 10,000

696,000

Passing under residuary clause . . . . . . $36,000

By the thirteenth clause of the will, Daniel Parish and James Parish were made residuary legatees and devisees.

The balance-sheet of the testator's property, in July, 1849, shortly before the execution of the first codicil, shows, after deducting debts and expense account, an estimated estate of $898,736 53.

At this time, the Barclay-street dwelling-house and the Chambers-street house, both left to Mrs. Parish in the will, had been sold.

By the *first* codicil, the Union-square property, then their place of residence, and a store in Wall-street, are left to Mrs. Parish. Both these parcels of property were acquired after the date of the will.

By the *second* codicil, personal property, consisting of stocks and bonds to a large amount, is left to Mrs. Parish, and $50,000 is distributed to public charitable uses.

By the *third* codicil Mrs. Parish is made residuary legatee and devisee; and in case she survives the testator, the residuary clause of the will is revoked.

On the 19th day of July, 1849, Mr. Parish suffered an apoplectic stroke, and, as its sequel, continued subject to a paralytic affection until his death.

Joseph Delafield, one of the executors named in the will, propounded it, with the three codicils, for probate. The citations were returned March 31st, 1856, and the examination of the witnesses for the proponent, and for Daniel and James Parish, who contested the three codicils, and of Ann Parish, and of Mrs. Martha Sherman, who contended for a revocation of the will, was continued until July 6th, 1857.

If the will stands, the only parties interested in contesting the codicils are James Parish and Daniel Parish, who will take, under the thirteenth clause of the will, what the codicils respectively purport to dispose of, if they be decreed invalid.

Ann Parish and Mrs. Martha Sherman have no interest in the codicils, or their support or rejection, if the will be sustained. Their rights are unaffected by the codicils.

The conflicting claims for the distribution of the large estate left by Mr. Henry Parish, arise between the residuary legatees under a will made fourteen years before his death, and when his property was but one-half the amount he left at his death, and the legatee under the codicils, which were made during the last seven years of his life, and the last less than two years before his death.

It is not a competition between heirs or next of kin, as such, and beneficiaries under a will. Both parties claim under the decedent's, not the law's, allotment.

The two brothers of Mr. Parish were made legatees of a contingent residuum of his estate by the will of 1842, which, had it then taken effect, would have given each of them about the same sum as he gave to each of his two sisters, and about the twentieth part of what in the same will he gave his wife. If his subsequent testamentary dispositions of his increased estate made in favor of his wife can be invalidated, and the will of 1842 be applied to the accumulated property of 1856, the brothers will each take about twenty times as much as the sisters, and very much more than the wife.

Their claim, then, is neither under the title, nor according to the apportionment of the law's distribution, nor by the decedent's apportionment, but by favor of misfortune which has perverted the will, in derogation of the equal claims, both in blood and the testator's wish, of the sisters, and the superior claims, both by marriage and the testator's wish, of the wife.

THE FRAME AND PURPOSE OF THE WILL AND CODICILS.

I. The clear plan and purpose of the will are—

1. To dispose of the whole of his estate, as he then valued it, in actual bequests, leaving the residuary clause to take effect upon a possible or inconsiderable surplus.

2. A specific disposition of all his real estate, leaving no part of it to fall into the residuum.

3. To make Mrs. Parish the only successor and representa-

tive of his wealth, in or with whom alone did he contemplate the name, dignity, credit, or prestige of Henry Parish's wealth or social position, as destined or desired to survive him. He gave her $331,000; and the largest amounts given by his will, otherwise, to a single legatee, are, $35,000 to his namesake Henry Parish, $20,000 to each of his sisters, and a probable residuum of about the same amount to each of his brothers.

4. That his whole real estate should go in this direction of representative survivorship in his wife, except such as he devised in the direction of nominal representative survivorship in the persons of his namesakes. The strength of this sentiment with the testator is shown by his leaving,

(1.) No real estate to any of his heirs or blood as such.

(2.) To his nephew Henry Parish, real estate to the value of $35,000, while to his other nephews he gives but $10,000 each, and that in the form of money.

(3.) To Henry Parish Kernochan, real estate to the value of $20,000, as much as he gives to his own sisters, or (in the residuary estimate) to his own brothers.

(4.) To Henry Parish Conrey, a mere namesake, real estate to the value of $5,000.

(5.) A distinct preference of the name of Parish over the blood, in giving to his brothers' children bequests *per capita*, *nominatim*, and omitting from such remembrance the child of his sister, Mrs. Sherman, in being at the date of his will, and making no such provision for her probable future issue. That issue from her marriage was not absent from his thoughts, appears from the ultimate bequest of the fund in which she had a life-estate to her issue.

(6.) A distribution of what property was spared from the object of ample provision for his wife, and not attracted to his namesakes, into numerous personal gifts (generous and munificent as gifts), rather than such a disposition as would found a fortune for any of his own or of his wife's blood who did not possess one, or would swell the already abundant fortune of any other.

(7.) An enumeration of his wife's kin in the distribution of these personal gifts on the same footing with his own, and contemplating with satisfaction the ultimate enjoyment by his wife's kindred of the property he bequeathed to her.

(8.) A protection of his wife's interest in the appointment of three of her brothers as executors, placing one of them with one of his own brothers, and his most intimate friend, and providing the other two as the only substitutes in case of vacancies in the executorship.

(9.) A clear apprehension of encroachment by his heirs upon the provisions for his wife, and in subversion of his will, if, by inadvertence or mischance in its provisions, a flaw could be picked in her title to the Louisiana property, and a provision which put his heirs under bond, as it were, to observe her rights and his will.

(10.) A prevailing tone throughout the will, that the existence of residuum was contingent and conjectural, and the full satisfaction, even, of prior legacies, insecure and uncertain; solicitous precaution that his wife's endowment should be free from peril, and that the subsequent legacies should suffer a ratable reduction, if need be, postponing any payment on account of the latter for the lapse of two years to ascertain its safety.

II. The testamentary memoranda and instructions, emphatically present and support the foregoing as the plan and purpose lying in the mind of the testator when making his will.

1. The activity of this sentiment towards his *namesakes* is shown in the meditated limitation of $75,000, after his wife's death, to Henry Parish, and Henry Parish Kernochan, equally. And again, in the meditated adoption of these same namesakes, as residuary legatees *pari passu* with his brothers, and *in exclusion of his sisters.*

2. The doubtfulness of any residuum is here very apparent, and the precautions against any premature computation to make out one are equally clear.

3. The testamentary memoranda furnish conclusive evidence that the decedent carefully computed the amount of his property as the preliminary basis of his testamentary dispositions; that he accommodated his fixed bequests to the amount of property thus ascertained, with the intent of exhausting it, but yet so as to avoid the incongruity of exceeding it; and that he adjusted an apparent or expected, though uncertain surplus, not to exceed the provision he had made for his two sisters; that he made a disposition of this apparent, though contingent surplus, in such way that if his property held out to its full measure, a large sum being still of outstanding and estimated mercantile assets, his brothers would take about equally with his sisters.

This computation is indorsed by testator, "estimate of the value of property of Henry Parish, as made 10th September, 1842, in which estimate he distributed his property and made his will, in New York, 20th Sept., 1842."

III. The evidence of Mr. Havens shows—

1. That the preparation of the will was made with great deliberation, and frequent consultations.

2. That the principal sense of obligation and of affection was directed towards his wife, producing a solicitude lest he should fall short of suitable provision for her.

3. That the residuary clause, as it reads, was induced from the general intention that all his property should be disposed of by will, and a preference that his brother Daniel (and not his general heirs) should have the advantage of any contingent surplus. This last sentiment, however, was made to yield to a delicate attention to the feelings of his brother James, that, when the actual gift was to prove more formal than substantial, there should be no room for ill-feeling between them.

4. That he regarded his will as a present disposition of his property, as it then was; the making of his will was presently suggested by his contemplated absence in Europe, and he provided himself with the forms of codicils to meet any occasion that might arise.

IV. The first codicil shows no departure, in plan or effect, from the frame and purpose of the will.

1. It follows the plan of the will in respect of a specific disposition of all his real estate, the codicil embracing all the real estate which he had acquired since the date of the will, and nothing else. (The Union Square property was purchased while he was in Europe, and the Wall-street building in 1846.)

2. It follows the plan of the will by which all his real estate is devised to Mrs. Parish, which is not given to his namesakes.

3. It follows the plan of the will by which their dwelling-house is devised to Mrs. Parish, its operation, so far as the Union Square property is concerned, being to make the will apply to the new dwelling-house, instead of the old one, which had been sold.

4. The increased value and greater style of the substituted dwelling-house, required a new provision of productive fortune to meet the solicitous care for his wife's position which marked his preparation of the will. The devise of the Wall-street property carries out the plan of the will in this regard.

5. The codicil but follows the plan of the will by which his wife is to be the only surviving representative of his fortune; the united provisions of the will and codicil not substantially advancing her proportion of his estate (as it had increased) beyond the proportion under the will as of its date.

V. The testimony of Mr. Havens shows that the first and only new testamentary disposition in the testator's mind, after his return from Europe, was to secure to his wife all his subsequently acquired real estate, viz., the Union Square property (not yet built upon). It was not, then, a question of replacement of one dwelling-house by another, for he still owned and lived in the Barclay-street house.

1. This immediate anxiety to have the newly acquired property taken out of the operation of the residuary clause and given to his wife, is not only confirmatory of the fixed testamentary purposes of the testator in respect of his real

estate above set forth, but clearly shows that the growth of the residuary fund was neither desired nor designed.

Upon his return from Europe, his property could hardly have increased from its amount at the date of the will (if at all), more than the investment made in the Union Square lots (\$34,000). This proposed devise to his wife, therefore, probably reduced the residuum below its amount when he made the will. This certainly would be its effect, considering the amounts given by Mr. Parish to his brothers Daniel and James on his return from Europe.

But further, the proposed devise of the vacant lots carried, in intent, all the large investment in building and decoration which was then contemplated, and was afterwards made. (The investment, beyond the purchase of the land, afterwards made in the Union Square building, was about \$80,000.) This devise, proposed in the summer of 1844, therefore swept, in intent, all probable accumulation in the residuary fund for a considerable period ahead.

2. This provision for his wife was the only testamentary project named. Daniel was not mentioned.

3. There is no indication in the evidence that the decedent's omission to execute the testamentary purpose in favor of his wife, which, on their return from Europe, he expressed to Mr. Havens, grew from any other cause than the common reasons of procrastinating testamentary acts. The matter was, at the moment, only temporarily postponed for an expected absence from the city.

VI. The second codicil follows the plan of the will, by which his wife is proposed as the sole surviving representative of his wealth in bulk—by which she is to take all his property, but such real estate as pride of name carried to his namesakes, and such wealth as munificence distributed as gifts, not as fortune, with equal hand to the numerous list of collateral relatives by blood and marriage—and by which the residuary fund was intended to be contingent and nominal.

The question, undoubtedly, more prominently than in the

case of the first codicil, arose as to whether the increment of his fortune should go to his wife, or be in part diffused in additions to the numerous gifts of the will, or go to swell the residuum.    It would ill comport with the clear purposes in regard to his property indicated by his will, to have applied its increase to enlarge ratably the bequests to his wife, the gifts to his friends, and the residuary fund, nor would it conform to the natural and probable testamentary dispositions of large wealth by its owner.

The only alternative would seem to be between the wife and the residuary legatees.

All motives of pride, and complacency of wealth, would point to an accretion of his accumulations *to the bulk of his property* in whose hands soever that was to survive him, rather than to its accretion to the wealth of another, when its name and identity would be lost.    This would carry it to his wife.

All motives of affection and duty (at the date of this codicil, not less than when he framed his will) would point in the same direction.

VII.    The third codicil exhibits the same purpose to keep the bulk of his fortune in his wife as the surviving representative of his name, his wealth, and his social position, rather than break it up, to be lost in the bulk of Daniel's fortune, or hidden in the obscure possession of James.

Had the revocation of the residuary clause of the will been *absolute*, a new feature would have been introduced by opening a possibility, should he survive Mrs. Parish, that the residuum would go to his heirs and next of kin, as undisposed of by will.

The revocation of the residuary clause of the will being dependent upon his wife's surviving him, makes this codicil conform to the plan of the will, and the previous codicils, viz., a preference of the wife's fortune over the brothers—they standing only after her, and before his heirs and next of kin.

The reciprocal relations which subsisted between Mr. and Mrs. Parish, and between each of them, and the family of each.

I. Relations, sentiments, and conduct of Mr. and Mrs. Parish during their married life.

Susan Maria Delafield was married in October, 1829, at the age of 24 years, to Henry Parish, then 41 years old.

The whole twenty-seven years of their married life were spent in the city of New York, excepting their absence, for travel in Europe, in 1842, 1843, and 1844.

They lived for some years after marriage with Mrs. Delafield, the widowed mother of Mrs. Parish, until their Barclay-street house was built. From that time they lived in Barclay-street, until 1848, when they moved to the house on Union Square, where they resided up to, and at the time of Mr. Parish's death in 1856.

Through the whole of this period Mr. and Mrs. Parish lived, for the summers, with Mrs. Delafield, at her country residence at Hellgate until 1840, when she died, and after that date with Mr. Henry Delafield, Mr. Parish's brother, to whom that property passed.

At the time of the marriage Mr. Parish was a dry-goods merchant, in active business in the city of New York, with Southern connections, and so continued until the year 1838, when he retired from business.

Mr. and Mrs. Parish were never separated for any length of time after their marriage, and lived as comported with his wealth and their position in the society of the city.

The relations between them were always such as belong to the union of husband and wife, and no diversity of taste or temper, nor any accident or influence, ever disturbed the affection or serenity of their daily married life.

II. Mr. Parish's relations to the Delafield family.

Towards Mrs. Delafield his feelings and conduct were those of a son, and towards Mrs. Parish's brothers and sister his

relations were intimate, cordial, and fraternal. For some years wholly, and for parts of twelve years continuously, he was an inmate of Mrs. Delafield's house, and thereafter, until his death, for four or five months every year he was an inmate of the house of Henry and William Delafield. Dr. Delafield was his physician. John Delafield, the head of the Phœnix Bank, of which Mr. Parish was a leading director, Major Richard Delafield, and Major Jos. Delafield, were his valued friends; and with all the family his intercourse, from his marriage to the end of his life, was habitual, cordial, and unbroken, marked by sincere affection and respect. Mr. Parish seems to have had no business or pecuniary relations of any kind with the members of the Delafield family. They were all independent in character, property, and position, and though he was their superior in wealth, they were never at all dependent on him, or recipients of aid from him. The only favors of a pecuniary nature between them seem to have been the loans to Mr. Parish's house, in the perils of 1837, from the house of Henry and William Delafield. Two brief notes from Mr. Parish, one to Mrs. Payne, and one to William Delafield, illustrate the footing on which he stood towards her relations.

III. Mr. Parish's relations to members of his own family. There seems to have been nothing noticeable in the personal relations and intercourse between Mr. Parish and his several brothers and sisters, and his brother-in-law, *affirmatively*. It appears clear, however, that no habitual or intimate associations existed between him and his brother James; and that they kept up no other intercourse than of casual interviews at long intervals. That with Daniel, his habitual intercourse was wholly as a business partner, though their relations were, in the main, friendly, and of mutual regard in other matters. Their tastes, modes of spending time, usual resorts, brought them rarely in company away from the store, and Daniel's health disinclined him to society. He was very rarely in Henry's house, either in Barclay-street or at Union Square, and his letter of June 10th, 1836, shows that their

conversations were not always agreeable. With Mr. and Mrs. Sherman he seems to have been cordial, and in the habit of not infrequent intercourse in visits at his own house; and with Miss Ann Parish he held equally, or more intimate relations.

IV. Mrs. Parish's relations to members of his family. Circumstances do not seem to have produced any intercourse, or scarcely acquaintance, between Mrs. Parish and Mr. James Parish or his family. With Miss Ann Parish, Mrs. Sherman, and Mrs. Daniel Parish and her daughters, she seems to have maintained relations of the most frank and cordial character. Her letters, put in evidence by the contestants, bear this impress unmistakably. With Daniel Parish and Mr. Sherman, her relations seem to have been entirely accordant with her husband's.

### Relations after the attack.

I. Mr. and Mrs. Parish. Mrs. Parish's whole life was absorbed in constant and affectionate ministry to his needs, mental, moral, and physical, and of complete devotion to his interests, and unbroken obedience to his will. Mr. Parish accepted this affectionate service and devotion as freely as it was offered. Except that his irritability of temper or of manner was sometimes exhibited towards her, he treated her in every way with confidence, respect, and affection.

II. The Delafield family continued precisely the same sentiments and habits in intercourse with Mr. Parish as before the attack. Her brothers Henry and William became inmates of the house to supply the protection which Mr. Parish's disabilities made necessary for himself and his wife. Dr. Delafield remained his physician, and Major Joseph and Major Richard Delafield continued their intimate and attentive friendship.

III. James Parish never visited him nor wrote to him during his affliction. Daniel Parish's few visits are detailed in the testimony; he rejected all share in aid of, or in advice concerning, Mr. Parish's affairs. He sold his lots in Union

Square, bought in connection with his brother's and with intent to build upon them for his own residence, in the year after the attack, and went to Europe the following year. From a period very soon after the attack, he neither had, nor attempted to have, any intercourse with Mr. or Mrs. Parish, or any of her family, and never went out to the carriage at any of the habitual visits to the store. Mrs. Daniel Parish was a visitor at the house, occasionally, but, before long, dropped all family or formal intercourse. Miss Ann Parish kept up her habits of visiting apparently as before the illness. Mr. Sherman's visits are detailed in the evidence. After they ceased, Mrs. Sherman continued her visits.

IV. Friends and acquaintances. Mr. Kernochan, Mr. Holbrook, Mr. Wiley, and Mr. Gasquet, each of whom had been mercantile partners with Mr. Parish, visited him habitually, and were cordially received, and urged to frequent the house. A numerous body of friends and acquaintances constantly had intercourse with Mr. Parish, and, as a rule, all persons calling were introduced to Mr. Parish's presence. Tradesmen, workmen, and business callers, all had access to him.

*Nature and consequences of the apoplectic seizure of July 19th, 1849.*

The attack was apoplectic, of moderate violence. Unconsciousness, and the disclosure of hemiplegiac paralysis of the right side, were noticed at the office of Mr. Prime, in Wall-street, where the seizure happened. Within a few days consciousness was undoubted, and intelligent communication with those around him established, and the extent of the paralysis was disclosed. He thenceforward recovered regularly and rapidly, sat up, saw visitors, was conversed with on business, moved about his chamber, the communicating rooms and hall, was carried down stairs, and rode out. In October, a severe disease of the bowels set back the tenor of his recovery, as well as produced, temporarily, its own grave impression on his health. His recovery from this special disease was rapid, after its juncture was passed. He re-

gained a full measure of general health, and maintained it with casual interruptions from definite diseases of some severity, and died seven years after the attack, at sixty-eight years of age, of a disorder of the lungs. After his October illness he became subject to occasional spasms, from whatever cause; but only once or twice were they followed by any grave sequel. They produced, of themselves, no injury to his general health. He maintained, after the October illness till his fatal sickness, the usual habits as to hours of rising and retiring, as to meals, as to diet, as to daily drives, as to occupation of time, which belong to a person in health. His persistence in all these habits, under the bodily disabilities he suffered, show great nervous energy and vital force. His recovery from various serious and critical illnesses, shows a general vigor of constitution, and healthy action of the organs of life. The special disability he suffered, and its consequences, only enhance the measure of vital powers which triumphed over them. His power of articulation which is exerted through the muscles of the mouth and tongue, was, in great part, paralyzed. The voice which is formed in the larynx, was left. His emunctory sphincters were somewhat implicated—variably, however—and their embarrassment was not regarded as a permanent and constant disorder by his physicians. His power of locomotion improved, and remained uniformly so as to permit his movement freely, with an attendant to steady his postures. His right arm gained a little, perhaps, but not substantially, for a while, but soon became wholly relaxed and useless. His left arm, for general purposes, was free in its movements, and had strength, and was under control. He had no use of it in writing, without painful and irksome effort, and would not long attempt the effort. His successes and failures are detailed in the evidence. He could not use it in picking his teeth, which service needed to be performed by his attendants. This shows his hand and arm not to have been pliable or steady enough for a use much less nice than that of writing. His senses were all entirely good, except that the imperfect condition of his eye-

sight, developed long before the attack of apoplexy, continued, and he had not infrequent troubles with his eyes. His paralysis did not affect either his senses or sensation. Nervous irritability or excitability manifested itself, but exclusively in connection with mental causes and influences, though with undue and exaggerated expression. For a medical view of the physical condition and bodily health of Mr. Parish, after the attack, in all points having or supposed to have any significance in connection with the condition and operation of his mind, and for general information concerning the nature and effects of the bodily ailments under which he suffered, reference is made to "A medical consideration of the physical condition of Henry Parish, as bearing upon the question of his mental capacity," submitted by the appellants.

STATEMENT OF THE SCOPE OF THE INQUIRY OF FACT, AND OF THE MEANS, INSTRUMENTS, AND SOURCES OF INVESTIGATION, THEIR EXTENT, VARIETY, CERTAINTY, AND COMPLETENESS.

The *scope* of the inquiry, as matter of fact, is, whether the codicils propounded, all or any one of them, form part of the last will of Henry Parish.

This inquiry, without considering, *now*, any narrower limitation which the actual circumstances of the case impose, is confined to three heads:

I. Whether Henry Parish, at the date of the codicils respectively, had TESTAMENTARY CAPACITY, or the power to make *any* will.

II. Whether, having such testamentary capacity, these codicils, respectively, were procured from him by UNDUE INFLUENCE OF OTHERS, whether of *fraud* or *coercion*.

III. Whether, having such testamentary capacity, and undue influence not being proved, he executed those codicils, respectively, as parts of his will—this being the question of the "FACTUM" of the instruments, or their *formality* and *authenticity*.

The *occasion* of the doubt, and, therefore, of the inquiry,

arises from the state of bodily ailment, infirmity, and disability under which Mr. Parish labored for the last seven years of his life, as the sequel of the apoplectic blow in July, 1849. Upon the means and sources of investigation applicable to this inquiry, the record suggests some general observations:

1. Mr. Parish, during the whole of these seven years, lived at his mansion at the head of Union Square, one of the most public places in the city, in the midst of that range of society in which he and his wife moved, and in which the contestants, and all the beneficiaries named in the will, moved. He was, ostensibly, the master of his house and of his household. He, almost daily, rode for several hours, in the business part of the day, to and through the most frequented parts of the city, stopping at the usual resorts to which his affairs led him before his illness.

2. His household, at all times, included a numerous body of servants, constantly changing at their own pleasure, and having such connections and associations outside of the house as they saw fit. All of these servants, at all times, had free access to Mr. Parish, and ready means of observation or knowledge of whatever occurred in the house. They were never selected, instructed, or secured in any manner whatever, nor attempted so to be, by any person; were never retained in service by any effort, or specially paid or favored in any way, during such service. They came and went, bringing into and carrying out of the house whatever views, feelings, prejudices, intelligence, and opinions might happen to them.

3. All persons who, by any social rule or personal claim, were visitors at the house of Mr. and Mrs. Parish, as friends or acquaintances of either, before the illness, were in like manner welcomed during the period under inquiry, with a few brief exceptions when the severity of particular disease necessitated seclusion. A large and varied list of most respectable and intelligent persons, in the various professions and employments of life, and in different social positions, and upon occasions habitual, frequent, or casual, on motives of relationship, friendship, affection, duty, courtesy, or business,

were admitted to the house and to the society of Mr. Parish at their own will. In the number were included every member of Mr. Parish's family, every partner, clerk, or business connection of his, who sought admission, and (leaving out of the present view the point as to Daniel Parish or Mr. Sherman) no person is shown to have been denied, or impeded in, access to the house, or intercourse, in the house or out of the house, with Mr. Parish, or observation of his person, his condition, his demeanor. Besides the witnesses examined, the proponent furnished in the evidence, to the contestants, a list of some sixty visitors, and the names of the servants, not called.

4. The professional persons employed either in the preparation or the execution of the testamentary instruments, or in medical attendance upon Mr. Parish, were taken upon the most obvious grounds of worthiness and ability.

Mr. Lord, it is unnecessary to say a word about. He is as well known to this court, and to every court in the State, as to the parties or their counsel. Dr. Delafield, and his partner, Dr. Markoe, as his own physicians, necessarily attended him if his care or cure was the object. Their character and position would have entitled them to such employment had they been strangers. Dr. Francis U. Johnston, among the most eminent physicians of the city, was selected, for that reason, to consult with Dr. Delafield in the urgency of the first attack, and continued till the convalescence. Dr. Bliss was called in, for a special occasion, and Dr. Wilkes and Dr. Dubois, eminent oculists, attended him for his eyes. All these were selected wholly for medical skill and personal character. The documentary witnesses were called upon the most suitable considerations, and outside of any circle of family or dependents. Charles Augustus Davis, a most eminent merchant and prominent member of society; Ephraim Holbrook, a man of wealth, former partner and near neighbor of Mr. Parish; John Ward, the best known and most respected banker in Wall-street; Daniel D. Lord, a lawyer of mature age and experience, partner with his father,

and attending at his suggestion. These were all the witnesses, these all the observers of Mr. Parish, that were, in any sense, selected or called in. Who else visited, or forebore to visit, acted on their own motion.

5. The proponent, and Mrs. Parish, the beneficiary under the codicils, have neither withheld nor disguised any thing that the real or fancied interest of the contestants required in evidence. Nothing sought has not been found—nothing found has not been produced. The contestants have not foreborne inquiry in any direction or to any extent. No timidity, false modesty, or fantastic courtesy has restrained them. No secrecy of nature or of affection has been respected, and every infirmity of either, that could be discovered, has been displayed. Whatever means tended to their end, their end has seemed to them to justify.

6. The great body of witnesses produced, on one side and the other, and the fulness of their testimony, the great labor and ability bestowed by the contestants' counsel in their examination, and their omission to call any other witnesses from the list of observers furnished them, must satisfy the court that nothing favoring the contestants' views has eluded their notice or escaped their grasp. In such case, the argument of the negative, or of what they have not proved, carries a weighty impression.

7. As there has been no defect of intelligence and honest observation of Mr. Parish in his daily life for seven years, nor any suppression or loss of evidence by fraud or misfortune; as the whole scene has been watched from as many points of view, by as many different and independent intelligences as could seem at all necessary or useful, and as the evidence has, in fact, produced so extensive a survey of the conduct of Mr. Parish and of those about him, of the conduct of persons in every possible relation to him, of the conduct of the witnesses themselves, it would seem that the materials were ample for a satisfactory and reliable judgment, broadly, one way or the other, unless, under the rules of our law, the point of inquiry is so nice, obscure subtle, or un-

certain, as to elude all this scrutiny into the subject of controversy by witnesses in the first place, and of their evidence through judicial procedure.

## STATEMENT OF THE RULES OF LAW GOVERNING THE INQUIRY, WITH THE AUTHORITIES.

Upon the question of testamentary capacity, our statutes give the rule as to who may and may not make wills. They exclude from this capacity only persons (above a certain age) who are "idiots or of unsound mind." The restriction upon alienation of lands is to the same purport.

"Every male person of the age of eighteen years or upwards, and every female, not being a married woman, of the age of sixteen years or upwards, of sound mind and memory, and no others, may give and bequeath his or her personal estate by will in writing." (2 *Rev. Stat.*, 60, § 21.)

"All persons, except idiots, persons of unsound mind, married women, and infants, may devise their real estate, by a last will and testament duly executed according to the provisions of this title." (*Id.*, 57, § 21.)

"Every person capable of holding lands (except idiots, persons of unsound mind, and infants), seized of, or entitled to, any estate or interest in lands, may alien such estate or interest at his pleasure, with the effect and subject to the restrictions and regulations provided by law." (1 *Id.*, 719, § 10.)

The difference in phrase between the statute of wills of personal estate and the statute of wills of real estate, in defining testamentary capacity, gives rise to no difference in their force in this regard, nor in their judicial construction. The tenor of judicial decisions in this State has been clear and uniform in maintenance of the rule of the statutes.

"Imbecility of mind in a testator will not avoid his last will and testament. Idiots, lunatics, and persons *non compos mentis*, are disabled from disposing of their property by will; but every person not embraced within either of the above classes, of lawful age and not under coverture, is competent

to make a will, be his understanding ever so weak. Courts, in passing upon the validity of a will, do not measure the extent of the understanding of the testator; if he be not wholly deprived of reason, whether he be wise or unwise, he is the lawful disposer of his property, and his will stands as a reason for his actions."

"A man's capacity may be perfect to dispose of property by will, yet inadequate to the management of other business, as, for instance, to make contracts for the purchase and the sale of property; and therefore a court of Chancery may commit the property of a person incapable of managing his estate to the charge of a committee, and yet, after his death, give effect to a will made by him whilst laboring under such incapacity." (*Stewart* v. *Lispenard*, 26 *Wend.*, 255.)

Mere imbecility of mind in a testator, however great, will not avoid his will, provided he be not an idiot or a lunatic. The term unsound mind, in the statute concerning wills, is of the same signification as *non compos mentis;* and any one otherwise competent, to whom these terms do not apply, may make a valid will. One has a right, by fair argument or persuasion, to induce another to make a will in his favor. (*Blanchard* v. *Nestle*, 3 *Den.*, 37.)

"Our law does not distinguish between different degrees of intelligence. It does not deny to a man of very feeble mind the right to make contracts and manage his own affairs. In the absence of fraud, proof of mere imbecility of mind in the grantor, however great it may be, will not avoid his deed. There must be a total want of understanding." (*Osterhout* v. *Shoemaker*, 3 *Den.*, 37, *note.*)

"Imbecility of mind, not amounting to lunacy or idiocy, in the grantor of land, is not sufficient to avoid his deed where, in obtaining it, there is no fraud."

The doctrine of *Jackson* v. *King* (4 *Cow.*, 207), approved and adopted. (*Odell* v. *Buck*, 21 *Wend.*, 142.)

"Where an act is sought to be avoided on the ground of mental disability, the proof lies with him who alleges it.

"Till the contrary appears, sanity is to be presumed.

" Idiots and lunatics, or persons *non compos*, are incapable of contracting; and the disability is confined to these.

" One *non compos* is one who has wholly lost his understanding. To affect a deed at the common law, an entire loss of the understanding must be shown. The common law has drawn no line to show what degree of intellect is necessary to uphold it." (*Jackson* v. *King*, 4 *Cow.*, 207.)

" It is one of the painful circumstances of extreme old age, that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has, in protracted life, to command the attentions due to his infirmities." (*Van Alst* v. *Hunter*, 5 *Johns. Ch.*, 148, 160.)

" The law treats the right of testamentary disposition with great tenderness. If questioned, it must be on strong grounds. To overturn this solemn, deliberate act, fraud, circumvention, idiocy, or lunacy must be affirmatively established."

" If we adopt the opinion of Mr. Mann, the most important witness for the contestants, that the decedent was mentally competent to make a will in October, 1851, with suggestion and advice, then, of course, he had testamentary capacity. There being testamentary capacity, the law does not regard its quality or degree, except so far as to see, in cases of low degree, that the testator enjoyed the free use of such capacity as he possessed." (*Thompson* v. *Quimby*, 2 *Bradf.*, 449, 487.)

The litigation on John Fisher's will shows what, in judicial inquiries, are regarded as doubtful cases, and may receive a determination either way.

Vice-chancellor Sandford sustained the will against impeachment for incapacity and for undue influence. (*Clarke* v. *Sawyer*, 3 *Sandf. Ch.*, 351.)

The chancellor rejected the will, his opinion showing that his judgment was based upon weakness operated upon by fraud, which is the objection of undue influence. (*Clark* v. *Fisher*, 1 *Paige*, 171.)

The Court of Appeals affirmed the decree of the chancellor, " annulling the will of the late John Fisher, deceased, as obtained by fraud and undue influence."

(This decree of the chancellor, thus affirmed, was not that in the case of 1 *Paige*, but the decree made on appeal from Vice-chancellor Sandford's decision in 3 *Sandf. Ch.*)

SHANKLAND, J. (delivering the opinion of the Court of Appeals), says : " Regarding as I do the cases of *Stewart* v. *Lispenard*, and *Blanchard* v. *Nestle*, as fixing the standard of testable capacity at any given point above that of the idiot and lunatic, the will cannot be declared void for the want of a sound disposing mind." (*Clarke* v. *Sawyer*, 2 *N. Y.* [2 *Comst.*], 498.)

See the observations of Senator Verplanck on the speculative question, whether the right of disposing of property after death flows from positive law and the policy of society, or is a part of the natural right of property, agreeing with Lord Mansfield (*Windham* v. *Chetwynd*, 1 *Burr.*, 414), that " the power of willing naturally follows the right of property." (*Remsen* v. *Brinckerhoff*, 26 *Wend.*, 333 ; *Stewart* v. *Lispenard*, *Id.*, 255, 296–7.)

" A few affirmative facts showing understanding, however humble, must, in such an inquiry, directed to the point of idiocy or total want of reason (not of lunacy, or disturbed or clouded intellect), outweigh very many negative facts. The affirmative facts prove the existence of mind ; and when that is once shown, the negative go to show only its defects and weakness, not its entire deprivation. According to the old rule, ' a wise man does not always show reason, a fool never does.' " (Senator Verplanck, in *Stewart* v. *Lispenard*, 26 *Wend.*, 310.)

" Mere feebleness of intellect, however considerable, in a testator, will not invalidate a will."

" The cases certainly establish the rule that feebleness of intellect, however considerable, in the testator, shall not invalidate a will."

" The reason for sustaining the wills of excessively weak

persons (and, by those, I mean persons of the lowest degree of mental capacity, where there is a glimmer rather than light), is, that the weak have the same rights with the prudent or strong-minded to dispose of their property, and that if imbecility, and not a total absence, or rather perversion, of mind, should constitute inability to act, it would be impossible to draw any clear line of distinction, or one which would generally prevail. There is much force in these reasons. At any rate, the rule has been thoroughly established and we must submit to it, whatever may be our opinion as to its necessity, propriety, or expediency." (*Newhouse* v. *Godwin*, 17 *Barb.*, 236, 257–8.)

The dissenting opinion of Mr. Justice Clerke in *Thompson* v. *Thompson*, is the only judicial criticism (to be found in our reports) in disparagement of the firm rule of our statutes and decisions on the subject of testamentary capacity. A careful perusal, however, of this well-considered opinion, will show that, after all, the learned judge is disposed to rest the legal consequences of imbecility, or unsoundness of mind, falling short of idiocy or lunacy (the case under consideration being one of alleged aberration of mind), more upon its leaving its subject " very much to the mercy of designing persons, and exposed to undue influence," and to approve Senator Verplanck's proposition (in *Stewart* v. *Lispenard*), that though this condition does not destroy testable capacity, it may, in connection with other evidence, show that the particular testamentary act " was the result of fraud, and of abuse of confidence, perhaps of delusion." (Judge Clerke's opinion [dissenting,] *Thompson* v. *Thompson*, 21 *Barb.*, 107, 127.)

The rules of our law on the subject of undue influence, in connection with testamentary acts, are—

1. That it must come to the substantial texture of fraud or coercion in the procurement of the testamentary acts questioned, to be recognized in the law as undue influence.

2. That it must be proved by the party contesting the testamentary act on that ground; and the exclusion of any such

conclusion forms no part of the proponent's proofs or argument.

These propositions have never been brought into question; but a brief citation from two cases, to be more specially referred to in another connection, is given.

"In the absence of any inconsistency between the provisions of a will and the declarations of a testator otherwise expressed, or of any affirmative evidence of fraud or undue influence, the court will not speculate as to the motives of the testator, nor, upon mere suspicion, presume procuration by artifice or undue means."

"It is sufficient, in the absence of proven fraud or undue influence, and where the requisite capacity exists, to stand by the will. If its provisions be grossly unreasonable or absurd, or opposed to the ascertained dispositions and affections of the party, these circumstances, if shown, may be of importance, as they reflect upon the question of capacity; but a person of competent mind 'is the disposer of his own property, and his will stands as a reason for his acts.'" (*Bleecker* v. *Lynch*, 1 *Bradf.*, 458, 472.)

"Influence, in order to be undue within the meaning of any rule of law which would make it sufficient to vitiate a will, must be an influence either by coercion or by fraud."

"It is, however, extremely difficult to state, in the abstract, what acts will constitute undue influence in questions of this nature. It is sufficient to say that, allowing a fair latitude of construction, they must range themselves under one or the other of these heads—coercion or fraud."

"One point, however, is beyond dispute, and that is, that whenever it has been proved that a will has been executed with due solemnities, by a person of competent understanding, and apparently a free agent, the burden of proving that it was executed under undue influence is in the party who alleges it." (Lord Ch. Cranworth, in *Colclough* v. *Boyse*, 6 *House of Lords Cases*, 45; *London Jurist, May*, 1857, 373.)

All that relates to the formal authentication of testamentary papers,—all that constitutes the "factum" of a will as a

valid and effectual legal act—is the subject of statutory regulation, both complete and definite.

" Every last will and testament of real or personal property, or both, shall be executed and attested in the following manner:

" 1. It shall be subscribed by the testator at the end of the the will;

" 2. Such subscription shall be made by the testator, in the presence of each of the attesting witnesses, or shall be acknowledged by him to have been so made, to each of the attesting witnesses;

" 3. The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed to be his last will and testament;

" 4. There shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator."

" No will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked or altered, otherwise than by some other will in writing, or some other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated, or destroyed, &c." (2 *Rev. Stat.*, *63*, §§ 40, 42.)

As no one of these statutory requisites to validity can be dispensed with, so no further requisites of authentication of the instrument propounded as the very will of the testator, can be insisted upon.

The " declaration of the testator to the witnesses that the instrument is his last will and testament, is plenary evidence, by the statute, that it is so known, understood, and intended by him to be. No other evidence to this point can supply the want of this—the want of further evidence can, in no case, disparage the effect of this." (*Remsen* v. *Brinkerhoff*, 26 *Wend.*, 345.)

POSITIONS OF THE PROPONENT, AND OF THE CONTESTANTS DANIEL AND JAMES PARISH, AND THE LIMITS OF THE CONTROVERSY BETWEEN THEM.

*First.* On the point of testamentary capacity, the proponent contends that Henry Parish, at the time of the execution of each of the codicils in dispute, was neither "an idiot," nor "of unsound mind," but, on the contrary, "of sound mind and memory." That the bodily disorder, disease, and disability of Mr. Parish, at the times in question, did not affect his testamentary capacity, and are, themselves, the sole and the adequate cause of the appearances which are insisted upon in disparagement of his mental capacity.

On this point the contestants, Daniel and James Parish, are understood to contend that Mr. Parish, at the times in question, was "an idiot," incapable of any testamentary act.

*Second.* On the point of undue influence, or procurement of the codicils in question by fraud or coercion, the proponent contends that such influence not only did not exist and has not been proved, but that no particle of proof has been produced tending to show any such influence.

On this point the contestants, Daniel and James Parish, are not understood to contend that any undue influence was exercised over, or upon, Mr. Parish, and so to contend would be fatal to their proposition that he was an idiot, having no testable capacity. But they contend that the codicils in question proceeded wholly from the will and invention of Mrs. Parish, and that all the apparent or alleged intervention of Mr. Parish in the testamentary acts was that of a mere puppet, set up and moved by her.

*Third.* On the "*factum*," or execution and authentication of the codicils in question, no controversy is made.

It will be perceived, then, that the contestation of fact, on the part of the contestants, Daniel Parish and James Parish, is reduced to the proposition that, from the date of the apoplectic blow of July, 1849, the testator was in a condition of idiocy, totally incapable of any testamentary act.

1. This excludes any controversy as to lunacy, insanity, derangement, aberration of mind, hallucinations, or delusions, and their actual or presumable import and influence in the premises. In this we all concur, no facts are brought in evidence tending to show disorder of this nature.

2. It removes the element of uncertainty, misconception, and error, which intervenes in a survey of facts and a comparison of opinions, produced by different observers at different times, of varying moods and fluctuating conditions which belong to the nicer cases of insanity, partial, interrupted, mental, or moral. Here, a continuous, uniform, and well-defined state of mind (or no mind) is in controversy. If he was an idiot when one witness saw him, he was an idiot when each witness saw him.

3. It excludes all claim or argument of undue influence, of which it is the essence that a testable capacity and volition are controlled, in the form of force or fraud, by another's volition.

4. It puts the issue upon a point of observation, capable of determination, if there were observers, other than idiots, to give the means of determination.

Thus Judge Clerke says of the characteristics of idiocy: "It is a congenital obliteration of the chief mental powers, amounting to a great insensibility to external impressions, accompanied by certain physical indications which can never be misinterpreted; indications which proclaim the torpor of the faculties within with as unerring certainty as the rolling eye and staggering gait proclaim the drunkard, or the pallid and hollow cheek the victim of disease." (*Thompson* v. *Thompson*, 21 *Barb.*, 107, 120.)

The learned judge speaks of "congenital" idiocy, but no distinction as to the *indicia* of the state can be, or was intended to be, taken between congenital or supervening (or acquired) idiocy.

This broad and open proposition, in the face of the overwhelming testimony of the numerous and intelligent observers to whose scrutiny Mr. Parish was subjected, and

who have sworn to his capacity, would not have been assumed as the necessary basis of his argument against the codicils by the able and sagacious counsel for the contestants, in preference to the twilight region of "feebleness of mind," "lack of spontaneity," "undue influence," "inofficious will," which form the staple of so many reported will cases, unless he was forced to it by the compulsion of his own acute and experienced professional perceptions of what was, and what was not, capable of argument.

1. Thus, if intelligence in the testator were admitted into his argument, and so the testimony left to its natural force, according to its plain sense, the degree of intelligence is manifestly either normal or undistinguishable therefrom by any measure of reduction.

2. The testator, standing as an intelligent agent, to maintain the proposition of "undue influence" upon the evidence, would appal the most intrepid reasoner.

3. To predicate "inofficiousness" of testamentary dispositions in favor of a wife, in such conjugal relations as are shown, in preference to collateral kindred, in such relations as are shown, would be, in terms, absurd.

4. With intelligence, without undue influence, a testament, not inofficious, requires but the formal proofs to establish the "*factum*" to secure its probate. These are incontestable.

In escaping these insurmountable difficulties, the contestants' counsel braves others, some of which may be noticed.

1. If Mr. Parish were an idiot for seven years, and the counsel can satisfy a judicial inquiry of that fact, Mrs. Parish must have known it through the whole period.

2. Instead, therefore, of proving overweening influence over her husband as the fault or fraud of Mrs. Parish, and this, too, in the particular acts only of the making of the codicils, and this, besides, only committed against the contestants, the proof of the idiocy of Mr. Parish includes the proof of the sudden and universal depravity of Mrs. Parish—making every act and motion of her life a falsehood—every

attitude, and word, and thought, a fraud—and, simultaneously, involving an exaltation and expansion of mental and moral power, by which, at will, as if a sorceress, she beguiles the intelligence and corrupts the integrity of all who come within her spell.

3. By the same necessity the proof must compass the complete overthrow of the whole body of the testimony in the sense in which it was given by the witnesses, to the absolute prostration of their virtue and their reason, and in mere derision of all that is " wisest, discreetest, virtuousest, best," in the society in which we all live.

Thus, to prove that the apoplectic blow which afflicted the body of Henry Parish overthrew his mind, the counsel, as his best and most probable theory, undertakes to prove that it crushed the moral nature of his wife, and with unspent force promiscuously dispersed, embraced in its catastrophe all those who stood about them.

This is, indeed, the proof of " *ignotum per ignotius*"—of " *difficile per difficilius*"—of the improbable by the impossible.

The proponent maintains, on these points, these propositions :

FIRST.—Mr. Parish, at the dates of the execution of the several codicils, possessed full testamentary capacity upon any rule or measure that can be claimed.

I. This appears sufficiently from the evidence given by the documentary witnesses to the respective codicils. Their intelligence, character, acquaintance with testator, means of judgment, opportunities of observation, and entire independence, give to their evidence irresistible weight.

II. The witnesses for the contestants, so far from showing deficiency of testamentary capacity, prove its adequacy.

. III. The evidence in support of the documentary witnesses is overwhelming in amount, in weight, in intelligence, in character, in independence, in variety, in opportunities of judging, and in the faculties of measuring and scrutinizing the operations of mind.

SECOND.—The evidence of the execution of the codicils, of careful and deliberate communication to the testator of the contents of each of them, of scrupulous consultation of the wish of the testator, both formally as to the execution of the several papers, and substantially as to their provisions, of full instructions (in respect of the second and third codicils) directly from the testator to the professional draftsman, is complete. To this no conflicting or contrary evidence is offered. The only question can be, therefore, of either the reliability of the witnesses in their testimony, or the reliability of the method by which the wishes of the testator were communicated or ascertained. There is no view in which any tribunal can judge over these witnesses, and against their evidence, instead of by them, and according to their evidence.

THIRD.—The codicils were not obtained by undue influence—*i. e.*, by either coercion or fraud in any form.

I. As to the first codicil, there can be no pretence of influence by habit or system; there is certainly no evidence of actual influence.

II. The second and third codicils were made at periods in the course of the testator's health, when he was at the highest vigor. There is no evidence of influence in respect of either of them.

FOURTH.—The secondary evidence of influence, viz., of a seclusion of the person of the testator, or an exclusion of other probable or natural objects of affection or testamentary care, is wholly wanting in the case. The evidence shows the utmost publicity of life, and unimpeded access to the testator on the part of the contestants. James never sought any intercourse of any kind. Daniel made for himself the only obstacles to a welcome at the house. He had abundant opportunities of intercourse with his brother out of the house, but never availed of any. Exclusion, to be an element in such a case, must be systematic, substantial, and against efforts to gain access. A mere fanciful, sentimental, or conventional exclusion, if any proof of such could be found, is

too unsubstantial to be of any weight in the cause. From a voluntary withdrawal from intercourse, the influences are wholly against the contestants.

FIFTH.—Undue influence is not predicable of a testamentary provision in favor of the wife, filling for the whole period of their married life, and more than a quarter of a century, the true conjugal relation, and in preference not over children, not in the disregard of needy relatives, not in disappointment of any expectations authorized or encouraged, but of one brother in independent circumstances, who maintained no acquaintance with him, and of another of abundant wealth.

SIXTH.—The codicils are not inofficious testamentary dispositions, not diversions from any previous testamentary purposes, and not inharmonious with any expressed or proved affections or intentions; but, on the contrary, they are officious,· in union with previous testamentary dispositions, conformed to expressed and proved affections and intentions.

OF THE TRUE WEIGHT AND IMPORT OF PHYSIOLOGICAL AND MEDICAL VIEWS BEARING, OR SUPPOSED TO BEAR, UPON THE PROBABILITIES, OR INFERENCES, AS TO THE CONDITION OF MR. PARISH'S MIND, FROM HIS BODILY DISORDERS.

The contestants might, under the rules of evidence governing such cases, have offered medical witnesses, in the character of experts, to speak upon the case presented by the evidence as to the physical condition of Mr. Parish, upon the· question of the probable or inferable condition of his mind. As the contestants' views find no support in the "opinions" of the six medical witnesses examined in the case, and who are entitled to speak in the double capacity of observers and of experts, it would seem important to them to have brought this ancillary evidence of experts, if they could find it, or if they esteemed it significant. Their omission to bring the evidence of experts, then, must be put to the account of its not being obtainable, or not being useful. Instead of intro-

ducing opinions of medical experts as evidence, open to the analysis and reduction of cross-examination, the contestants may adduce such opinions, by way of arguments, exposed to no such analysis or reduction. The proponent presents "A medical consideration of the physical condition of Henry Parish," by an eminent physician and physiologist, as mainly useful and instructive to the court in two ways.

*First.* To supply such special knowledge concerning the bodily diseases of apoplexy and paralysis, as will show their relation to the nervous and cerebral system, and aid in the discrimination between physical and mental derangement, as the cause and explanation of the significant appearances in Mr. Parish's life and conduct, during the period involved in this controversy.

*Second.* To exhibit, by proofs drawn from the results of medical experience and science, the fundamental truth, that the diseases of apoplexy and paralysis (and whatever others, if any, are imputed to Mr. Parish), are bodily diseases in cause, seat, character, and treatment; that whether mental derangement or debility attends them or flows from them, is an inquiry original and special to each case under observation, and to be answered by a scrutiny applied to the mind and its manifestations; that this mental scrutiny and investigation are governed by the same rules as if the bodily disorders were not present, save only that the derangement and debility which are accounted for as simply affections of the physical frame are to be as absolutely excepted from the mental phenomena and conclusions as if the forms of disease were fever, or gout, or dyspepsia. In other words, that whether a paralytic's mind is affected, is an inquiry of the same nature, and to be satisfied in the same manner, as the same inquiry in respect of a man in bodily health or in any other bodily sickness. The universal testimony of medical science and medical authorities shows, that the observation and judgment, concerning the integrity or deterioration of the mental faculties in a patient afflicted with the diseases in question, are as much a matter of direct investigation, applied

to the mind itself, as are the observation and judgment, concerning the integrity or depreciation of any bodily function or part, a matter of direct investigation applied to the function or part. From the mental appearances, just as from the bodily, inferences may be drawn as to the seat and gravity of the cause of the paralysis, but no inference arises against the mental faculties, which are observed in play, from the fact of a paralysis, any more than against the motion of a limb or the exercise of a physical function, when the motion and the exercise are manifest. The appearances, mental or bodily, exhibit the nature and extent of the paralytic affection, and no general reasoning as to what might be expected, can, in the least, contradict or displace the actual appearance.

It follows, necessarily, that all correction or modification of an estimate concerning the state of the intellect of a patient formed upon observations in life, by anatomical or physiological investigation *post mortem*, is rejected by medical as well as by judicial reasons. Mental traits and action observed in life, if they show a rational condition, can never change their character by a *post mortem* exploration of disintegration or degeneration of the brain, any more than the motion of the limb or the function of digestion observed in life, can be displaced by an autopsy of the brain.

So, on the other hand, mental disorder or debility, manifested in life, could never be made mental integrity and vigor by the explorations of anatomy disclosing no adequate cerebral defect, any more than the motion of a limb or the use of a sense, lost in life, would be proved to have been healthful and sound, from no trace appearing of lesion or atrophy of the appropriate nervous or cerebral structure.

The whole method of inductive reason rests upon these principles. The arguments of experts, if any shall be introduced by the contestants, must leave the matter just where they find it; to wit, that no generalizations from the cases of paralysis can show what the state of Mr. Parish's mind was, but that the observations of those who saw him must furnish the means of judgment. That being established, the weight

and import of the experts' arguments are measured by the intelligence and candor, circumspection and temper, which they disclose. They carry no such weight or import as materials for the formation of judicial determination, as the evidence of observers, nor as the evidence of mere experts having the sanction of an oath and the test of cross-examination.

JAMES T. BRADY and CHARLES O'CONOR, *for Contestants James and Daniel Parish.*

Henry Parish, the testator, was a wealthy and respectable New York merchant, of competent education and high intelligence. In September, 1842, he made his will, arranging its details in numerous private consultations with Charles G. Havens, Esq., one of the law firm usually employed by him. He was then aged fifty-four years, and had finally retired from business; his wife was aged thirty-seven. They had been then married thirteen years. There never was any issue of the marriage. His estate was then about $732,000. His collaterals were his brother, James Parish, then having six children; his brother, Daniel Parish, then having seven children; his sister, Ann Parish, unmarried, and aged fifty-two years, and his sister, Mrs. A. M. Sherman, having one child.

The dispositions of the will are as follows: he gave to his wife $331,000; to his nephew, Henry Parish, the son of his brother Daniel, $35,000; to his cousin and namesake, Henry Parish Kernochan, $20,000; to his namesake, Henry Parish Conrey, of New Orleans, $5,000; to his two sisters, Miss Nancy Parish, and Mrs. Allen M. Sherman, $20,000 each; to Mrs. Payne, his wife's aunt, an annuity valued at $5,000; to each of his five executors, as a personal gift, $10,000, making a total of $486,000.

If his estate should prove sufficient, he further gave a legacy of $10,000 to the seven children of his brother Daniel; to the six children of his brother James; to his cousins, Mrs. Joseph Kernochan and Mrs. Abeel; to his brothers-in-law, Dr. Edward Delafield and Major Richard Delafield; and

to one sister and three sisters-in-law of his wife, making $210,000. The total amount of dispositions was $696,000. The residue he gave equally to his brothers James and Daniel Parish, or the survivor of them, and the issue of the other. He named as executors Daniel Parish, Joseph Kernochan, Joseph Delafield, Henry Delafield, and William Delafield.

On July 19, 1849, at mid-day, while transacting business in Wall-street, the testator was suddenly stricken down by an apoplectic stroke. This produced *hemiplegia* on the right side—a permanent disability. According to our view of the evidence, this seizure affected the brain so seriously that the testator was immediately reduced to a state of idiotic dementia, from which mental condition he never recovered in any degree whatever. He survived the event more than six years. His general bodily health was completely restored, his appetite for food returned in its full vigor, he had the full use of one eye and the perfect use of the left arm and hand; yet he never was able, during all this time, to write, to read, to distinguish one figure or one letter of the alphabet from another, to utter one word, or to give one single reliable indication of intelligence or intention higher in grade than such as are exhibited by animals of the dullest species. Of course, he performed no business or other transactions. During all this time he was in the custody of his wife, by whom the residuary legatees were denied access to him. Every transaction concerning his business or property was conducted without any participation on his own part; and nearly every such transaction was controlled and directed by his wife and her agents. Gradually, and as rapidly as practicable, she transferred his personal estate into her own name; and, at his decease, she claimed nearly the whole of it, on pretence that this continuous succession of transfers to her name constituted so many gifts *inter vivos*. The first codicil dated August 29, 1849, gave to the wife his newly acquired real estate, worth about $200,000. The second codicil executed September 15, 1853, gave her the same real estate over again, and about $350,000 worth of stocks, &c. It

gave also $50,000 to religious and charitable institutions, and revoked the appointment of the testator's brother Daniel as executor, and it also revoked the $10,000 bequest to him. The third codicil, dated June 15, 1854, made the wife sole residuary devisee, and revoked the residuary bequest to the brothers.

These codicils were dictated by the wife, drawn on her retainer by *her* counsel, and each was executed by a mark. In fact these marks were all made by the wife's counsel. He placed the pen in the testator's left hand, which was perfectly sound, well, and strong; he then drew that hand to the appropriate places; and there, guiding the movement of the pen himself, he, the counsel, made the marks which are alleged to be the testator's subscriptions. The case might be said to present complete proof of undue influence and of fraud, and of coercion, but that one important and indispensable ingredient of such a case is lacking. The testator was in so low a state of idiocy, that he was incapable of being influenced, deceived, or coerced. The disputed codicils are not his acts.

FIRST POINT. The testator had not capacity to make a testament at any time subsequent to his apoplectic seizure on the 19th of July, 1849.

I. The condition denominated idiocy in the Statute of Wills is not necessarily congenital. It may be produced by reduction of power in the material organ of thought or mind, through natural decay, the gradual operation of disease, or sudden violence. (*Swinburne*, part 2, § 5; *De Witt* v. *Barley*, 17 *N. Y.*, 350.)

II. It is not necessary to the existence of the state denominated idiocy, that there should be a total absence of perception, memory, or even of reason. Idiocy has never been defined, and never can be; it is a condition which no power of language can adequately describe, although illustrations of its existence may easily be presented. It is a state of mind which may differ from the most perfect mental integrity, only in the degree of power present. Every descrip-

tion, every illustration, and every instance to be found in the books prove this. (*Dean's Med. Jur.*, 457; *Marquis of Winchester's Case*, .6 *Coke R.*, 23 (*a*); *Comb's Case, Moore*, 759; *Herbert* v. *Lowns*, 1 *Ch. Rep.*, 12, 13; *Greenwood* v. *Greenwood*, 3 *Curt.*, 336 Append. 30; *Ball* v. *Mannin*, 3 *Bligh, N. S.*, 1; *Marsh* v. *Tyrrell*, 2 *Hagg.*, 122; *Harwood* v. *Baker*, 3 *Moore P. C.*, 282, 290; *Jones* v. *Godrich*, 5 *Id.*, 16, 36; *Den* v. *Van Cleve*, 2 *Southard* (*N. J.*), 589, 661; *Den* v. *Johnson, Id.*, 454; *Goldie* v. *Murray*, 6 *Jur.*, 608; *Stulz* v. *Schœffle*, 16 *Id.*, 909; *Boyse* v. *Rossborough*, 3 *Jur., N. S.*, 373; S. C., 6 *House of Lords Cases*, 2, 45; *Howard* v. *Coke*, 7 *B. Munroe*, 655; *Elliott's Will*, 2 *J. J. Marsh.*, 340; *Turner* v. *Turner*, 1 *Littell*, 101; *Shropshire* v. *Reno*, 5 *J. J. Marsh.*, 91; *Comstock* v. *Hadlyme Soc.*, 8 *Conn.*, 254; *Kinne* v. *Kinne*, 9 *Id.*, 102; *Rambler* v. *Tryon*, 7 *S. & R.*, 90; *Harrison* v. *Rowan*, 3 *Wash. C. C.*, 580; *Stevens* v. *Van Cleve*, 4 *Id.*, 262; *Sloan* v. *Maxwell*, 2 *Green's Ch.* (*N. J.*), 563; *Andress* v. *Weller*, 2 *Id.*, 604; *Heister* v. *Lynch*, 1 *Yeates* (*Penn.*), 108; *Dornick* v. *Reichenback*, 10 *S. & R.*, 84; *Tomkins* v. *Tomkins*, 1 *Bailey* (*S. C.*), 92; *Davies* v. *Calvert*, 5 *Gill & John.*, 269; *Black* v. *Ellis*, 3 *Hill* (*S. C.*), 68; 2 *Evan's Pothier*, 539, *et seq.*; *Clarke* v. *Fisher*, 1 *Paige*, 171; *Stewart* v. *Lispenard*, 26 *Wend.*, 290, 291, Walworth, Ch.; *McCully* v. *Barr*, 17 *S. & R.*, 445; *Ford* v. *Ford*, 7 *Humph.*, 92; *Converse* v. *Converse*, 21 *Verm.*, 168; *Coleman* v. *Robertson*, 17 *Ala.*, 84; *Kirkwood* v. *Gordon*, 7 *Rich. So. Car. Law*, 474.)

1. One who could count five, and no further, would show some understanding, yet he would in law be esteemed an idiot. (*Swinburne*, part 2, § 4; *Den* v. *Johnson*, 2 *Southard*, 454; *Den* v. *Van Cleve*, 2 *Id.*, 589, 661.)

· 2. One who at a testable age should possess all the knowledge and capacity of a child three years old—and this is considerable—would be esteemed an idiot. (*Swinburne*, part 2, § 4; *Shropshire* v. *Reno*, 5 *J. J. Marsh.*, 91; Walworth, Ch., in 26 *Wend.*, 290, 291; *Howard* v. *Coke*, 7 *B. Mun.*, 655.)

3. The *Cretins* of the Alps are called idiots in the works which treat of them. They perform all the functions of ani-

mal life, perpetuate their species, reason well enough to a certain extent, and can perform successfully a limited amount of mechanical labor, and that of a kind requiring some ingenuity.

III. The opinion of Senator Verplanck, in the case of Alice Lispenard's Will (26 *Wend.*, 296), is sometimes referred to as determining that testamentary capacity exists, if there be any mind. This leaves it to be ascertained whether there be any mind; and this, of course, involves the inquiry, what is mind? Consequently the opinion concludes nothing, and leaves the law as it stood before.

The opinion of a single senator in that court cannot always be deemed an authoritative exposition of the law, even though no other be delivered, and though judgment be according to its conclusion. It was really the decision of a question of fact and not of law.

IV. The *onus probandi* that the testator was possessed of sufficient mental capacity, is on the party propounding an alleged testamentary paper. If, after all the evidence is in and due consideration is had, the mind of the court is *in equilibrio*, the paper must be rejected. (*Barry* v. *Butlin*, 1 *Curteis*, 637; 2 *Moore's Privy Council Cases*, 480; *Broming* v. *Budd*, 6 *Id.*, 430; *Panton* v. *Williams*, 2 *Curt.*, 530; 2 *Notes of Cases Supplemental*, 21, 29; *Baker* v. *Batt*, 2 *Moore P. C.*, 317; *Crowninshield* v. *Crowninshield*, 2 *Gray*, 527; *Comstock* v. *Hadlyme*, *Soc.* 8 *Conn.*, 254; *Gerrish* v. *Nason*, 22 *Maine*, 438; *Cilley* v. *Cilley*, 34 *Id.*, 162; *Wallis* v. *Hodgeson*, 2 *Atk.*, 56; 1 *Powell on Devises*, Jarman's ed., 81.)

SECOND POINT. If it could be presumed that the testator had testamentary capacity at the times when the marks alleged to be his own were affixed to the codicils, the evidence would exhibit all the features of undue influence, fraud, and coercion to be found in that unfortunately familiar class of cases.

I. The professional gentleman who drew the instrument, being the agent of Mrs. Parish, and all his little intercourse with the testator being in her presence, and under her super-

vision, the maxim *qui se scripsit heredem*, applies. (*Paske* v. *Ollett*, 2 *Phill.*, 324; *Middletown* v. *Forbes*, cited in 1 *Hagg.*, 395; *Ingram* v. *Wyatt*, 1 *Hagg.*, 384; *Baker*. v. *Batt*, 1 *Curt.*, 155; 2 *Moore P. C.*, 317; *Butlin* v. *Barry*, 1 *Curt.*, 614; *Durnell* v. *Corfield*, 1 *Robert. Eccle. Rep.*, 51; *Durling* v. *Loveland*, 2 *Curt.*, 225; *Croft* v. *Day*, 1 *Id.*, 782; S. C., *sub nom. Dufaur* v. *Croft*, 3 *Moore P. C.*, 136; *Mitchell* v. *Thomas*, 10 *Jur.*, 461; 12 *Id.*, 967; 6 *Moore P. C.*, 137; *Raworth* v. *Marriott*, 1 *M. & K.*, 643; *Jones* v. *Godrich*, 5 *Moore P. C.*, 16; *Mynn* v. *Robinson*, 2 *Hagg.*, 179; *Crispell* v. *Dubois*, 4 *Barb.*, 393.)

II. All persons but her own friends being excluded, and the testator being completely subject to the will and pleasure of Mrs. Parish for the gratification of his only known desires, *i. e.*, food and drink, he must be regarded as not having been a free agent. (*Swinburne*, 998, part 7, § 18; *Blewett* v. *Blewett*, 4 *Hagg.*, 410; *Marsh* v. *Tyrrell*, 2 *Id.*, 84.)

III. There is a total absence of proof that, in reference to these codicils, there existed spontaneity or even volition. The testator merely yielded to irresistible importunity or force. (1 *Fonblanque's Equity*, 6, Am. ed., 1807; 8 *Viner's Ab.*, 167, tit. *Devise*, Z, 2 pl. 7, A. D. 1791; *Swinburne on Wills*, part 2, § 25; *Green* v. *Skipworth*, 1 *Phill.*, 53; *Billinghurst* v. *Vickers*, *Id.*, 187; *Harwood* v. *Baker*, 3 *Moore P. C.*, 282; *Lamkin* v. *Babb*, 1 *Swinburne on Wills*, § 1; *Id.*, part 7, § 4; *Hacker* v. *Newborn*, *Styles*, 427; *Mountain* v. *Bennett*, 1 *Cox*, 353, 355.)

IV. In the alleged gifts *inter vivos* and the repetitions of the testamentary grants obtained, we may discern that duplicity in title-making which frequently characterizes this description of fraud. (*Vreeland* v. *McClelland*, 1 *Bradf.*, 393, 431; *Middletown* v. *Forbes*, cited in 1 *Hagg.*, 395; *Welles* v. *Middletown*, 1 *Cox*, 112; 4 *Bro. P. C.*, Toml. ed., 245; *Bennett* v. *Vade*, 2 *Atk.*, 324.)

Counsel for the contestants presented, also, certain references to authorities, arranged under the following three heads:

I. The conscience of the court is to be satisfied that the paper in question was the act of a free and capable testator. The amount of proof required will, of course, vary according to the circumstances of each particular case; but the rule is invariable. (*Baker* v. *Batt*, 2 *Moore P. C.*, 317.)

The same rule was declared and ably vindicated, by the Supreme Court of Massachusetts, in *Crowninshield* v. *Crowninshield* (2 *Gray*, 526). It was there held, that the burden of proving the sanity of a testator is upon him who offers the will for probate, and does not shift upon evidence of his sanity being given by the subscribing witnesses. This case, at p. 530, overrules what is said in *Brooks* v. *Barrett* (7 *Pick.*, 99).

In *Gerrish* v. *Nason* (22 *Maine*, 438), WHITMAN, C. J., says: "The presumption that the person making a will was at the time sane, is not the same as in the case of the making of other instruments; but the sanity must be proved." In *Cilley* v. *Cilley* (34 *Maine*, 162), RICE, J., said "that the burden is upon the appellant to show that the testator was not of sound mind at the time the instrument was executed, if he would set it aside as invalid for that cause."

In *Wallis* v. *Hodgeson* (2 *Atk.*, 56), LORD HARDWICKE said: "It had been determined over and over in this court, that you must show the person to be of sound and disposing mind, when a will is to be established as to real estate, and especially if there are infants in the case; proving it to be well executed, according to the statute of frauds and perjuries, is not sufficient." (*Powell on Devises*, Jarm. ed., 81.)

The rule as to the *onus* may be illustrated by other cases. In *Powers* v. *Russell* (13 *Pick.*, 69), it was held, that where the proof on both sides applies to one and the same issue or proposition of fact, the party whose case requires the establishment of such fact, has all along the burden of proof, although the weight in either scale may at times preponderate. But where he gives *prima-facie* evidence of such fact, and the adverse party, instead of producing proof to negative the same fact, proposes to show another and distinct propo-

sition which avoids the effect of it, there the burden of proof shifts and rests upon the party proposing to show the latter fact.

In *Tourtellot* v. *Rosebrook* (11 *Met.*, 460), in an action to recover damages caused by a fire communicated to the plaintiff's land from a coal-pit which the defendant lawfully set on fire upon his own land, it was held that the burden of proving the defendant's negligence was upon the plaintiff, and *prima-facie* proof of the defendant's negligence does not throw upon him the burden of disproving it.

In *Delano* v. *Bartlett* (6 *Cush.*, 364), it was held, that where a want of consideration is relied on in defence to an action on a promissory note; and evidence is given on the one side in the affirmative, and on the other in the negative, of the fact of consideration; the burden of proof is on the plaintiff to satisfy the jury, upon the whole evidence of that fact. (S. P., *Sperry* v. *Wilcox*, 1 *Met.*, 267.)

There are *dicta*, and some decisions in this country, which declare a different doctrine as to the burden of proof from that asserted in the authorities above cited. But there is no opposing decision in which the question has been deliberately examined in the light of the decisions cited above. There are also occasional *dicta* in the ecclesiastical courts, which have sometimes been supposed to be inconsistent with the rule above stated; but, properly understood, those *dicta* do not conflict with the cases cited. The rule stated above was acted on in *Newhouse* v. *Godwin* (17 *Barb.*, 236).

II. Competency to execute a testament does not exist unless the alleged testator had reason and understanding sufficient to comprehend such an act.

Opposed to the long line of authorities cited under our first point (*ante*, 38, 39) which establish this rule, is the opinion of Senator Verplanck in *Stewart* v. *Lispenard* (26 *Wend.*, 255).

It is remarkable that the learned senator cites not a single authority relating to testamentary capacity, which supports the standard adopted by him. A large portion of the *dicta*

cited and relied upon by him, relate to an entirely different matter, viz., the prerogative of the crown to take into its custody the persons and estates of idiots and lunatics. This prerogative, being in its nature odious, and liable to abuse, was always viewed with jealousy, and strictly construed. Decisions or opinions in such cases are not authoritative on the subject of testamentable capacity. Indeed this distinction is expressly taken by *Swinburne* (part 2, § 4). One of the head-notes to *Stewart* v. *Lispenard* contains the following sentence: " Courts, in passing upon the validity of a will, do not measure the extent of the understanding of the testator; if he be not wholly deprived of reason, whether he be wise or unwise, he is the lawful disposer of his property, and his will stands as a reason for his actions." This is taken substantially from *Shelford on Lunacy*. It is there said (2 ed., 39): " A person's being of weak understanding, is not of itself any objection in law to his disposing of his estates. Courts will not measure the extent of people's understandings or capacities ; if a man, therefore, be legally *compos mentis*, be he wise or unwise, he is the disposer of his own property, and his will stands as a reason for his actions; and there is no such thing as an equitable incapacity where there is a legal capacity." The only authorities cited by Shelford in support of this paragraph, are *Osmond* v. *Fitzroy* (3 *P. Wms.*, 129), and *Willis* v. *Jernegan* (2 *Atk.*, 251). In fact, however, the paragraph is copied verbatim from a note by Mr. Powell to *Swinburne on Wills* (vol. 1, p. 127). That note is as follows: " A person's being of a weak understanding is not of itself any objection in law to his disposing of his estates. Courts will not measure the size of people's understandings or capacities; if a man, therefore, be legally *compos mentis*, be he wise or unwise, he is the disposer of his own property, and his will stands as a reason for his actions. Neither courts of law or equity examine into the wisdom or prudence of men in disposing of their estates; there is no such thing as an equitable incapacity when there is a legal capacity."

Powell's authority for his note is *Osmond* v. *Fitzroy* (3 *P. Wms.*, 129). That case arose upon a bond. The Duke and Duchess of Cleveland intrusted the Lord Southampton, their eldest son (then an infant) to the care of the plaintiff, to attend him in his travels. Lord Southampton, when twenty-seven years of age, was prevailed on by the plaintiff (being still in the service) to give him a bond for £1,000, which was prepared by the plaintiff, and kept secret from the parents. The book says : " There were also some proofs of the weak capacity of the young lord, and that at that time he was unable to raise money to pay off the bond." It was held that equity would set aside the bond as obtained by fraud and breach of trust. But Sir Joseph Jekyll, in delivering his judgment, said : " When a weak man gives a bond, if there be no fraud or breach of trust in the obtaining it, equity will not set aside the bond only (*i. e.*, merely) for the weakness of the obligor, if he be *compos mentis ;* neither will this court measure the size of people's understandings or capacities, there being no such thing as an equitable incapacity, where there is a legal capacity." This, therefore, merely accounts to saying that the standard of capacity is the same in equity as at law, which no one disputes. The learned Sir Joseph Jekyll does not attempt to define what the standard of capacity is either at law or in equity ; much less does he say that there must be a total deprivation of reason to constitute incapacity. There would seem to have been no pretence in this case that Lord Southampton was so imbecile as to be absolutely incapable of contracting. It is observable that the words, " If he be not wholly deprived of reason," in the head-note to *Stewart* v. *Lispenard*, above cited, are not found either in Powell's note, or in the case upon which he relies, or in Shelford. In all those books the words are, " if he be legally *compos mentis*." So in *Bath & Montague's Case* (3 *Ch. Cas.*, 107), Holt, C. J., said : " Be a man wise or unwise, if he be legally *compos mentis*, he is the disposer of his own property."

The case of *Clarke* v. *Sawyer* (2 *N. Y.* [2 *Comst.*], 498),

left this question untouched. The reporter expressly states that a majority of the court did not pass " upon the question as to the degree of mental capacity necessary to make a will." CLERKE, J., in *Thompson* v. *Thompson* (21 *Barb.*, 116), shows clearly that the opinion of Senator Verplanck is not a binding authority.

If Mr. Verplanck's opinion could be thought to contain an authoritative enunciation of the law, it is so grossly and mischievously erroneous that it ought to be departed from. It may thus be stated: If mind exist at all, and it be not disordered in its scarcely perceptible manifestations, the individual thus gifted has testable capacity. This is not yet an axiom, nor a landmark of property.

In *Blanchard* v. *Nestle* (3 *Den.*, 37), the then recently promulgated opinion of Senator Verplanck was given to the jury, and the court in banc, per JEWETT, J., concurred. At the same term the court, in *Osterhout* v. *Shoemaker* (3 *Den.*, 37, *note*), laid down the same doctrine as to a deed. These judgments are rather instances of obedience to what may have been mistakenly considered paramount authority, of a recent date, than acts of concurrence by judicial persons.

Some additional light, beyond the report of Mr. Wendell, touching this celebrated case, may be found in the New York *Courier and Enquirer*, of April 7, 1842, where an opinion by the Hon. Henry A. Livingston, one of the senators who voted with the majority, is reported.*

---

* COL. HENRY A. LIVINGSTON'S OPINION. *In the Court for the Correction of Errors. In the case of the will of Alice Lispenard.*—The frequent applications to break the validity of wills, and endeavors to set aside the intention and wish of testators, have almost become a matter of business, and promise to continue such while the process appears so easy to accomplish the desired end. And at the instance of any or all the remote relatives of a deceased testator, leaving an estate, if a glimmering of hope to obtain a portion of the property takes possession of the avaricious heart, every testament must be brought to the scaffold, and the fatal axe must be applied to strike it out of existence. But it has now almost become time to look around and begin to think, that one of these days some distant descendant of some old family will rush to this tribunal, and with powerful, overwhelming counsel at his

What was said in 3 *Denio*, 37, with the "faint praise" of
Judge Strong in 17 *Barb.*, 357, is believed to constitute all
that can be found in the New York Reports favoring Mr.
Verplanck's doctrine.    In *Jackson* v. *King* (4 *Cow.*, 207),

---

command, break down our own wills, and swear we were insane or *non compos
mentis*, not knowing what we were about, because we did not leave them the
property they covet, and thus scatter the earnings of a long life of industry
to the four winds of heaven.   Well may we say "We toil for heirs, we know
not who, and straight are seen no more."   One of the prominent advantages
that this court is supposed to possess, is the final termination of litigation ;
but I hear counsel expressing the determination not to stop here, but jurors
are to be impanelled, and facts investigated, all of which I should have
thought might better have been done before we ever had any thing to do
with it.   This case presents many very interesting facts, and shows upon how
slight a point and slender a thread hangs the difference between capacity and
inability to make a will ; the testimony is lengthy and voluminous, all classes
of individuals have been examined, from the humble colored washerwoman
to the scientific doctor and the learned divine : each in their turn have told
what they knew of the capacity and understanding of Alice Lispenard, and
from the first dawn of her childhood to the last moment she drew the breath
of life, and the cold clod had covered her remains, every moment has come
under the stern scrutiny of the retentive memories of these various witnesses.
I shall not pretend to follow through the long volumes of this case, but a few
of the questions and answers propounded in this book of the proceedings may
not be improper to advert to.

In page 123, the question is asked Mrs. Sarah A. Stewart, "What did she
say of the other persons you have named ?"   She answered, "Alice would
often say she did not think they cared any thing for her, whether she were
dead or alive, and that they should not have a cent of her money ; my
brother should have it all, that he had been a good friend to her."   In page
75, the question is asked the Rev. Duncan Dunbar, "Do you recollect seeing
Alice upon your return from Europe? if so, relate the circumstances."   An-
swer.   "I returned from Europe about the 9th or 10th of November last.   A
few days afterwards I called at Mr. Stewart's to inquire for the family.   I
was shown into the parlor where Miss Alice was sitting alone.   As soon as I
spoke she recognized my voice.   She rose up and cordially embraced me
with a shake of my hand, and congratulated me on my return.   She asked
particularly if my health was benefited by the voyage, I having went to
Europe on account of my health.   She also asked how Mrs. Dunbar stood
the sea, and if she was well since her return.   She expressed regret that the
ladies of the family had gone out to ride, and that they would be much dis-·
appointed at not seeing me."   Again the question is asked the same reverend
gentleman, "Did her whole manner exhibit strong feelings of friendship ?"
Answer.   "Yes, so much so that I informed my family on my return home

there is indeed some pretty loose language.   But whatever it may mean, it is not authoritative on this question. The same observations apply to *Odell* v. *Buck* (21 *Wend.*, 143), where congenital idiocy or incapacity was the imputation,

that day, that none of our friends had expressed greater cordiality and affection, and kind satisfaction on the return of myself and Mrs. Dunbar to the city."

In page 134, Mrs. Charles Stewart is asked: "From your knowledge and acquaintance of your aunt, have you any doubt of her capacity to make a will, and have you ever heard her converse upon that subject?" She answers: "I think she was perfectly competent; the conversation to which Mr. Webb alluded to in his examination, passed in my presence, I mean the Rosevelt property; after he left, she spoke of it to me, his having asked her to give her share to him—said she, he shall not have it, that her brother, meaning Mr. Stewart, should have whatever she had." In page 235, Mrs. Murden is asked: "Did you make any remarks respecting the visits of the two Miss Lispenards?" To which Mrs. Murden answers: "She did not; but I made a remark to her, and told her that her nieces had called to see her; she said, they do not care any thing about me, they only hope when I die to get some of my property; but that none of them should have any thing but her brother and sister Stewart. I have often heard her make the same remark, and say they had been so kind to her." In page 146, Mrs. Van Dalson is questioned: "Did she appear to take any interest in your own family?" Her answer is, after stating several circumstances: "I called at the house one day; Alice said, 'You have got another daughter, Mrs. Van Dalson.' I said, 'Yes, Miss Alice, I intend to name her after you.' She said, 'You need not name your brat after me, expecting to get something, for I shall not give her any thing.'" Thus, in my opinion, by this answer, plainly intimating that she was conscious of possessing property, and intended to give it to whom she pleased.

In page 19, the Rev. Charles S. Stewart, the question is asked him: "From your knowledge and observation of Alice, have you any doubt of her capacity to make a will, and disposing of such property as she possessed?" To which he answers: "No; I have none. I believe she possessed the ordinary characteristics of mind, and was habituated in their right exercise. The belief has been induced by the constant opportunities I had of knowing that she was correct in her observations of all the ordinary circumstances and events passing around her, and the inferences she drew from them appeared to be correct. She had a good memory, and in other respects she showed she had the common traits of mind; and I believe that her will was made under the influence of the same principles and affections that give rise to the wills of other persons; that it was founded in gratitude and affection to the persons named in it; that she has more than once to myself expressed the warmest affections for Mr. Stewart, and his daughter, Mrs. Stewart, formerly Mrs.

and *Jackson* v. *King* is referred to. The only case out of New York in which *Stewart* v. *Lispenard* appears to have been cited with approbation or followed, is *Potts* v. *House* (6 *Geo.*, 324). But the Georgia court soon receded from that position. (See *Terry* v. *Buffington*, 11 *Id.*, 337, 344.)

Skillman, independent of the fact that such affection was evident from her ordinary deportment, and under the circumstances of her life in connection with these two persons. I fully believe that her will would have been the same had she been possessed of the finest mind and the highest cultivation." The question is again asked: " Did you observe any alteration in her capacity or information during the last seven or eight years of her life ?" The answer is: "I have previously stated that there was a change in my opinion concerning the character of her mind, which arose from my intercourse with her, and my increased opportunities of judging. I believe there was of late years a development of mind, and an increased exercise of intellect, from the treatment and management she received in the family of Mr. Stewart, and the correction of some habits to which I know she had been addicted from my own observations, and which I believe militated against the right exercise of mind."

From all I am able to gather from this case, and I have attentively listened to the argument of counsel, I am led to the conclusion and belief, that Alice Lispenard was a person of very moderate intellect, but not an idiot; and that she had the power to know and appreciate her friends. Thus we see, that when, as it were, abandoned by her nearest blood-relations, and humbly boarding under the roof of poverty, with strangers, she was indeed a poor, forlorn being, and the demon of intemperance had a powerful dominion over her, and the little faint rushlight of understanding was almost obliterated, and the descendant of the high-minded Lispenard became a common carrier of wood, and a drawer of water to those very persons who had been the servants at the old lordly mansion on the hill. But when she was removed by the kindness and friendship of her brother-in-law, Mr. Stewart, and raised to the dignity of an inmate in his family, and seated at his table, enjoying the benevolent smile of a good Samaritan, you hear no more of her choking at table, with coarse beef; but by degrees she becomes enabled to attend to the little avocations of the family, and feels that there was some blood still circulating in her veins, that tells her she was not that abject outcast they would fain make people believe. By degrees she becomes more temperate, until finally she is entirely so; then the clouded faculties, few and small, however, I admit, but still she belonged to the human family; and I never can consent to place an extinguisher on the faint, glimmering light of her understanding, and put it out forever, but will allow that little spark to shed an humble lustre upon the last act of her life, which was to make a just will, and give what she had to those she loved, and those who cherished her.

I am, therefore, of opinion that the proceedings in this case be reversed.

The standard of testable capacity may be illustrated by the case of infants. In the civil and canon law, as administered by the English ecclesiastical courts, boys under fourteen years of age, and girls under twelve, are held to be absolutely incapable of making a will. And this rule seems to have been established upon the single ground that the average of children under these ages have not sufficient judgment and discretion to make a will. If, therefore, the court can be satisfied that the decedent possesses less capacity than an ordinarily gifted boy of fourteen, this would seem to be conclusive against his capacity to make a will. The true standard may also be illustrated by cases of lunacy. It is now conclusively settled in England, that the least particle of lunacy (*i. e.* delusion) upon any subject, if firmly seated, renders the subject absolutely intestable. This was settled by the unanimous judgment of the Judicial Committee of the Privy Council in *Waring* v. *Waring* (6 *Moore P. C.*, 341). And see the late case of *Dyce Sombre* v. *Troup* (1 *Deane,* 113, 114). The law being thus strict on the subject of lunacy or mental irregularity, it would seem absurd to adopt Senator Verplanck's standard on the subject of idiocy or pure feebleness and lack of power. (See Dr. Rush's Treatise on "The Diseases of the Mind," published 1812, in the 13th chapter, which treats of "Fatuity, or Idiotism.")

III. Where testable capacity is doubtful, or, being established, is of a very low grade, the paper propounded as a testament will be rejected, unless the evidence fully establishes the fairness of the transaction, and shows satisfactorily that the decedent really exercised a free and unrestrained volition. (*Cockraft* v. *Rawles*, 4 *Notes of Cases*, 237 ; *Swinburne*, part 2, § 25 ; *Green* v. *Skipworth*, 1 *Phill.*, 53 ; *Middleton* v. *Forbes*, 1 *Hagg.*, 395 ; *Jones* v. *Godrich*, 5 *Moore P. C.*, 9 ; *Montefiore* v. *Montefiore*, 2 *Addams*, 354 ; *Brouncker* v. *Brouncker*, 2 *Phill.*, 57 ; *Mynn* v. *Robinson*, 2 *Hagg.*, 179 ; *Evans* v. *Knight*, 1 *Addams*, 237 ; *Harwood* v. *Baker*, 3 *Moore P. C.*, 282 ; *Mountain* v. *Bennett*, 1 *Cox*, 353 ; *Marsh* v. *Tyrrell*, 2 *Hagg.*, 84.)

JOHN W. EDMONDS, *for Anne Parish and Martha Sherman, Contestants.*

Henry Parish died March 2d, 1856, leaving a widow, Susan M. Parish, two brothers, Daniel and James Parish, and two sisters, Anne Parish and Martha Sherman. He left no children. On the 20th of September, 1842, he made a will. In July, 1849, he was stricken with paralysis, and remained speechless for the rest of his life, except the occasional utterance of one or two words. His right side was paralyzed. The muscles of his face soon recovered from the attack, the right leg partially recovered, but the right arm remained affected until his death. And for the residue of his life, viz., from July, 1849, to March, 1856, for a period of about seven years, he communicated thought only by gesticulation, by his countenance, and by sounds indicating yes and no, or assent and dissent. During that period he executed three codicils to his will:

One on the 29th August, 1849 (which was re-executed on the 17th December, 1849); one on the 15th September, 1853; and one on the 15th June, 1854. The chief effect of these codicils was to change the disposition of his estate from his brothers to his wife.

By the will he gave his brother Daniel a specific legacy of $10,000, as an executor, and gave the residuum of his estate, which he valued at about $40,000, to his two brothers. By his codicils, besides specific devises to his wife, he gave her the residuum, revoking the specific bequest of $10,000 to Daniel and the devise of the residuum to the two brothers.

By his will he made thirty-three specific devises, or bequests (besides the residuum). By his codicils he revoked none of those, except the $10,000 to his brother Daniel, but he added four bequests to charitable uses, amounting to $50,000. By his will (in September, 1842), he gave to his wife real and personal property estimated by him to be worth $331,000.

By his first codicil (in August, 1849), having in the mean time sold his dwelling and furniture in Barclay-street, which

he had valued at $28,000, he devised to his wife his new
dwelling, valued at . . . . . . . . . . . . $110,000
The furniture in which had by that time come to
    be worth . . . . . . . . . . . . . .     50,000
And a store in Wall-street, which he had bought
    in 1847, and was valued at . . . . . . .     70,000
                                              ─────────
    Making a total, by that codicil, of . . . $230,000

By the second codicil (in September, 1853), he confirmed
the devises in the first, and, in addition, gave to his wife, in
personal property, at par value . . . . . . . . $349,460
And made four charitable gifts for . . . . .     50,000
                                              ─────────
    Making a total by that codicil . . . . $399,460

By the third codicil (in June, 1854), he devised the whole
residue of his estate to his wife, which residue, at the time of
his death, was worth . . . . . . . . . . . . $221,454
    This residuum is arrived at in the following manner:
    At his death his whole estate was:
In hands of special administrator . . . . . . $452,950
Invested in Mrs. P.'s name . . . . . . . . . 619,964
    Real estate, viz.:
In the will, after deducting Barclay-street
    property . . . . . . . . . . . $163,000
In the first codicil . . . . . . . . . 230,000
                                    ───────── 393,000
                                              ─────────
    Total of his estate . . . . . . . . $1,465,914

Specific legacies were by the will $690,000
Deducting lapsed and revoked
    legacies . . . . . . . .    75,000
                             ───────── 615,000
By the first codicil . . . . . . . . 230,000
By the second codicil . . . . . . . . 399,460
                                    ───────── $1,244,460
                                              ─────────
    Leaving for the residuum . . . . . . $221,454

Besides the increase in value of the property above its par (which was very considerable), and the chance of falling in of specific legacies which, under the twelfth clause of the will, did not vest in the legatees until they attained twenty-one years of age.

Thus, under the will—

| | |
|---|---:|
| The wife would have received . . . . . . . . | $331,000 |
| The specific legacies (deducting for those lapsed by death) . . . . . . . . . . . . . . . | 424,000 |
| The brothers would have got the residuum at . . | 710,914 |
| Making the total of . . . . . . . . . | $1,465,914 |

Under the codicils—

| | |
|---|---:|
| The specific legacies would have been as above. | $424,000 |
| The specific legacies for charities . . . . . | 50,000 |
| The wife would have got the residuum at (besides the chances of increase before mentioned) . . | 991,914 |
| Making the total . . . . . . . . . | $1,465,914 |

In the latter event, the brothers would not have received any thing. But, in any event, the brothers' children would have received $130,000 (deducting only lapsed legacies). And the sisters would have received only $40,000, and their children nothing, in any event.

### CHANGES OF CONDITION.

1. About fourteen years elapsed between the making of his will and his death, and during seven years of that period he was speechless.

2. When, in September, 1842, he made his will, he made an inventory of his estate, and estimated its total value at $732,000. When he died in 1856, his estate had increased, as before mentioned, to the sum of $1,465,914, having in that time increased more than double.

3. His dwelling in Barclay-street, valued at $18,000, and his house in Chambers-street, valued at $5,000, had been sold, and his furniture, valued at $10,000, had been mostly sold.

4. He had bought other real estate, viz., his dwelling on Union Square, at a cost of $111,260; a building on Wall-street, at a cost of $76,000; and had furnished his house at a cost of $50,000.

5. He had originally 117 shares of Manhattan Gas Co. stock, at the par value of $50 a share (and worth $60), $5,850. When he died, he had 468 shares at par value, $23,400.

6. He had improved his real estate in New Orleans, thus: House and lot on Camp-street, valued, when he made his will, at $3,000; was built on, at an expense of $6,985 42; in 1845 was valued at $9,000. And the two lots on St. Joseph-street, valued at, when he made his will, $3,000; were built on, at an expense of $10,786 50; in 1845, valued at $17,000.

7. In September, 1842, he had, in bonds and mortgages, $13,000. In 1856, he had thus invested, $220,450. Of the mortgages on hand in 1842, none were in existence in 1856, and only $3,021 in 1848. Of those on hand in 1856, none were held by him in 1842.

8. In 1842, his interest in firms was $472,379. In 1856, $6,000.

9. *New Orleans property.* He sold one of the three lots on St. Joseph-street. On the other lots a fire occurred, two or three years prior to his death, which destroyed $30,000 of their value, but which he received in insurance, thus converting into personalty, and spending that which was specifically devised as realty.

10. *Gifts.* He gave away—taking thus from under the operation of his will, and virtually revoking it *pro tanto*— $9,978 51; which is exclusive of gifts to devisees under his will, $91,731 37. And, in addition, is the gift to Mrs. Parish of the stocks and securities invested in her name, $369,212 35. Making a total of gifts, $470,923 23. Whether such gifts be valid or not, they show an intention by testator to take that amount away from the will, and an intention to dispose of it otherwise than by his will.

11. *His father's estate.* In the statement of 1842, there is

no mention of his father's estate. But it appears that in March, 1842, he received a legacy of $30,000 from that estate, and that seems to have been all he expected from that source. But from May, 1845, to March, 1851, he received in addition from that estate, $23,351 17. In the balance-sheet for 1849, he enters the receipts from his father's estate at $47,048 77; after which, he received $5,830, or a total of $52,878 77, of which no mention is made in 1842.

12. *Stocks and public bonds.* The change of condition in these assets was as follows: The stock, &c., held in September, 1842, was $61,500; in March, 1856, $797,797. The amount held in September, 1842, which he did not hold, or was valueless when he died, was $32,420; or more than half the whole amount. The increase in the kind of stocks he then held, by rise in value, or further purchases, was $242,414; or four times as much as all he then held.

13. *General change of property.* Of all the specific property which the testator had in 1842, when he made his will, amounting in the aggregate to $732,879, he had when he died, in 1856, only $308,970; thus changing $423,909 of his original estate.

His real estate diminished in value to the amount of $38,000. He invested $210,000 in the purchase of real estate. And $30,000 of his real estate was destroyed by the fire in New Orleans; in which three items alone there was a change to the amount of $278,000.

In bonds and mortgages there was a change from $13,000 to $220,450.

In stocks, &c., there was a change from $61,500 to $797,797.

In his father's estate there was a change from $30,000 to $52,878 77.

In his interest in the firms there was a change from $472,379 to $6,000.

By gifts he made a change to the amount of $470,923 23.

And the bulk of his estate changed from $732,100 to $1,465,914.

14. *The condition of his legatees changed.* Mrs. Payne's life-estate in the Chambers-street property was revoked by his sale of the property; and her annuity, valued by him at $5,000, lapsed by her death. The following legatees died during the lifetime of the testator, to each of whom was devised $10,000 : Jane Ann, Elizabeth, Mary Louisa, Henrietta, daughters of James Parish; Mrs. Kernochan, Emma Delafield, William Delafield; thus lapsing legacies to the amount of $75,000. His brother Daniel had one child born after September, 1842, and his sister Martha had two children after that time, and only one before.

15. *His relations with his family.* The testator was on good terms with his two sisters, but not with his brothers; and the alienation between them occurred after his will was made in September, 1842, and continued until his death. He was on good terms with his wife and all her relations, especially her brothers and sisters, without an exception. His brother Daniel was a man of large wealth. And his brother James was worth over $50,000.

16. *The testator never intended that his will should take effect, but always intended to revoke it.*

*a.* He made it originally to be temporary, on the eve of his departure for Europe, Sept. 26th, 1842.

*b.* He executed it in duplicate, and took one copy with him in order to alter or revoke it, if he saw fit. And left a power of attorney to sell any and every thing.

*c.* Immediately on his return from abroad, he consulted his counsel about altering it, expressing his dissatisfaction with it, because of the changes which had occurred.

*d.* In August, 1849, his desire to alter his will was mentioned by Mrs. Parish, in his presence, to Mr. Lord, and again in presence of Fisher.

*e.* His repugnance to his will, and his desire to abrogate it was so strong, that when, during the long silence of seven years, he attempted to write, the only word he attempted to frame, besides his signature, was the word "will."

*f.* His attempting to write his name, was at the suggestion

of others; but his attempt to write "will," was of his own accord, and was repeated by him on several occasions.

*g.* By vehement and repeated gesticulation, he signified his wish for the box in which the will was kept.

*h.* He always intended equality in the distribution of his estate, especially between the brothers and sisters.

*i.* Four times during his sickness, when the several codicils were drawn and executed, he expressed a similar wish.

*j.* He expressed a wish to disturb the legacies to his brothers' children.

17. *The acts of the testator were in conformity with an intention to abrogate his will.*

*a.* He consulted counsel in 1844 about altering it, and had a copy made for that purpose. He also consulted counsel on that subject twice in 1849, once in 1853, and once in 1854.

*b.* He executed three codicils, which, with the alterations by death and change of property, left a very small part of the will to go into operation.

*c.* He placed a large amount of his property in the name of his wife, and invested her with the absolute control over it, with the intention of making her its owner.

*d.* He made large gifts, showing a clear intention that the will should not operate on the amount thus given away.

*e.* He placed $75,000 in the hands of his brother-in-law, with the intention of making that a gift to his sisters, or to that brother-in-law. He had, by his will, given $90,000 to his brothers-in-law on his wife's side, and this was intended as a gift to the only brother-in-law he had on his side. That gift of $75,000 was never revoked by him. It was voluntarily surrendered by the brother-in-law, at the instigation of others, and not by the action of the testator.

*f.* He sold, in 1847, the homestead and furniture, and the house in its vicinity, all of which he had specifically devised, and that being his voluntary act, it showed his intention to revoke *pro tanto.* And he made no attempt at compensation until rendered imbecile in 1849.

*g.* He disposed of every item of personal property that he

owned, when he made his will in 1842. And so far as any of that was specifically bequeathed, he revoked his will.

*h.* He not only sold his homestead and furniture, and neighboring property, valued at $33,000, but he marked on his books, in 1849 (seven years after making his will) a depreciation of $38,000 in his real estate, and he knew of the destruction of $30,000 in his New Orleans property, without rebuilding, and thus virtually revoked his will as to $101,000.

*i.* He invested over $200,000 in the purchase of certain real estate, which, not being specifically devised, would go either to the heir-at-law or the residuary legatees, thus diverting the price of the homestead, &c., $33,000, and the loss on the New Orleans estate, $30,000, from the devisees of these items to some other beneficiary. All this was done before his sickness, and when he was fully competent to prevent this revocation, *pro tanto*, if he had desired it.

18. *The testator had a general intent as to the corpus of his estate, in connection with his wife and his brothers and sisters; and a special intent as to the numerous other objects of his bounty.*

The general intent must always prevail over the special.

That general intent can be best carried into effect by a total revocation.

In that event the wife would have ½ of personal . $543,243
Her dower in the real estate, valued at $261,000,
    she being 58 years old, would be worth . . .    42,663

Making a total to widow . . . . . . $585,906

The four brothers and sisters would have one-quarter of residuum, $881,004; thus producing a result manifestly nearer his general intention than the will or codicils, or either or all of them.

If the widow is right, the brothers will get nothing, instead of over $50,000, under the will, or over $400,000 in case of intestacy. If the brothers are right, the widow would get $298,500, instead of over $1,000,000, under the will and codicils, or over $500,000 in case of intestacy.

DELAFIELD *v.* PARISH.

## POINTS OF LAW.

I. When the codicils were executed, the testator had not a full testamentary capacity, and was under undue influence, and those codicils are all void.

II. The will made in September, 1842, fourteen years before his death, was revoked: 1. By his intention to revoke. 2. By his acts of revocation. 3. By the alteration of estate. 4. By the changes of the beneficiaries under it, and his relation to them.

III. The will being revoked and the codicils void, it is a case of intestacy, in whole or in part.

*First.* AS TO TESTAMENTARY CAPACITY AND UNDUE INFLUENCE.

I. There is no foundation for any distinction in respect to the codicils.

1. The testator's mind was more impaired at the execution of the first codicil than the others, and had not then recovered its health as much as it did afterwards.

2. The first codicil was as much, if not more, the result of suggestion from others than of his own volition.

II. Testamentary capacity consists of the power of thinking, and the power of uttering thought, and of the power to will, and to express and execute that will. If either of these elements are wanting, testamentary capacity is deficient.

III. It is doubtful if the testator had the necessary capacity to think and to will.

1. Nothing but great mental weakness would have deterred him from using the means of communicating thought by writing or letters, when he had the physical capacity to use either mode.

2. The mental weakness that could produce such a result, and keep the testator for seven years without communion with his fellow-man, cannot be measured, and it is, therefore, impossible to say that he had a sound and disposing mind.

3. The affirmative of proving that he had such sound and

disposing mind is with the proponents, and any rational doubt on that subject is enough to destroy a testamentary disposition. (2 *Jarm. on Wills*, 51; *Marsh* v. *Tyrell*, 2 *Hagg.*, 122; *Converse* v. *Converse*, 21 *Vermont*, 168; *Stewart* v. *Lispenard*, 26 *Wend.*, 255; *Clark* v. *Fisher*, 1 *Paige*, 171; *Goble* v. *Grant*, 2 *Green Ch.*, 629.)

IV. But whatever may have been his mental capacity, it is a conceded fact that he had no power to utter a thought, or express a will, without the suggestion, or at the instigation of some other person.

Thus, if at any time after his attack of paralysis he had wanted to give any part of his estate to his sisters, it would have been impossible for him to do so, because their names were never mentioned to him, and he had no power of himself to mention them.

V. It is also very clear that in the dispositions in his codicils, he was laboring under undue influence in whole or in part.

Many of the ideas in those codicils were suggested by others, and not by himself. He denied or assented to his gift of the Union Square and Wall-street property, according to the form in which the question was put to him.

VI. A will executed under such circumstances is not the free unbiassed action of a sound and disposing mind, which the law demands as a condition to its validity. (*Davis* v. *Calvert*, 5 *Gill. & John.*, 269; *Bleecker* v. *Lynch*, 1 *Bradf.*, 458, 471, aff'd on appeal; *Weir* v. *Fitzgerald*, 2 *Bradf.*, 42; 1 *Jarm. on Wills*, 30, 39, 41; *Clark* v. *Fisher*, 1 *Paige*, 171; S. C., 2 *N. Y.* [2 *Comst.*], 498; *Crispell* v. *Dubois*, 4 *Barb.*, 393; *Worthington on Wills*, 28, 32; *Ingram* v. *Hyatt*, 1 *Hagg.*, 384, 404.)

*Second.* THE WILL MADE IN 1842, FOURTEEN YEARS BEFORE HIS DEATH, WAS REVOKED.

I. *Revocavit vel non* is a question of intention, and all facts showing the intention may be received in evidence. (*Boudinot* v. *Bradford*, 2 *Yeates*, 170; *Jackson* v. *Holloway*, 7 *Johns.*, 394.)

1. From the execution of his will in September, 1842, until his sickness in July, 1849, a period of seven years, the testator's capacity to revoke, both as to intention and the expression of that intention, is unquestioned.

2. From July, 1849, to his death in March, 1856, another period of seven years, he had the capacity to will a revocation, and to give utterance to that intention. It required less capacity of utterance to destroy the will already made, than to make a new one with all its complications of amounts, persons, and articles of property. His difficulty was in the capacity of utterance, not in that of willing.

3. Every expression of his, during those fourteen years, in reference to his will, was that of dissatisfaction with it, and consequent wish that it should not stand. He never was heard to "express" himself content with it, though it was repeatedly the topic of thought and action with him.

4. In the execution of this purpose, he knew of, and acquiesced in, did, or suffered to be done, things which amounted to a revocation, which he knew must have that effect, and which effect he could have prevented in a great degree, if not entirely.

5. Those things were: Death of seven legatees, and the lapsing of legacies to the amount of $75,000; disposing of every article of personal property, amounting to $540,000; disposing of every article of personal property specifically bequeathed, amounting to $10,000; converting real estate, specifically devised, into personalty, to the amount of $53,000; converting personalty into real, to the amount of over $200,000, thus changing its descent from next of kin to heirs, and altering the widow's share from an absolute ownership of one-half, to life-estate in one-third; more than doubling his whole estate, and thus, except as to a few specific legatees, entirely changing the distribution of his estate; and executing the codicils.

II. Under these circumstances there was an actual revocation of the will, in whole or in all of it, except the specific legacies. Revocation may be in whole or in part. (*Beck v.*

*McGillis,* 9 *Barb.,* 35; *Ward on Legacies,* 261–276; *Coates* v. *Hughes,* 3 *Binn,* 498; *Langdon* v. *Astor,* 16 *N. Y.,* 51; *Harwood* v. *Goodright,* 1 *Cowper,* 90.) A subsequent devise of an estate tail revokes, *pro tanto,* a prior devise of an estate in fee. (*Clark* v. *Berkley,* 1 *Eq. Cas. Abr.,* 412; S. C., 2 *Vern.,* 720.) So if one devise all, and after settle a part, the will is good for the remainder only. (*Coke* v. *Bullock, Cro. Jac.,* 49; *Roll. Abr.,* 616; *Hartness* v. *Bailey, Prec. in Ch.,* 515; *Tucker* v. *Thurston,* 17 *Ves.,* 130.) Mortgage in fee, after a devise, is a revocation *pro tanto* only. (*Brydges* v. *Duchess of Chandos,* 2 *Ves., Jr.,* 417.) A settlement in performance of articles, the whole fee being conveyed, and some of the purposes being inconsistent with the will, the will was revoked as to the settled estates. If lands devised are conveyed for a partial purpose, as a mortgage, or for the payment of debts, it is a revocation, *pro tanto,* of a prior devise. (S. C., in the House of Lords, 3 *Ves.,* 685; *Parsons* v. *Freeman,* 1 *Wilson,* 308; 3 *Atk.,* 741; *Amb.,* 116.) If testator devised and then suffered a recovery, or conveyed and took back a new estate, it was a revocation *pro tanto.*

III. Ever since the Statute of Frauds passed in the reign of Charles II., in 1641, and our Statute of Wills revised in 1813 (*Roberts on Frauds,* 467, 473; 1 *Rev. L.,* 364, §§ 2, 16), the rule as to revocation under such or similar circumstances has been, that it would be implied.

Copyhold estates are not within the statute. (*Carey* v. *Asken,* 2 *Bro. C.,* 58; *Rob. on Fr.,* 319, 322, 323; *Burkitt* v. *Burkitt,* 2 *Vern.,* 498; *Habergham* v. *Vincent,* 2 *Ves., Jr.,* 205.) Nor is a trust in copyhold lands within it. (*Rob. on Fr.,* 322.) So in case of an agreement to charge lands for the benefit of certain persons to be named by a certain person in his will. Such appointment is not within the statute, and may be made by a not duly attested will. (*Rob. on Fr.,* 327, 332; *Jones* v. *Clough,* 2 *Ves.,* 365.)

By a will duly executed, charging land generally with legacies, a testator enables himself to lay any number of additional legacies on the land by a subsequent testamentary dis-

position unexecuted. (*Rob. on Fr.*, 344; *Masters* v. *Masters*, 1 *P. Wms.*, 423.)

In the case of a devise to pay debts, testator may contract enough to revoke every other devise or bequest. (*Rob. on Fr.*, 345.) Lord Hardwicke, in *Masters* v. *Masters*, says the Statute of Frauds does not affect the question as to legacies, because it did not prevent a man from creating by will a fluctuating charge.

An annuity was charged on all estate, real and personal, and by an unexecuted codicil, testator gave all the personal to another. The annuity was revoked as to the personal. (*Buckeridge* v. *Ingram*, 2 *Ves., Jr.*, 652; approved in 8 *Ves.*, 500.) And that, not because the thing given was destroyed, but the fund out of which it was given. So a devise to charitable uses was held not to be within the statute. (*Griffith Flood's Case, Hob.*, 136; *Collison's Case, Ib.*) Terms of years will *pass* by a will unattested, though they could not thus be *created.* (*Rob. on Fr.*, 359; *Whitechurch Case*, 2 *P. Wms.*, 236.) So as to fixtures, which can be removed and converted into personalty—*e. g.*, steam-power in a factory. (*Rob. on Fr.*, 365.) Or a devise of corn growing, is good by a will unattested. (*Fisher* v. *Forbes*, 2 *Eq. Cas. Abr.*, 392.) So a devise of a mortgage may be revoked by an unattested will, because it is regarded as personal. (*Casborne* v. *Searfe*, 1 *Atk.*, 605.) If in an unexecuted will there is a legacy to the heir on condition that he do not dispute the will, it is enough to put the heir to his election. (*Boughton* v. *Boughton*, 2 *Ves.*, 12.) A lease and release to the use of a marriage settlement is not within the statute, but is good as an implied revocation. (*Goodtitle* v. *Otway*, 2 *H. Bl.*, 516.)

THE FOLLOWING ARE CASES OF DEPARTURE FROM A LITERAL READING OF THE STATUTE.

*The Statute of Frauds, section 5, requires a Will to be signed by the Testator.*—*Lemayne* v. *Stanley* (3 *Lev.*, 1), holds that if the will is in the testator's writing, and his name is inserted, it is enough. Same point in case of agreements.

(*Stokes* v. *Moore, Doug.*, 241.) Sealing a will is a signing within the statute. (*Warnford* v. *Warnford*, 2 *Str.*, 764.) Making a mark is a signing. (*Harrison* v. *Harrison*, 8 *Ves.*, 185.) "The statute is satisfied by any symbol of consent and ratification." An acknowledgment by testator will do. (*Rob. on Fr.*, 461.)

The republication of wills of personal estate is not affected by the Statute of Frauds. (*Abney* v. *Miller*, 2 *Atk.*, 599.)

*The Subscription of the Witnesses is to be in the presence of the Testator.*—It has been held that it was enough if the testator *might* see; it was not necessary he *should.* (See *Shires* v. *Glascock*, 2 *Salk.*, 688.) As when the testator signed in her carriage, the witnesses went back into the office and signed their attestation. (*Casson* v. *Dade*, 1 *Bro. C. C.*, 99.)

He must not only be corporally present, but there must be a mental knowledge of the fact. (*Right* v. *Price, Doug.*, 241.)

The testator became insensible after executing the will, but before the witnesses could sign the attestation, which, however, they did do then and there, and he was alive and in the same room with them.

*The 5th Section requires Credible Witnesses.*—Who are "credible?" The courts have construed the word, and converted it into "competent." At first it was held to be determined by the nature of the punishment, as sitting in the pillory. (*Co. Litt.*, 6, b.) Afterwards by the nature of the crime. (*Pendock* v. *Mackinder, Willes*, 665 ; *Windham* v. *Chetwynd*, 1 *Bur.*, 414; *Hindon* v. *Kersey*, 4 *Burn. Ecc. L.*, 97.) The result was, "credible" means "competent."

*The 6th Section makes a Cancelling of the Will a Revocation.*—Yet it is well settled that that depends on the intention, and something more is necessary than a mere literal compliance. In *Onions* v. *Tyver* (1 *P. Wms.*, 343), Lord Cowper held that when a man made a second will devising the same property and cancelled his first, the cancelling amounted to nothing, because he did not intend to revoke his first will unless he could make his second effectual.

*The 22d Section declares that Wills of Personal Property*

*must be in writing.*—It has been held that it is enough if written by the testator, though not signed. (*Rob. on Fr.*, 448.) If signed, but not written by him. (*Ib.*) If written by another, though not signed by him. (*Ib.*) Then as to the *form* of the writing,—a memorandum or scrap of paper showing a testamentary disposition, is enough. (*Downing* v. *Townsend, Amb.*, 280.) So of a letter giving an account how testatrix wanted to dispose of her property. (*Rob. on Fr.*, 451.) So a formal will drawn and declared by her right, but not signed. (*Ib.*) So where testator died before blanks could be filled in a will drawn to suit. (*Id.*, 452.)

1. An intention to revoke, though not always essential to a revocation, yet is an important element, not only in characterizing acts proved, but in determining the question of *revocavit vel non.*

*a.* Our statute has recognized this, in rejecting parol evidence of such intention. (2 *Rev. Stat.*, 64.)

*b.* But the effect of intention, when properly proved, is well recognized. (*Brush* v. *Wilkins*, 4 *Johns. Ch.*, 517; *Johnston* v. *Johnston*, 4 *Phill.*, 447; *Marston* v. *Roe*, 8 *A. & E.*, 14; *Walton* v. *Walton*, 7 *Johns. Ch.*, 258.)

2. The alteration of circumstances connected with the testator and his personal relatives, or those who would naturally be the objects of his bounty, is often enough to work a revocation. Thus, in marriage and birth of children. (*Marston* v. *Roe*, 8 *A. & E.*, 14; *Parsons* v. *Lanoe*, 1 *Ves.*, 191; *Gibbons* v. *Caunt*, 4 *Id.*, 848; 3 *Ph. Ev., by Edwards*, 608; *Israell* v. *Rodon*, 2 *Moore P. C.*, 51; *Overbury* v. *Overbury*, 2 *Show*, 242; *Doe* v. *Lancashire*, 5 *T. R.*, 49.)

In a case of subsequent marriage and birth of child. (*Gibbons* v. *Caunt*, 4 *Ves.*, 848.) The same ruling was extended to the case of a will before marriage, and then death, followed by birth of a posthumous child. (*Doe* v. *Lancashire*, 5 *T. R.*, 49.) It was extended to the case of a widower, who married and had issue, though his will was in favor of the issue by the first marriage. (*Hollway* v. *Clarke*, 1 *Phill.*, 339.)

Such a change is not merely presumptive evidence of an intention, but is an absolute revocation, on the ground of a tacit condition. (*Israell* v. *Rodon*, 2 *Moore P. C.*, 51.) That such revocations are not excluded by the Statute of Frauds, has been considered as settled, ever since the case of *Christopher* v. *Christopher*, in the Exchequer, in 1771, and revocations are necessarily implied or presumed from so material a change in circumstances as marriage and birth of a child. (*Kneebel* v. *Scrafton*, 2 *East*, 530.)

A will by a father, on the assumption of his son's death, and of a wife, on the assumption of her husband's death, revoked by their being alive. (1 *Lee*, 120; 5 *E. E. R.*, 325; *Ward on Legacies*, 261–276; *Campbell* v. *French*, 13 *Ves.*, 321.)

An advancement is a revocation. (*Lovelass on Wills*, 367, 371; *Worthington on Wills*, 86; *Story Eq. Jur.*, §§ 1111, 1112; 2 *Williams on Ex'rs*, 946.)

3. The alteration of estate is often enough to work a revocation. (*Lugg* v. *Lugg*, *Salk.*, 592; *Christopher* v. *Christopher*, *Dickins*, 445; S. C., 4 *Burr.*, 2171, *note; Id.*, 2182; *Brady* v. *Cubit*, *Doug.*, 30; *Bullin* v. *Fletcher*, 1 *Keen*, 377; S. C. on appeal, 2 *My. & Cr.*, 438; *Ward* v. *Moore*, 4 *Mad.*, 368; *Adams* v. *Winne*, 7 *Paige*, 97; *Cave* v. *Holford*, 3 *Ves.*, 650; S. C., 7 *T. R.*, 399; 1 *B. & P.*, 576; *Walton* v. *Walton*, 7 *Johns. Ch.*, 258; *Toller on Executors*, 19, 22; *Clapper* v. *House*, 6 *Paige*, 149; *Sparrow* v. *Hardcastle*, 3 *Atk.*, 798.)

A. devises a mortgage and forecloses, or takes a release of the equity of redemption; it is a revocation as if he cancelled the mortgage and took an absolute deed, for it was an alteration of interest and a new purchase. (*Ballard* v. *Carter*, 5 *Pick.*, 112.)

A man in his will manumitted his slave, and afterwards sold her; held to be a revocation. (*Matter of Nan Mickel*, 14 *Johns.*, 324.)

If a father gives a daughter a portion by will, and afterwards gives to the same daughter a portion in marriage. This by the laws of all other nations, as well as of England, is a revocation of the portion given by the will. (*Hartop* v.

*Whitmore*, 1 *P. Wms.*, 182.) In this case Lord Hardwicke says: As to the objection of his having lived so long after giving the portion to his child (four years) on her marriage without ever revoking that part of the will, there could be no need for the father to revoke that legacy which he before had done by giving the portion in his lifetime, since that would be but revoking the same will twice.

Wherever an estate is modified in a manner different from that in which it stood at the time of making the will, it is a revocation. (*Livingston* v. *Livingston*, 3 *Johns. Ch.*, 156; *Parsons* v. *Freeman*, 3 *Atk.*, 748; S. C., 1 *Wils.*, 308.)

Lord Hardwicke rules: It is admitted on all hands that if testator, having a legal estate, devises it and suffers a recovery, it is a revocation; or if he devises and then conveys, though he takes back a new estate, if he levies a fine to his own use in fee, it is a revocation. (*Amb.*, 116. See *Parker* v. *Biscoe*, 3 *Moore*, 24.)

Ch. J. Traver held that the least alteration of interest worked a revocation. (*Arthur* v. *Breckenham, Fitzgib.*, 240.)

Testator after a devise conveyed the estate and took back a declaration of trust, which was performed and ceased, so that he was entitled to a reconveyance; still it was a revocation, because the estate did not continue in the same condition. (*Sparrow* v. *Hardcastle*, 7 *T. R.*, 416, n.; 3 *Atk.*, 798. See *Swift* v. *Roberts, Amb.*, 618.)

The whole subject was fully discussed several times and settled, that where a testator, after a will, conveyed to trustees in trust for himself in fee till marriage, and in default of issue, to use of self in fee, and he married and died without issue, it was a revocation, because of the alteration in estate. (*Cave* v. *Holford*, 3 *Ves.*, 650; 7 *T. R.*, 399; 1 *Bos. & Pul.*, 576.)

*Bennett* v. *Tankerville* (19 *Ves.*, 170); *Knollys* v. *Alcock*, (5 *Ves.*, 654); *Williams* v. *Owens* (2 *Ves.*, Jr., 601); *Cotter* v. *Layer* (2 *P. Wms.*, 622); and *Mayor* v. *Garland* (*Dickins*, 563), are all to the point that an executory contract to sell land devised, is a revocation of the devise.

Chancellor Kent says, in *Walton* v. *Walton* (7 *Johns. Ch.*, 258) ; either a change of the estate, or an act, though nugatory in itself, evincing an intention to revoke, will amount to a revocation. So where testator sold the devised estate and took a mortgage back, all was revoked, because it was a change from realty to personalty. (*Adams* v. *Winne*, 7 *Paige*, 97.) It was held in *Beck* v. *McGillis* (9 *Barb.*, 35) : 1. That a sale of devised property, though a mortgage back, was a revocation. 2. And so of a devise of a mortgage, a foreclosure, and a new mortgage taken.

A bequest of a lease and furniture of a house was revoked, by the expiration of the lease, a sale of part of the furniture, and removal of the residue to another house. (*Colecton* v. *Garth*, 6 *Simons*, 19.) As to revocation by sale or disposition, see *Francis* v. *Collier* (4 *Russ.*, 331) ; *Bullin* v. *Fletcher* (2 *Myl. & Cr.*, 439) ; and *Lock* v. *Foot* (5 *Sim.*, 618). Where lands contracted for are devised, if the subsequent conveyance is so framed that the legal estate is modified from the equitable possessed at the time of the devise, it is a revocation. (*Bullin* v. *Fletcher*, 1 *Keen*, 377.) The effect of the alteration of the estate is wholly independent of intention, and sometimes violates the intention clearly indicated. (See *Rawlins* v. *Burgis*, 2 *V. & B.*, 386 ; 2 *My. & Cr.*, 438.)

It has been urged that the rules and distinctions acted upon in these cases have been disapproved by eminent persons. As an argument of this nature may make the judge more cautious in concluding that a rule which he supposes to be applicable to a case really is so, there is no impropriety in it ; but whether the authorities relating to revocation be open to great objection, and whether it is or not a subject of regret that they should have been applied to cases of this nature, would not afford ground to deviate from decisions which have been acquiesced in, and have for many years furnished a rule for determining the rights to property. It is the duty of a judge to administer the law according to the evidences of it which are to be found in the authorities and in the recognized practice of the profession. The inquiry

before him is not what the law ought to be, but what it is and how it ought to be applied to the particular cases under consideration.

It may be lamented that the law upon any subject is in such a state as to induce eminent judges and writers to express their disapprobation of it, and their regret that they are bound to give it effect, but it would be still more to be lamented if judges should be found who thought themselves at liberty to declare the law according to their own fancies of what it ought to be. All stability would be lost, and the law which should be administered on clear and fixed principles would be involved in uncertainty and confusion.

A devise of two lots by one who was under-lessee of them, is adeemed by his afterwards taking an assignment of the leases. (*Porter* v. *Smith*, 16 *Sim.*, 251.) Two checks given in September, 1833, and a will dated November, 1834, together admitted to probate as a will; yet the latter held a revocation of the checks. (*Walsh* v. *Hadstone*, 13 *Sim.*, 261.) Testator devised £10,000 to M., and afterwards transferred £12,000 consols to joint names of testator and M. Held, an ademption. (*Twining* v. *Powell*, 2 *Collyer*, 262.) In *Vawzer* v. *Jeffry* (3 *Russ.*, 479), the lord chancellor said, upon the authority of several cases (*Ryder* v. *Wager*, 2 *P. Wms.*, 328 ; *Cotter* v. *Layer*, 2 *Wms.*, 122 ; *Knollys* v. *Alcock*, 5 *Ves.*, 648), that an agreement to convey, constitutes a revocation. In *Bullin* v. *Fletcher* (2 *Myl. & Cr.*, 438), the lord chancellor said : In *Parsons* v. *Freeman* (3 *Atk.*, 471), Lord Hardwicke establishes the principle, that whenever the estate is modified in a manner different from that in which it stood at the time of making the will, there is a revocation. A subsequent conveyance which made an alteration in the quality of the estate is a revocation. (*Ward* v. *Moore*, 4 *Mad.*, 368.) Though a trust to pay debts is no revocation, yet where in the deed there is a provision that after paying debts, the trustee should pay to such persons as the testator should appoint, and in default of an appointment to himself in fee, that is a revocation. (*Kenyon* v. *Sutton*, cited in 2 *Ves.*, *Jr.*, 600.)

So a conveyance to pay debts with surplus to the wife, is a revocation. (*Hodges* v. *Green*, 4 *Russ.*, 28.) Testator made a contract for the sale of land devised in his will, under which the purchaser took possession and paid part of the purchase-money, then becoming bankrupt, the property was sold in satisfaction of the testator's lien for the unpaid purchase-money and bought in by the testator,—the property not being reconveyed to him, but released to him by the bankrupt's assignees. The testator died seized, and the court held the will was revoked as to that land, and that such revocation was not done away with by the subsequent regaining of the land. (*Andrew* v. *Andrew*, 39 *Eng. L. & E.*, 158.)

If the legal estate which the testator acquires by the conveyance, differs in quality from the equitable estate, which he had at the date of the will, the conveyance revokes the devise. (*Plowden* v. *Hyde*, 9 *Eng. L. & E.*, 243.) And so in the case of a contract for purchase, if the legal estate which the testator acquires by the conveyance differs from that which by the terms of the contract the vendor agreed to convey to him, the conveyance revokes the devise. And this revocation equally takes place even though the testator after the conveyance has as absolute a power of disposing of the property as he had before. And the revocation takes place without regard to the testator's intention, and even in direct contravention of his intention. S. C. affirmed on appeal (13 *Eng. L. & E.*, 180), where this was ruled : If a person seized in fee made his will, devising land, and afterwards conveyed the legal estate so as to take it back to himself not in fee, this is a revocation (see, also, *Schroder* v. *Schroder*, 31 *Eng. L. & E.*, 197 ; *Francis* v. *Collier*, 4 *Russ.*, 331 ; *Lock* v. *Foote*, 5 *Sim.*, 518) ; all cases of change of interest in the estate working a revocation.

A mortgage was devised, paid, and the amount reinvested, —held to be a revocation. (*Gardner* v. *Hatton*, 6 *Sim.*, 93.) A devise of all testator's property in the funds which he sold and invested on mortgage, was revoked thereby. (*Hayes* v. *Hayes*, 1 *Keen*, 97.) A renewal of a lease was a revocation

of a bequest of it. (*Marwood* v. *Turner*, 3 *P. Wms.*, 163; *Coffin* v. *Fernyough*, 2 *Bro. C. C.*, 291.) A revocation of the appointment as an executor, is a revocation of a legacy to him. (*Roach* v. *Haynes*, 8 *Ves.*, 593. See *Abbott* v. *Massie*, 3 *Id.*, 148; *Harrison* v. *Rowley*, 4 *Id.*, 212; *Mascal* v. *Mascal*, 1 *Id.*, 323; *Ward* v. *Moore*, 4 *Madd.*, 368; *Toll. Ex'rs*, 22.) An ineffectual attempt to grant or devise property already devised by will, will amount to a revocation, and so the codicils of the testator in this case, though void as a testamentary disposition, are yet good as a revocation. (*Exp. Ilchester*, 7 *Ves.*, 372; *Montague* v. *Jeffreys*, *Moor*, 4, 291; 1 *Roll. Abr.*, 615; *Beard* v. *Beard*, 3 *Atk.*, 72; *Harwood* v. *Oglander*, 6 *Ves.*, 215; *Darley* v. *Darley*, 3 *Wils.*, 6.) The testator suffered a recovery which was absurd, and useless, and utterly bad, and without any reasonable meaning to be deduced from it, yet it was a revocation. (*Dister* v. *Dister*, 3 *Lev.*, 108.) A devise to a person incapable of taking, is a revocation. (*Roper* v. *Radcliff*, 10 *Mod.*, 230.) The principle is stated that an act nugatory in itself, is yet good as a revocation. (*Walton* v. *Walton*, 7 *Johns. Ch.*, 258.)

If an incomplete testamentary disposition shows an intention to revoke, it is good as such. (*Kidd* v. *North*, 2 *Phillips*, 91; citing *Jackson* v. *Jackson*, 2 *Cox*, 35; *Atty.-Gen.* v. *Harley*, 4 *Madd.*, 263; *Heming* v. *Clutterbuck*, 1 *Bligh, N. S.*, 479; *Fraser* v. *Byng*, 1 *Russ. & Myl.*, 90.)

Where testator intends a complete conveyance, and dies before it is perfected, as feoffment *sans* livery, it is a good revocation. (*Clymer* v. *Littler*, 1 *W. Bl.*, 349.) A deed intended to operate as an assignment of uses, but not sufficient for that purpose, is good as a revocation. (*Shove* v. *Pincke*, 5 *T. R.*, 124; citing 2 *Salk.*, 292; 1 *Roll. Abr.*, 615, pl. 30; *Wentworth Off. Exs.*, 22.) If the instrument be complete, but inoperative from the incapacity of the taker, it is a revocation, because the act was enough to alter the testator's intent. (*Beard* v. *Beard*, 3 *Atk.*, 72; S. P., *Roper* v. *Constables*, 2 *Eq. Ca. Abr.*, 359, p. 9.)

A second will signed, but not attested, is good as a revoca-

tion, though futile as a disposition. (*Onions* v. *Tyrer*, 1 *P. Wms.*, 343; *Pre. in Ch.*, 459.)

The foregoing cases show that by the law, as well settled at the time of the enactment of the Revised Statutes, this will, or at least the residuary clause of it, was revoked by the intention of the testator; by a change of parties; by an alteration of the estate; and by the attempt to change the disposition by means of the codicils, gifts, and otherwise.

IV. The Revised Statutes have not changed the law in this respect, nor intended to change it.

1. The revisors' notes are not evidence of the meaning of the statute. (*Sedgw. on Stat.*, 430; *Forrest* v. *Forrest*, 10 *Barb.*, 46.)

*a.* The law prior to the Revised Statutes being well settled by adjudications, a change of phraseology is not a change of the law, unless such change of phraseology evidently purports an intention to work a change. (*Sedgwick on Stat.*, 428; *In re Yates*, 4 *Johns.*, 359; *Taylor* v. *Delancy*, 2 *Cai. Cas.*, 243; *Elwood* v. *Klock*, 13 *Barb.*, 55.)

*b.* The intention of the Legislature to alter the law must be evident, or the language of the new act must be such as palpably to require a different construction, before the courts will hold the law changed upon such revision, merely from the fact of a change of language. (*Croswell* v. *Crane*, 7 *Barb.*, 195; *Gaffney* v. *Colvill*, 6 *Hill*, 574; *Theriat* v. *Hart*, 2 *Id.*, 280; *In re Brown*, 21 *Wend.*, 316, 319.)

*c.* The section of the Revised Statutes (2 *Rev. Stat.*, 64, § 42) is merely a revision of the Revised Laws, and is so declared by the revisors (3 *Rev. Stat.*, 3 ed., 631), and, therefore, is not to be regarded as any alteration of the law.

*d.* Besides, the Legislature not having adopted the plan of the revisors, but having omitted some of their plan, and added some parts to it, cannot be regarded as adopting their notions in full. See section 44 (2 *Rev. Stat.*, 64), which the Legislature altered, though it was recommended purposely to cover the whole ground, and was altered so as not to do so.

2. The Legislature cannot be regarded as having intended to include all cases of implied revocations, because it was not possible for the Legislature by any statute to put an end to them. Thus, if A. devises a farm, then sells it and spends the price; or, if B. makes a bequest of a watch, and sells it or loses it, or of a horse or an ox, and it dies, or is killed before testator dies; or of a dwelling-house or furniture, and they are destroyed by fire; or of a ship and cargo, and they are totally lost at sea; in all these, and in various kindred cases, there is an implied revocation which no statute can prevent, and which it is at once apparent was not met nor intended to be met by the statute.

3. There is, therefore, a class of cases where, from sheer necessity, there must be an implied revocation, even beyond what the statute has provided for, and it is wrong to say that there can be no revocation of any will unless it is particularly mentioned in the statute. The statute reaches a certain class, and regulates them, and those not within that class are not reached by the statute.

4. It was so with the English Statute of Frauds: sections 6 and 22 of which were as follows: Sect. 6. "No devise in writing, of lands, &c., or any clause thereof, shall at any time after, &c., be revocable otherwise than by some other will or codicil in writing, or other writing, declaring the same, or by burning, &c." Sect. 22. "No will in writing, concerning any goods, or chattels, or personal estate, shall be repealed, nor shall any clause, devise, or bequest therein, be altered or changed by any words, or will, by word of mouth only, except the same be in the lifetime of the testator committed to writing." (*Act of* 29 Car. II., ch. 3, §§ 6, 22; *Rob. on Fr.*, 467; this act was passed in 1641.)

5. At first, and for about forty years, that act was read just as strictly and literally as it is contended we must read our Revised Statutes. But the cases of implied revocations by necessity arose, and the English courts yielded to such necessity. The following cases will trace their decisions down from 1682 to the present time, and beyond the English Stat-

ute of Wills adopted in 1838, and based on our Revised
Statutes:

In 1682, *Overbury* v. *Overbury* (2 *Show*, 242). In 1689,
*Sugg* v. *Sugg* (*Salk.*, 592). In 1748, *Parsons* v. *Lanoe* (1
*Ves.*, 189). In 1771, *Christopher* v. *Christopher* (*Dickins*,
445; S. C., 4 *Burr.*, 2171, n.; 2182, n.) In 1778, *Brady*
v. *Cubitt* (*Doug.*, 30). In 1793, *Doe* v. *Lancashire* (5
*T. R.*, 49). In 1836, *Bullin* v. *Fletcher* (1 *Keen*, 377; S.
C. in appeal, 2 *My. & Cr.*, 432). In 1838, *Marston* v. *Roe*
(8 *A. & E.*, 14). In 1852, *Plowden* v. *Hyde* (9 *Eng. L. &
Eq.*, 243; S. C., 13 *Id.*, 175). In 1856, *Andrew* v. *Andrew*
(39 *Id.*, 158).

6. The enactments contained in these two sections of the
English Statute of Frauds, were incorporated into the revi-
sions of our statutes, in 1801, 1813, and 1830. (1 *Rev. L. of*
1801, 178, §§ 3, 16; 1 *Rev. L. of* 1813, 365, § 3; 367, § 16;
2 *Rev. Stat.*, 64, § 42.) And the current of English decisions
was received by us, and incorporated into our jurisprudence.
(1 *Jarm. on Wills*, Perkins ed., 152; 4 *Kent Com.*, 521;
*Brush* v. *Wilkins*, 4 *Johns. Ch.*, 506; *Walton* v. *Walton*, 7
*Id.*, 258; *Adams* v. *Winne*, 7 *Paige*, 97; *Beck* v. *McGillis*,
9 *Barb.*, 35.) And the same rule has been adopted in others
of the States of the Union, where these enactments of the
Statute of Frauds were in force. (*Semmes* v. *Semmes*, 7
*Har. & Johns.*, 388; *Burns* v. *Burns*, 4 *Serj. & Raw.*, 295;
*Havard* v. *Davis*, 2 *Binn.*, 406; *Boudinot* v. *Bradford*, 2
*Yeates*, 170; *Bates* v. *Holman*, 3 *Hen. & Munf.*, 502; *Wit-
ter* v. *Mott*, 2 *Conn.*, 67.)

7. The rule, then, existing both in England and in this
country, notwithstanding the Statute of Frauds, declares that
a will, under the circumstances which attend this of Henry
Parish, is revoked. (*Johnston* v. *Johnston*, 1 *Phill.*, 447;
*Brush* v. *Wilkins*, 4 *Johns. Ch.*, 506; *Sherry* v. *Lozier*, 1
*Bradf.*, 437; 4 *Kent Com.*, 528; 3 *Ph. Ev.*, by *Edwards*,
608; *Langdon* v. *Astor*, 16 *N. Y.*, 51; *Betts* v. *Jackson*, 6
*Wend.*, 173.)

WILLIAM M. EVARTS, *on behalf of the Proponents,*

Put in the following brief in reply to some questions of law discussed in the contestants' argument.

I. The statutes of this State express the rule in respect to testamentary capacity, by which the question must be determined whether any particular person has or has not power to make a will. (2 *Rev. Stat.*, 56, § 1; *Id.*, 60, § 21.)

The latter section was reported by the revisors to the Legislature, with fourteen years as the age of competency for males, and twelve for females, and with a suggestion that those ages were too young. It was in reply to this suggestion that the Legislature increased the ages, and inserted the words " and no others," to exclude the idea that younger persons might still make wills of personalty as at common law. (3 *Rev. Stat.*, 2 ed., 629, rev. note.) That the whole section is thrown into the form of permitting certain persons to make wills, rather than that given to the provision in regard to devises of real estate, which excepts certain persons as incapable out of a general permission to all, is to be attributed to its greater simplicity of construction in the present form, and not to any difference of intent on the part of the Legislature. Under each section the intent is the same, viz., that all persons, not by law disabled, may make wills. The same exception occurs in the statute relating to the alienation of lands. (1 *Rev. Stat.*, 719, § 10.)

Although under the two sections relating to real estate, the persons incapable to alien or devise are designated as " idiots, or persons of unsound mind," and under the section as to wills of personalty, the persons incapable are those not " of sound mind and memory," yet there can be no doubt that this verbal difference in expression does not indicate any difference in the substance of the rule of exclusion. That no ground can be conceived of on which to found a difference is apparent. General permission to alien property in life and at death is the purpose and policy of the Legislature; the

exceptions to the power are founded on the existence of a personal disability in the owner, and rightfully depend on the nature and extent of the ground of disability, and not on the kind of property. The use of the same terms in earlier statutes, shows that they are not different in meaning. Thus the exception in the old statute of wills, is of wills made by any "idiot or person of insane memory." (1 *Rev. L.*, 365, § 5.) In the act concerning fines and recoveries, the parties to the fine are required to be "of sound memory," and the fine is declared to bar all persons " of sound memory" who do not sue in five years. (1 *Rev. L.*, 358, § 1.) In sections 7 and 12 of the same act (pp. 361, 363), the rights of persons "not of sound mind" are saved from the bar declared in the preceding section.

In the early English statute concerning fines (18 Edw. I.), all persons in the world " *de bone memorie*" are declared barred, which words Coke translated " of good memory" (1 *Inst.*, 510), and employs as the contrary of " *non compos mentis.*" (*Id.*, 516, n. 18.) These words, "*non compos mentis,*" occur in the Statute of Westminster 2d, ch. 48 (13 Edw. I.), and are translated by Coke " not whole of mind." (2 *Inst.*, 480.) The same words are said by Littleton (section 405), to be of the same meaning as " *de non sane memorie,*" and they are used interchangeably in the old pleadings as the different names of a certain and definite mental state known to the law, and affording the ground and criterion of legal action. Thus, to refer to a single case only, in an action of trespass which turned on the validity of a deed executed by one whose capacity was disputed. The traverse alleged that the grantor was of good memory; without this, that he was out of his sound or sane memory, " *extra sanam memoriam suam.*" It was objected that the writ appropriate to the recovery of lands aliened by a person incapable to convey, used the term " *non compos mentis,*" and that therefore the traverse should be taken in those words; and further, that in the form proposed the traverse would include the deed of a sick or drunken man, whose deeds were good. It was answered,

that the sick or drunken man has "his entire memory," and the traverse was held well pleaded. (39 Hen. VI., 43, b.) The argument expressed a little more at large was this : "*non compos mentis*" is the exact legal designation of the state which, if it exists, will avoid the deed, and should therefore be used ; whereas "*extra sanam memoriam suam*" describes a drunken or sick man, as well as one *non compos.* The decision, and the reason assigned, "that the sick and drunken have their entire memory," show that the words, "out of sound memory," were employed, not as descriptive terms, but as the name of a condition, and were equivalent in legal significance to "*non compos mentis,*" and that being "of good memory," or "of entire memory," is equivalent to "*compos mentis.*" No new meaning, therefore, has been imparted to the rule of law in respect to mental incapacity, by the use of the terms "of sound mind and memory" in the statute regulating wills of personal property. They do not require the courts to enter into any metaphysics, as to the nature of mind or of memory, or of soundness or unsoundness, as if those words were words of mere description, nor to fix from such considerations a standard of capacity based upon the meaning of these separate terms. Their meaning, on the contrary, is to be ascertained by finding from legal decisions to what states of mind those terms have been appropriated as a name. That such a reference must be had, is apparent as soon as an attempt is made to define the term "sound," in its connection with mind or memory. We say even of men of ability, that their minds are unsound when their own ingenuity persuades them of the truth of propositions which the common sense of mankind rejects, and yet we do not intend to impute to them, by the expression, legal unsoundness, which entails an incapacity to make deeds or wills.

Before entering directly on the inquiry to ascertain what is the mental state referred to in the statutes, of which incapacity is the legal consequence, it should be observed that a person who falls within the class of incapables can make no alienation of land, no will of real or of personal estate.

The incapacity is absolute.  He can no more make a very simple will, than a very complex one.  There are no grades of capacity declared.  If capacity exists to make the simplest conceivable disposition, the most complicated one cannot be rejected on the score of want of capacity.  The rule of the statute is then to be applied to the owner of property, anterior to the consideration of any particular act of disposition.  If found incapable according to the meaning of the statute, then the law denies to him the exercise, in these several forms of disposition, of that dominion over property which is fundamental in our notions of it.  Now, in our system of society and of law the present owner alone has any right or interest in property.  He has the power to destroy it or to give it away unquestioned.  No expectant heir can allege any interest in it, but is as much a stranger to that which he hopes to inherit as he is to that which he expects to earn or create.  This exclusion of any right of interest in another is, of course, necessary to the existence of property in a complete and absolute sense.  For just in so far as any other than the present owner should, by law, be given any right, interest, or authority, or should be considered in the framing of rules in respect to the disposition of property, so far would the present owner's right and property be diminished and conferred upon that other.  We therefore confidently urge that, in the exposition of these statutory provisions they are not to be regarded as made in the interest of heirs or expectants of any sort: nor are they to be deemed a diminution of the present owner's right of disposition.  They are intended, on the contrary, to further and advance the general policy of our law on the subject of property, by insuring to the owner the complete power of disposition, to take effect either in his lifetime or at his death, and according to his mere pleasure.  Whatever ceremonies are imposed as necessary to the legal validity of the act of disposition, are founded upon considerations either of affording and preserving proof of the act, or of protecting the owner against the fraudulent substitution of an instrument not in accordance with his purpose.

DELAFIELD *v.* PARISH.

II. The only rule of mental capacity in respect to feebleness of mind as distinguished from insanity, which will harmonize with this settled policy of the law as to the right of property, is that which leaves the power of disposition unrestrained if the owner have any mind. If he have any mind at all, the law should not pronounce him incapable of assent to any disposal of his property. Whether he has assented to any particular disposition is a different question from that of capacity. The authoritative decisions in this State have maintained the views which have been stated, with great distinctness and steadiness. In *Jackson* v. *King* (4 *Cow.*, 207), a deed was questioned on the ground of the incapacity of the grantor. WOODWORTH, J., giving the opinion of the court on granting a new trial, says, " It must be shown that the grantor was *non compos* within the legal acceptation of the term ; that it was not a partial, but an entire loss of the understanding; for the common law seems not to have drawn any discriminating line by which to determine how great must be the imbecility of mind to render a contract void, or how much intellect must remain to uphold it. But weakness of understanding is not of itself any objection, in law, to the validity of a contract. If a man be legally *compos mentis*, he is the disposer of his own property." In *Odell* v. *Buck* (21 *Wend.*, 142), which was also a question of the capacity of the grantor of a deed, BRONSON, J., giving the opinion of the court, says : " Buck, at the time the deed was executed, was not a lunatic, or one who had lost the use of that reason or understanding which he once had. He was not an idiot, or one that hath no understanding from his nativity. Although a man of imbecile mind, he had reason and understanding. Fraud was not set up as a ground of avoiding the deed, but the case turned wholly on the incapacity of the grantor to contract. It is impossible to say that this deed was void. No part of the evidence goes far enough to show a total want of understanding."

The opinion of Senator Verplanck in *Stewart* v. *Lispenard* (26 *Wend.*, 255), is especially deserving of notice, both for its

profound philosophy and its accurate appreciation of the authorities. The principles involved in the judgment as announced by him have been followed in the courts of this State, except in the Surrogate's Court of New York, where the doctrine (if it can be called a doctrine), that they only are competent to make wills, whose wills, when made, that court on the whole approves, would still seem to have some sway.

The cases of *Blanchard* v. *Nestle* (3 *Den.*, 37), and *Osterhout* v. *Shoemaker* (*Id.*, *note*), in the Supreme Court, show a free and clear approval and adoption of the reasoning and principles of Senator Verplanck's opinion. In *Newhouse* v. *Godwin* (17 *Barb.*, 246, 257-8), Mr. Justice Strong, giving the opinion of the court, recognizes the rule as certainly established by the cases, that mere feebleness of intellect, however considerable in the testator, will not invalidate a will. The difficulty which Judge Strong felt and expressed, arose from the seeming incongruity of calling a person whose intellect, from natural or acquired defects, was but the next degree above positive idiocy or lunacy,—a person of sound mind and memory, in the language of the statute. That incongruity would not have appeared to him to exist, if he had adverted to the fact that those terms were exactly equivalent in the law to "*compos mentis*," and embraced all persons not "*non compos mentis.*" Judge Gridley, in *Stanton* v. *Wetherwax* (16 *Barb.*, 261-2), felt no such difficulty, recognizing at once both the equivalence of the terms "not of sound mind and memory" and "*non compos mentis*," and also the accuracy of the designation of the general classes of "*non compotes*," as set forth by Lord Coke and adopted by Blackstone; according to which, besides idiots from birth and lunatics, those persons only are included who, by sickness, grief, or other accident, wholly lose their understanding. In the Court of Appeals, *Clarke* v. *Sawyer* (2 *N. Y.* [2 *Comst.*], 498) is the only reported case in which this subject came under discussion, and, according to the report, a majority of the court did not pass upon the question of mental capacity; but SHANKLAND, J., who gave the opinion, recognizes the authority

and force of *Stewart* v. *Lispenard* and *Blanchard* v. *Nestle*, as confining incapacity to the lunatic and the idiot.

This being the state of the authorities in New York upon this subject, it is not surprising to find the overthrow of the decision in *Stewart* v. *Lispenard* attempted by an array of cases from all quarters, which seemed to afford promise of assistance, as well as by an attack upon the accuracy of the opinion in that case, both in its statement and in its appreciation of the authorities on which it professed to be based. In regard to the cases cited which have any claim to be regarded as authoritative in this State, it must for the present suffice to say, that they were before the Court of Errors when *Stewart* v. *Lispenard* was decided, and that so far as they differ in doctrine from that case, they have been overruled by it, and by those cases which have followed and approved it.

The first ground of the direct grounds of attack is, in substance, that the cases cited by Senator Verplanck in support of the standard of mental capacity maintained by him, relate mainly to the prerogative of the crown to take into its custody the persons and estates of idiots and lunatics. That this prerogative, in its nature odious, was always strictly construed, and that the cases and opinions relating to it are not authoritative on the subject of testamentary capacity. Now, the prerogative in respect to idiots might be odious, inasmuch as the king took the profits of the estate of natural fools or idiots from birth, to his own use. But the other branch of the prerogative, which relates to other *non compotes* who were born of sound memory, and have become *non compos*, does not seem subject to the same odium, and consequent narrow construction; for the profits of their estates the king took not to his own use, but wholly to the use of the *non compos* and his family. (*Beverly's Case*, 4 *Coke*, 126 *b*, 127 *b*.) But one of the most direct and strongest authorities cited by Senator Verplanck, though it does not relate in terms to testamentary capacity, has not any relation to the subject of the prerogative. It is Coke's commentary on sections 405 and 6 of Littleton, in the chapter on Descents,

the latter of which relates to the right of the heir to avoid a feoffment made by his ancestor when *non compos.*

Lord Hardwicke's observations in *Barnsley's Case* (3 *Atk.*, 168, 173) show that when the question was of exercising the prerogative for the custody of the persons and estates of those of unsound mind, the same standard of intellectual capacity was acted on as the courts of law applied, when for other purposes it became necessary for them to say what constituted unsound mind. He held, in substance, that there was no specially narrow and restricted sense in which the term *non compos* was applied in questions relating to prerogative proceedings. It is obvious that the inquiry to which Lord Hardwicke addressed himself, was, Who is *non compos*, within the Statute of Fines, whom a fine will not bar if he be not a party to it, and who may not be a party; who is *non compos* within the meaning of the Statute of Limitations against whom it shall not run; who is *non compos*, so that his heir shall have a writ to avoid his feoffment? He had before him a return that Barnsley, from the weakness of his mind, was incapable of governing himself and his lands and tenements, and he recognized the possible usefulness of setting a curator or tutor over prodigal and weak persons, as in the civil law; but finding that the courts of law had invariably regarded the words *non compos* as importing a total deprivation of sense, he did not feel at liberty to act on any finding which in substance came short of that. We say, then, that there is no ground of authority for saying that the law adopts any sense of the terms *non compos mentis*, in their application to persons idiotic, or of weak or imbecile mind, which does not import a complete deprivation of reason or sense.

Another, and the most elaborate occasion of criticism on the case of *Stewart* v. *Lispenard*, seems to be the use, in the last clause of the reporter's first head-note, of the words, "if he be not totally deprived of reason." The line of critical observation is this: that the head-note is taken almost word for word from *Shelford on Lunacy*, with the exception that, instead of the words above cited, Shelford uses the words

" if he be legally *compos mentis.*" That the paragraph in Shelford is taken from a note by Powell, in his edition of *Swinburne on Wills.* That Powell's authority for his note is *Osmond* v. *Fitzroy* (3 *P. Wms.*, 129), in which Sir Joseph Jekyll, M. R., says, " equity will not set aside the bond, only for the weakness of the obligor, if he be *compos mentis;* neither will this court measure the size of people's understandings or capacities, there being no such thing as an equitable incapacity where there is a legal capacity." That in this passage, Sir Joseph Jekyll does not define the standard of capacity at law or in equity, but simply affirms its identity, " which no one disputes;" and that he does not say that there must be a total deprivation of reason to constitute incapacity; and finally, that the words, " if he be not wholly deprived of reason," are to be found neither in Powell's note nor Shelford's text, nor in the case which Powell cites, nor even in *Bath & Montague's Case,* which the counsel cites, but that in each of those places the words are, " if he be legally *compos mentis.*" This is true to the letter. But in order that it should be effectual to diminish the force, as authority, of the case criticised, it was necessary to show that the reporter's duty in some way required him to state, not the doctrine of the case which he was reporting, but that of some other case which he was not reporting, but which had furnished some elements to the decision.

Senator Verplanck in his opinion quotes Shelford's language, " if a man therefore be legally *compos mentis,*" and also quotes Lord Hardwicke's language, that " *non compos mentis*" imports " a total deprivation of reason" as contradistinguished from weakness of mind ; and the judgment given proceeds upon the basis that Lord Hardwicke's interpretation of those words, and his understanding of the rule of law, were correct. If Sir Joseph Jekyll differed from Lord Hardwicke on a question of law, looking to the mere authority of names, it would certainly be pardonable to follow the latter ; but as Sir Joseph did not give his opinion, and Lord Hardwicke gave his, and the Court of Errors agreed with him in

opinion, it was surely not improper for the reporter of the decision to make the substitution of the one phrase for the other, and thus make his head-note distinctly enunciate exactly what the court had decided.

There is certainly no reason to suppose that Sir Joseph Jekyll or Chief-justice Holt used the terms "legally *compos mentis*" in any different sense than that which Lord Hardwicke said belonged to them : nor after the true sense of the terms had been once elucidated by so eminent a judge as Lord Hardwicke, are we to expect to find the same exposition often repeated in the books. It happens, however, to have occurred in *Rochfort* v. *Lord Ely* (*Ridgeway's Cases in Parliament*, 532). Lord Chancellor Lifford says, "There is no such thing as equitable insanity ; it is a legal thing understood according to a legal definition. A deprivation of sense and a total want of understanding to contract ; a deprivation of a man's reason, as is said by Lord Hale. The genus of it has been described also by the general words '*non compos;*' weakness does not carry that idea with it. Courts of law understand it in the legal sense ; the genus of it is expressed by the words *non compos*, or *insanæ mentis ;* and this agrees with the old idea in the books, that a man shall not stultify himself, and the reason given (though it does not hold now as it has been heretofore laid down), shows what the law considers as *non compos.* . . . . . The statutes of fines and limitations all adopt the words '*non compos, non sanæ mentis*,' as technical words, to express the deprivation of reason, agreeably to the wisdom of the law which aims at certainty. These words are legitimated, and they are now the only legitimate words to describe the incapacity." At page 551, in a different proceeding between the same parties, Lord Chancellor Lifford says, further, "The next point is, that he was an idiot or natural fool, and of unsound mind through a radical defect; or if not so, yet so defective through weakness of understanding, as to be incapable of doing any legal act to alter the estate." Having disposed of the question of idiocy and unsound mind, he proceeds to consider the ground

that he was so far of unsound mind as to be incapable of managing his affairs, and consequently of doing any legal act. He says, " The true answer has been given, and, indeed, the candor of the plaintiffs' counsel has admitted, that there is no such thing as equitable incapacity distinct from legal; were it otherwise, the greatest mischief would arise; there are no scales to weigh the human understanding; the wisdom of the law is human wisdom ripened by ages, and the law draws lines, which, though in a moral sense imperfect, as all human institutions are, yet they are better than none at all; infinitely better than if the judge was to determine in every case; were it so, the case would depend on the judge's affections, his patience, his discretion, and nothing but confusion would arise in society. I, therefore, must speak to my own rule, of *compos* or *non compos*, as defined by Littleton; I must hold him capable." In the same case (p. 527), Lord Chancellor Bowes says, " The dominion over his own property is the blessing and happiness of a man living in free societies; that the law allows alienation by people extremely weak, who are not capable of reasoning but on a particular thing happening to be then before them; that in the case of wills, a man is making a will *in extremis*, and is as incapable of reading two skins of parchment, as a Hebrew Bible; but if he knows that the consequence of that act will be a disposing to one he likes, and from one he does not like, that will could not be overturned, and yet there was the greatest incapacity."

We submit, therefore, that the policy and reason of *Stewart* v. *Lispenard* are sustained by the authorities cited; that it is in accordance with the course of decision in this State, and ought upon no ground to be disturbed.

The doctrine of the case was adopted in *Potts* v. *House* (6 *Geo.*, 324), and still more recently in *Morris* v. *Stokes* (21 *Id.*, 552).

Some observations occurring in the English books, and which are constantly invoked on questions of this sort, may be noticed. *Winchester's Case* (6 *Coke*, 23 *a*), was an appli-

cation for a prohibition to the ecclesiastical court against proving a will, on the suggestion that the testator was not of sane memory, and that the will related to real as well as personal estate, and that the heir's chances of success before a jury might be prejudiced by an adverse determination in the ecclesiastical court. The prohibition was granted. So far as the adjudication went, it has been long since overruled. The statement as to testamentary capacity which it contains, is a mere addendum to the statement of the case, and no part of what took place in court. It rests for its authority on having been written by Lord Coke, who was of counsel to obtain the prohibition, as he mentions in deciding *Egerton* v. *Egerton* (2 *Bulstrode*, 219). It seems probably to have been taken from what was said in *Combes' Case* (*Moore*, 759), decided in 3 *Jac.*, 1, shortly before 6 *Coke* was published.

*Combes' Case* seems to have been a mixed criminal and civil proceeding in the Star Chamber. It is called a bill of forgery against Combes and others for the supposed forgery of a will of Richard Brokenbury, lately one of the queen's ushers. It was held that to omit a thing or legacy out of a will which is directed to be inserted, is not forgery; but if it is directed to give land to one for life, remainder to another in fee, and the estate for life be omitted, whereby the remainder will take effect presently, that is forgery. They also held that if one write a will without direction, and bring it to the devisor, and he allows it, it is good; but if he were then of *non sane* memory, the will is void, and yet is not a forgery. And so it was adjudged; and Combes, who was charged with the forgery, was cleared of that. But the filling up the blanks by him when Brockenbury was not of sane memory, was thought to be a misdemeanor, if he knew him to be of *non sane* memory—but the misdemeanor was pardoned. Then follows the passage cited, which, from the expressions used, would seem to relate to a man at his last gasp, and almost incapable of receiving impressions through his senses, and it may be that one in that condition may not have had any reason left. The citation from *Herbert* v. *Lowns* (1 *Rep.*

*in Ch.*, 12, 13, or 24, 25), would more accurately have represented the case if it had been carried a little further. The court did not proceed to give its decision on the principle quoted. It says, "Although it hath been often taken," &c., "yet this court would not pronounce that the said Bland was not of a disposing memory at the making said will and conveyances; but this court was fully satisfied and did pronounce that the said Bland was a very weak man, and apt to be circumvented, and that, therefore, although the said deeds and will were not void in law, as not being made by a man of *non sane* memory, yet so much thereof as was drawn from him by practice and circumvention, ought to be made void in equity." In each of these cases it is apparent that actual imposition as well as diminished intellect existed, and the expressions used are to be interpreted in reference to the joint effect of both facts.

As to *Mountain* v. *Bennett* (1 *Cox*, 353), it is of no great consequence that EYRE, Ch. B., in charging the jury is reported to have used the terms " a momentous instance" with reference to the act of making the will there in controversy, nor as the will was sustained by the jury was it ever necessary to consider whether the chief baron did not err against the party claiming under the will. In *Greenwood* v. *Greenwood* (3 *Curt.*, App. 30), what Lord Kenyon is reported to have said as to mind competent to dispose of property by will, was quite beside the question in the cause, which turned on the effect of a delusion in respect to the conduct of the brother of the testator. *Ball* v. *Mannin* (3 *Bligh, N. S.*, 1) is the same case mentioned in Senator Verplanck's opinion as *Bell* v. *Martin* (1 *Dow & Clark, N. S.*, 386), and which is there commented on by him.

In conclusion, as to this branch of the subject, we say, that when once the mind has fairly embraced the ideas, the whole aim and purpose of the law is to give effect to the owner's dominion over property; that it has no choice or preference as to the person to whom at death it shall be devolved; that it fixes a course of devolution in accordance

with · the usual feelings and affections of men to take effect when the owner expresses no different wish, not to give expectant heirs an interest before their day, but only because property must pass to some one; it seems impossible. that any thing more should be required in respect to mental capacity, than that there should exist so much mind as can entertain a wish in respect to the disposition to be made. If such a wish be entertained and expressed in the forms and with the ceremonies required by law, and there be no fraud, nor coercion, surely no legal obstacle can make it ineffectual.

III. From the same general considerations favoring the largest dominion over property by its owner, it would seem to follow, that when an act of disposition appears to have been done by the owner it should ·be intended that the requisite mental capacity was not lacking, and that the burden should be thrown upon those who deny the owner's mental capacity to establish the fact of incapacity. It is not for the owner to make out his right of disposition by showing his mental capacity. The right of disposition is incident to the ownership, and it is for those who deny the existence of the right, to establish the ground of fact on which the denial rests. Such clearly is the law of New York. In *Jackson* v. *Van Dusen* (5 *Johns.*, 159), VAN NESS, J., in giving the opinion of the court, says: "In all cases where the act of a party is sought to be avoided, on the ground of his mental imbecility, the proof of the fact lies upon him who alleges it, and, until the contrary appears, sanity is to be presumed. In *Jackson* v. *King* (4 *Cow.*, 216), WOODWORTH, J., lays down the rule in the same terms. In *Osterhout* v. *Shoemaker* (3 *Den.*, 37), the charge of the judge, which was sustained by the court, imposed the burden of making out the alleged want of mental capacity on the party desiring to avail himself of it. *Swinburne on Wills* (vol. 1, p. 119), which is mainly made up of extracts from the text of the civil law, and from commentators upon it, says: "Every person is presumed to be of perfect mind and memory, unless the contrary be proved. And, therefore, if any person go about to impugn or over-

throw the testament by reason of insanity of mind, or want of memory, he must prove that impediment." So in 2 *Phillips' Evidence* (293) it is said : "If a party impeach the validity of a will on account of a supposed incapacity of mind in the testator, from whatever cause it may proceed, whether from a natural decay of intellect, from derangement or partial insanity, it will be incumbent upon him to establish such incapacity by the clearest and most satisfactory evidence."

In the courts of other States considerable difference of opinion has occurred upon this subject. The principal cases which do not agree with the law of New York are collected in the argument of the contestants. Some of them seem to proceed upon what the courts have regarded as the special requirements of their own statute law, while in all of them is disclosed what we conceive to be a fundamental and fatal error in the consideration of the subject. They treat the question as if the maker of a will was in the position of one who claims under a statute power, by whom every step must be affirmatively shown, or of one who is to plead performance of conditions precedent, in order to entitle himself to demand some consequent duty. We, on the other hand, suppose that the qualifications imposed by the statutes are not to be looked upon as conditions precedent to the existence of a right to make wills. That the general right and power is to make wills as it is to do other acts of disposition ; that the limitations on that right are, in their own nature, exceptions out of the general rule ; and that, so far as defect of mental capacity or intellectual disorder are concerned, those exceptions are such as the unwritten law, without any statutory declaration, would have indicated. That it is therefore eminently fit that the burden of proving the exceptional case should rest on him who asserts it to exist, and to have taken away from the particular individual, the common and general incident to ownership, the power of disposition by will.

In addition to the cases in New York, many others may be cited : *Stevens* v. *Van Cleve* (4 *Wash. Cir. C.*, 262); *Hoge* v. *Fisher* (1 *Pet. Cir. C.*, 163 ); *Harrison* v. *Rowan* (3 *Wash.*

*Cir. C.*, 582); *Zimmerman* v. *Zimmerman* (23 *Penn.*, 375);
*Pettes* v. *Bingham* (10 *N. H.*, 515); and *Sloan* v. *Maxwell*
(2 *Green Ch.*, 580).

Assuming, then, that a man is not by want of capacity
disabled to make *any* will, the statutes expressly point out
what shall be the authentication which such an instrument
must receive to make it effectual. When those requirements
have been complied with, as no other evidence could supply
the absence of the statutory proofs, so nothing further in
addition or corroboration can be required. Such a will may
be defeated if it be shown to be the product of fraud or coer-
cion, and into that question the effect of impaired or naturally
feeble intellect will enter; for it is obvious that such an in-
tellect will be more subject than a strong one to be deluded
by fraud or overcome by force. But these are grounds to be
made out by the party alleging their existence. (*Colclough*
v. *Boyse*, 6 *House of Lords Cases*, 45; *Barry* v. *Butlin*, 1
*Curteis*, 637.) The influence to vitiate an act must amount
to force and coercion, destroying free agency; it must not be
the influence of affection and attachment; it must not be the
mere desire of gratifying the wishes of another; for that
would be a very strong ground in support of a testamentary
act; further, there must be proof that the act was obtained
by this coercion; by importunity which could not be resist-
ed; that it was done merely for the sake of peace; so that the
motive was tantamount to force and fear. (1 *Wms. on Ex'rs*,
44). These are the principles and tests which all the cases put
forth as the criteria of undue influence, when alleged against
those standing in indifferent relations to the testator.

Certainly, in the relation of man and wife, where it has
not commenced after the invasion of disease, where it was
entered upon on the usual motives, and under usual circum-
stances, the law does not require that the wife shall not influ-
ence the husband, or subject her conduct to more stringent
rules, or more uncharitable suspicions than those which are
applied to others. On this point the law is clearly stated in
*Stulz* v. *Schœffle* (18 *Eng. Law & E.*, 579, 597).

THE SURROGATE.—The following instruments in writing were propounded for probate as the last will and testament of Henry Parish, deceased:

In the name of God, Amen! I, Henry Parish, of the city of New York, merchant, do make, publish, and declare the following as my last will and testament:

*First.* I give, devise, and bequeath unto my beloved wife, Susan Maria, the house and lease of the lot now known as No. 49 (forty-nine) Barclay-street, in the city of New York, where I now reside, (called lot No. 200 in the lease from Columbia College to me, dated the first day of May, one thousand eight hundred and thirty,) with all my right and interest in, to, and under the same; and also (after the decease of my friend and relative, Mrs. Catharine Payne) the house and lease of the lot now known as No. 88 (eighty-eight) Chambers-street, in said city of New York, (in the lease from St. Peter's Church called lot No. 429 of the Church farm, assigned to me by Joseph Sands by assignment, dated the second day of April, one thousand eight hundred and thirty one,) with all my right and interest in, to, and under the same. I also give, devise, and bequeath unto my said wife, in fee, the following real estate situated in the city of New York, to wit: The store and lot now known as No. 54 (fifty-four) Pine-street, (which was conveyed to me by George Suckley and Daniel Oakey by deed dated the first day of May, one thousand eight hundred and twenty-six;) and my equal undivided half of the lot and store now known as No. 160 (one hundred and sixty) Pearl-street, the other half of which is owned by Joseph Kernochan, a correct map of which said lot, No. 160 Pearl-street, and also of lot No. 162 Pearl-street, and lots Nos. 124 and 126 Water-street, hereinafter mentioned and devised, made by Joseph F. Bridges, City Surveyor, dated the tenth day of September, 1842, and certified to be correct by Joseph Kernochan and myself, is now on record in the office of the Register of the city and county of New York. I also give, devise, and bequeath unto

my said wife in fee, the following real estate situated in the city of New Orleans, and which was allotted to me or fell to my share, on a division of a part of the real estate belonging to my late firm of Gasquet, Parish & Co., of New Orleans, which division was made in March last (1842); to wit: A store and lot of ground fronting on Tchapitoulas-street, next to the corner of Lafayette-street, and adjoining ground now or late of T. Banks, being about thirty-two feet and three inches wide in front by ninety-two feet and three inches and one quarter of an inch deep; a store and lot of ground situated at the corner of Tchapitoulas and Lafayette streets, fronting on Tchapitoulas-street, being about twenty-one feet and three inches and three quarters of an inch wide in front, and ninety feet and six inches and one quarter of an inch deep on Lafayette-street; a lot of ground fronting on Camp-street, being about twenty-five feet and nine inches wide in front by one hundred and fifty feet deep; and three lots of ground fronting on St. Joseph-street, being each about twenty feet and two inches wide in front by one hundred feet deep.

*Second.* I also give, devise, and bequeath unto my said wife all my household furniture, including all my silver and plate, wines, and library of books; all horses and carriages that I may own at the time of my decease; and also my pew (No. 98) in Grace Church in the city of New York.

*Third.* I give, devise, and bequeath unto my executors hereinafter named, and to the survivors and survivor of them, or to such of them as may qualify and act as such, the sum of two hundred thousand dollars of my personal estate, in trust, to invest or keep invested that amount in bonds and mortgages on unincumbered real estate, or in the stock of the city of New York, or of the State of New York, or of the United States, and to pay or apply the interest or income thereof to the sole and separate use of my said wife during her natural life; and upon her decease to pay over the said sum of two hundred thousand dollars as my said wife shall by her last will and testament, or writing in the nature of a last will and testament, direct and appoint.

*Fourth.* I give, devise, and bequeath unto my nephew and namesake, Henry Parish, son of my brother Daniel Parish, in fee, my undivided one-half of the lot and store now known as No. 162 (one hundred and sixty-two) Pearl-street in the city of New York, the other half of which is owned by Joseph Kernochan; and also my undivided one-third part of the store and lot, now known as No. 172 (one hundred and seventy-two) Pearl-street corner of Pine-street, in the said city of New York, the remaining two-thirds of which are owned by the said Joseph Kernochan and Daniel Parish.

*Fifth.* I give, devise, and bequeath unto my namesake, Henry Parish Kernochan, son of my friend Joseph Kernochan, in fee, my undivided half of the two lots and stores now known as Nos. 124 (one hundred and twenty-four) and 126 (one hundred and twenty-six) Water-street in the city of New York, the other half of which is owned by the said Joseph Kernochan.

*Sixth.* I give, devise, and bequeath unto my friend, Peter Conrey of New Orleans, all my part or share of, or interest in the undivided real estate situated in the State of Louisiana belonging to my said late firm of Gasquet, Parish & Co., in trust to convey the same, or to pay over the proceeds thereof, to my namesake, Henry Parish Conrey, son of the said Peter Conrey; a part of which undivided real estate is situated in Jefferson parish in the said State of Louisiana, and the balance (about three thousand two hundred acres of land) in Oachita in said State. It being my wish that the liquidating partners of my said late firm should be allowed, if they should think best, to sell said undivided real estate and pay over the proceeds to the said Peter Conrey, and in case the said real estate should be divided, it is my wish that the portion allotted or set apart to me should be conveyed to my said namesake; my desire being not by this devise or bequest to embarrass my late partners in the liquidation or settlement of the estate of my said late firm.

*Seventh.* I give, devise, and bequeath unto my friend and relation, Mrs. Catharine Payne of the city of New York, the

house and lease of lot now known as No. 88 (eighty-eight) Chambers-street in the city of New York, now occupied by her, (which after her death I have hereinbefore given to my wife,) to have and hold the same during her natural life. I also give, devise, and bequeath unto the said Catharine Payne an annuity of one thousand dollars to be paid to her half-yearly during her natural life ; the first five hundred dollars to be paid to her at the expiration of six months after my decease, and the like sum of five hundred dollars to be paid to her every six months thereafter during her life; the premium of insurance, ground-rent, and taxes of said house and lot are, during the lifetime of said Catharine Payne, to be paid by my executors.

*Eighth.* I give, devise, and bequeath unto my executors hereinafter named, and to the survivors and survivor of them, or to such of them as may qualify and act as such, the sum of twenty thousand dollars of my personal estate, in trust, to invest or keep invested that amount in bonds and mortgages on unincumbered real-estate, or in stock of the city of New York or of the State of New York or of the United States, and to pay or apply the interest or income thereof to the sole and separate use of my sister, Ann Parish, during her natural life; and upon her decease to pay over the said sum of twenty thousand dollars as my said sister shall by her last will and testament, or writing in the nature of a last will and testament, direct and appoint.

*Ninth.* I give, devise, and bequeath unto my executors hereinafter named, and to the survivors and survivor of them, or to such of them as may qualify and act, a further sum of twenty thousand dollars, in trust, to invest or keep invested that amount in bonds and mortgages on unincumbered real-estate, or in the stock of the city of New York or of the State of New York or of the United States, and to pay or apply the interest and income thereof to the sole and separate use of my sister, Martha Sherman, wife of Allen M. Sherman, during her natural life, and upon her decease to pay over the said sum of twenty thousand dollars to her lawful issue, the

issue of any deceased child to take the share of the deceased parent; and in case my said sister shall die without leaving any lawful issue, then, in trust, to pay over the said sum of twenty thousand dollars as my said sister may by last will and testament, or writing in the nature of a last will and testament, direct and appoint.

*Tenth.* I give, devise, and bequeath unto each of my executors hereinafter named, to wit, Daniel Parish, Joseph Kernochan, Joseph Delafield, Henry Delafield, and William Delafield, or to each of them who shall be living at the time of my decease, the sum of ten thousand dollars, to be received or retained by them in lieu of all commissions or compensation as such executors, and which ten thousand dollars each is to receive, whether he qualifies and acts as such executor or not.

*Eleventh.* The provisions herein made for my wife are intended by me and are to be accepted by her in lieu of her dower in my estate.

*Twelfth.* After the expiration of two years from my decease, and after all the foregoing provisions of my will shall have been fully provided for and complied with, or my executors shall be satisfied that they can fully comply with said provisions and also with the provisions hereinafter made, if the residue of my estate shall amount to, or exceed, the sum of two hundred and ten thousand dollars, then I give, devise, and bequeath the said further sum of two hundred and ten thousand dollars to my executors hereinafter named, and the survivors and survivor of them, or to such of them as shall qualify and act, in trust, to pay to my nephews, John H. Parish, and Daniel Parish, junior, (sons of my brother Daniel Parish,) and Jacob Parish and Thomas Parish, (sons of my brother James Parish,) respectively and to each of them who shall be then twenty-one years of age, the sum of ten thousand dollars thereof; and if either of my said nephews shall be then under twenty-one years of age, then in trust to pay or apply the interest or income of the sum of ten thousand dollars to his use until he comes of age; and as my said

nephews shall respectively attain the age of twenty-one years, then to pay over to each of them the said sum of ten thousand dollars; and upon the further trust to pay or apply to the sole and separate use of each of my nieces, Sarah E. Parish, Mary P. Parish, Anna Parish, Susan D. Parish, and Margaret K. Parish, (daughters of my brother Daniel Parish,) and Mary Louisa Parish, Henrietta F. Parish, Elizabeth Parish, and Jane Ann Parish, (daughters of my brother James Parish,) the interest and income of the like sum of ten thousand dollars thereof, during their natural lives; and upon the further trust, to pay or apply to the sole and separate use, respectively, of my cousin Mrs. Margaret E. Kernochan, wife of Joseph Kernochan, of Mrs. Julia Delafield, wife of Joseph Delafield, of Mrs. Harriet Delafield, wife of John Delafield, of Mrs. Eliza Delafield, wife of Rufus K. Delafield, of my cousin Mrs. Mary P. Abeel, wife of James Abeel, and of Miss Emma Delafield, and of each of them during their natural lives, the interest or income of a like sum of ten thousand dollars; and upon the further trust to pay to each of my friends, Doctor Edward Delafield and Major Richard Delafield, the sum of ten thousand dollars thereof. And in case the said residue of my estate at or after the expiration of two years from my decease, and after fully complying with the previous provisions of my will, shall not amount to the said sum of two hundred and ten thousand dollars, then I give, devise, and bequeath the rest, residue, and remainder of my estate to my said executors, and to the survivors and survivor of them, or to such of them as shall qualify and act, in trust, to divide and appropriate, and pay or apply the same, or the interest or income thereof, in the manner, and to or for the use of the persons above, in this the twelfth clause of my will, specified, so that each of the persons named as devisees or legatees in this clause of my will shall receive, if a male, one equal twenty-first part of such rest, residue, and remainder of my estate; or, if a female, the interest and income of the like twenty-first part of such rest, residue, and remainder of my estate. And in case of the death of either

of the persons named as devisees or legatees in this clause of my will, leaving lawful issue, such issue is to receive the principal sum herein directed to be paid to or held for such devisees or legatees; and in case of the death of either of said persons named as devisees or legatees in this clause without lawful issue, then such principal sum, in each case, is to be paid over as the deceased devisee or legatee shall by last will and testament, or writing in the nature of a last will and testament, direct and appoint. It being my intention that the bequests or legacies, in this clause of my will, made or given to my said nephews, should become vested in them when they respectively attain the age of twenty-one years, and not before. Interest is to be paid or allowed upon all of the bequests or legacies, contained in this clause of my will, from and after the expiration of two years from my decease, but not sooner; and my executors shall not be required by any of the devisees or legatees named in this clause to pay any of the said bequests or legacies, or any part thereof, until such reasonable time after the expiration of said two years from my decease as my said executors shall see fit, being governed by the condition of my estate; but my executors are authorized to pay the said bequests or legacies or any part thereof, as soon after, but not before, the expiration of the said two years from my decease, as they shall deem proper and expedient.

*Thirteenth.* I give, devise, and bequeath all the rest, residue, and remainder of my estate, of every nature and description, (after all the devises, bequests, or legacies, hereinbefore specified, shall have been fully paid or provided for, and after the preceding provisions of my will shall have in all respects been fully complied with,) to my brothers, Daniel Parish and James Parish, equally, share and share alike, and in case of the decease of either, his share is to go to his lawful issue.

*Fourteenth.* It is my will and intention that all the property, real and personal, that I may own or possess at the time of my decease shall pass under this will, whether the same be now owned or possessed by me, or may be hereafter

acquired by purchase, descent, distribution, or otherwise. And I hereby authorize my said executors, and the survivors and survivor of them, or such of them as shall qualify and act, to sell and convey any real estate that I may own or possess at the time of my decease and not hereinbefore devised or disposed of.

*Fifteenth.* And inasmuch as the devises and bequests herein contained of real estate, situated in the State of Louisiana, may prove insufficient to vest the same as I have hereinbefore provided, it is my will that my heirs-at-law, by whom the said real estate would be inherited in case it should not pass under this will, do release or convey the same in conformity with the devises thereof contained in this will; and the devises, bequests, and legacies contained in this will to or for the benefit of my said heirs-at-law, are made upon the express condition that my said heirs shall so release or convey the said real estate in Louisiana in case it should become necessary or proper, in order to carry my will in respect to said real estate into effect. And in case my said heirs-at-law should not so release or convey said real estate in Louisiana, I revoke the provisions herein made for them, and I give, devise, and bequeath the sums and property hereinbefore devised, bequeathed, or given to them, or to my executors for their benefit, to my wife, except the sum of five thousand dollars which I give to my said namesake, Henry Parish Conrey, in lieu and stead of the provision hereinbefore made for him.

*Sixteenth.* I nominate and appoint my brother, Daniel Parish, and my friends, Joseph Kernochan and Joseph Delafield, to be three of the executors of and trustees under this my last will and testament; and in order to give as little trouble as possible to my executors, I desire the said three to first qualify and act as such; and I also nominate and appoint my friends, Henry Delafield and William Delafield, to be two additional executors and trustees, and I desire them to qualify and act as such executors and trustees, whenever any two of the three first-named executors and trustees shall

be deceased or shall become for any reason unable or incompetent to perform the duties of such executors and trustees.

HENRY PARISH. [L. S.]

Signed, sealed, published, and declared by the testator, as, and. for, his last will and testament, in our presence, who, at his request and in his presence, and in the presence of each other, have hereunto subscribed our names and places of residence as witnesses thereto, at the city of New York, this twentieth day of September, one thousand eight hundred and forty-two. CHARLES G. HAVENS,

9 Nassau-street, New York.

WM. ED. SAUNDERS,

116 Wooster-street, New York.

I, Henry Parish, by way of codicil to my last will, give to my dear wife, in fee simple, the following lands: namely, the lands on which my dwelling-house, conservatory, stable, and the adjoining dwelling on Broadway, are erected, situate at the corner of Broadway and Seventeenth-street on Union Square, and the rear lot on Eighteenth-street. Also the lands and building owned by me in Wall-street, now known as number 67 Wall-street.

In witness whereof I have subscribed these presents as a codicil to my will, this twenty-ninth day of August in the year of our Lord, one thousand eight hundred and forty-nine.

HENRY × PARISH.

Signed by me by direction of H. Parish, DAN. LORD.

HENRY PARISH, his × mark.

Subscribed by Henry Parish as a codicil to his will, and declared by him as such in our presence attesting the same at his request. The contents having been read to and understood by him. E. HOLBROOK, Northeast corner Fourth

Avenue and Eighteenth-street.

DANIEL D. LORD, Nineteenth-street, New York City.

DANIEL LORD, 26 Beach-street, New York.

On this seventeenth day of December, 1849, Henry Parish again subscribed the above in our presence, it having been

again read to him; and he declared that he had signed it as a codicil to his will.

> DANIEL LORD, 26 Beach-street, New York.
>
> E. HOLBROOK, Northeast corner Fourth Avenue and Eighteenth-street.

By this codicil to my will, executed September 20, A. D. 1842, I, Henry Parish, do hereby devise, bequeath, and dispose as follows: *First.* Unto my dear wife, Susan Maria Parish, her heirs and assigns forever, I give my land and dwelling-house on Union Square (known as number 26 East Seventeenth-street) in which we live, and the land in the rear to Eighteenth-street, on which the stable is built; and also the lot on the corner of Broadway, on which the conservatory is built, and the adjoining lot on the easterly side of Broadway, known as number 860 Broadway, now occupied by Mrs. Catharine Payne, the said lands all lying together; also I give to her, in fee simple my land on Wall-street, with the building thereon, known as number 67 Wall-street; all in the city of New York.

*Second.* Unto my wife, Susan Maria, I also give the stocks, bonds and securities following, namely: One hundred and fifty-three shares of the stock of the Bank of Commerce; two hundred shares of the stock of the Metropolitan Bank; twenty-five shares of the New York and California Steamship Company stock; fifty shares of the Panama Railroad Company stock, and two thousand and fifty-eight shares of the stock of the Phœnix Bank; a bond and mortgage of Nelson Shook, and a bond and mortgage of Philip Keiley; which stocks and mortgages by my direction have been put into her name. Also I give her twenty bonds of the Hudson River Railroad Company; twenty-five (income) bonds of the Erie Railroad Company; twenty (mortgage) bonds of the same company; twenty-five bonds of the Watertown and Rome Railroad Company; twenty-seven bonds of the New York and Harlem Railroad Company; twenty-five bonds of the New York and New Haven Railroad Company; twenty bonds of the Pennsylvania Coal Company; ten other bonds

of the New York and Harlem Railroad Company; ten bonds of the Cincinnati Gas-light and Coke Company; fourteen bonds ($1000 each) of the New Haven and New London Railroad Company; twelve bonds ($500 each) of the same Company; seven bonds of the Northern Indiana Railroad Company; eight bonds of the Covington and Lexington Railroad Company; eight bonds of the Michigan Southern Railroad Company; which stocks and bonds at par, and without interest, amount to three hundred and forty-nine thousand four hundred and sixty dollars. Also I give her my scrip in the Panama Railroad Company, and in the Manhattan Gas-light Company.

If any of the stocks or bonds above given should be sold or paid off in my lifetime, the same shall be made good to her by an equivalent of other stocks held by me; or if my estate have no stocks for that purpose, in money.

The gifts in this codicil to my wife, are in addition to what is given her in my will: some of the lands given to her in the said will have been sold.

*Third.* I bequeath to the American Bible Society ten thousand dollars; to the Orphan Asylum Society, in the city of New York, I bequeath ten thousand dollars; to St. Luke's Hospital, in the city of New-York, I give ten thousand dollars; to the New York Eye Infirmary I bequeath twenty thousand dollars; all payable two years after my decease.

*Fourth.* I revoke the appointment of Daniel Parish to be one of my executors (in the seventeenth clause of my will) and the gift of ten thousand dollars to him as executor in the tenth clause thereof.

In witness whereof I have subscribed this codicil, as a codicil to my last will and testament, and have published the same as such, in presence of the witnesses subscribing with me, this fifteenth day of September, in the year of our Lord one thousand eight hundred and fifty-three.

HENRY PARISH, his × mark.

Subscribed by Henry Parish (whose name was written by

the undersigned, Dan. Lord) in our presence; and the codicil being read to him in our presence, he before us declared that he had subscribed the same as a codicil to his will; and at his request we attest the same as witnesses.   Sept. 15th, 1853.

> CH. AUGT. DAVIS, No. 1 University Place, New York.
> DANIEL LORD, 34 West Seventeenth-street, New York.

By this further codicil to my will (dated September 20th, 1842), I, Henry Parish, do devise, bequeath, and direct in manner following, namely: I give, devise, and bequeath to my wife, Susan Maria Parish, all the rest, residue, and remainder of my estate, real and personal, as it shall be at my decease (after all the devises and legacies in my will and codicils which shall actually take effect shall be provided for) to have and to hold, to her, her heirs, executors, administrators and assigns forever; and in case she shall survive me, I revoke the thirteenth article of my above-written will. In witness whereof, I have subscribed this codicil subjoined to my said will, this fifteenth day of June, in the year of our Lord one thousand eight hundred and fifty-four.

> HENRY PARISH, his ✕ mark.

Subscribed as a codicil to his will by Mr. Henry Parish in our presence, his name having been, by his direction, written by Daniel Lord subscribing witness; and the codicil having been read to him, he declared that he had subscribed it as a codicil to his will, and requested us to attest the same.   1854, June 15th.          DANIEL LORD, 34 West Seventeenth-street, New York.

> JOHN WARD, 8 Bond-street, New York.

The probate of all these papers was resisted by Mrs. Sherman and Miss Anne Parish, the sisters of the decedent; and the codicils were contested by Daniel Parish and James Parish, the brothers of the decedent, who are named as residuary devisees and legatees in the thirteenth clause of the will.   At the date of the will, September 20th, 1842, the decedent was in good health, and in the free unabated possession and enjoyment of his mental faculties.   On the 19th day

of July, 1849, he was seized with paralysis; the first codicil was made August 29th, 1849; the second, September 15th, 1853; and the third, June 15th, 1854. Mr. Parish departed this life March 2d, 1856.

Rarely, if ever, in the annals of justice has a case been presented involving at its trial such a close and rigid investigation of every fact having a material bearing, however remote, upon the issue; exhibiting scientific examination and criticism of the highest order, upon physical and rational phenomena; developing in its progress questions of profound interest to the physiologist and to the jurist; and finally discussed and illustrated with forensic power and brilliancy worthy of admiration. To pass judgment in such a cause, *tantas componere lites*, is a task of no ordinary labor and gravity. It has, however, fallen to my lot; and having, as it were after a long and toilsome journey, arrived at a conclusion, it remains for me to indicate the grounds upon which it is based.

Before stating the reasons of my decision, I feel an obligation, and certainly find it a pleasure, to say that the view of the case, which is in my judgment controlling, has rendered it unnecessary to consider matters of domestic and family relation with any special minuteness. I have seen no reason for impeaching the motives of any of the parties interested, or for attributing acts usually betokening affection, to unworthy and sinister intentions. The controversy, I am satisfied, depends upon the application of certain rules of law to the evidence concerning the condition of Mr. Parish after his attack, and without any reference to the question of actual undue influence or fraudulent procurement, which is generally involved in cases of this character. There were three interests represented before me—one in favor of intestacy, one in support of the will alone, and one in support both of will and codicils.

I. On behalf of the sisters of the decedent, it was contended that the will of September, 1842, was totally revoked, " First, because," to employ the language of this allegation,

" it was the intention of the testator that it should be re-
voked; next, that there was an implied revocation by law,
of the will, growing out of the subsequent action of the dece-
dent, and the change in his circumstances; and third, that
so much of the will was thus impliedly revoked, even inde-
pendent of intention, that the whole must fall to the ground;"
or, as stated in other words, " that the will was revoked *in
toto* partly because of the intention of the testator; partly by
implied revocation in law; and chiefly because so much of it
is thus destroyed that it is impossible, according to the prin-
ciples of law, that every part could be carried into effect,
without violating every intention that the testator could
have had."

The first position in this argument is grounded on "the
intention of the testator," to revoke, and it involves the as-
sertion that after the paralytic seizure in July, 1849, he pos-
sessed sufficient capacity to revoke his will, and to express
his intentions in that respect. But if he could revoke his
will, why could he not make a codicil, and if so, there was no
intestacy. This difficulty, therefore, necessitates the further
proposition that the decedent had, after his attack, a degree
of mental power adequate to revoke, but inadequate to
create—potential to annul the will, but impotential to estab-
lish the codicils. If there be such a stage between the
rational and the imbecile as this, it is difficult to define or
characterize it abstractly by marks or tokens, and equally
difficult to demonstrate it in the living subject. But to test
this question in its strongest position, let us suppose the
codicils inoperative, and that the decedent had continued in
the full vigor of his intellect, and the unimpeded power of
expressing his ideas from the execution of the will in 1842
to the very day of his death, would there have been a valid
revocation of the will? It will readily be admitted that a
mere intention to revoke never effectuates an express revoca-
tion. The most satisfactory evidence that the testator had
repeatedly and explicitly declared that it was his deliberate
design to annul or destroy his will, would not authorize the

court to reject the instrument. A written statement to that effect, in the testator's own handwriting, would not be a valid revocation unless celebrated according to the forms prescribed by the statute. A legal act must be done *animo et facto*. There must concur the intention and the act. Intention or mere purpose, to become legally operative, must be expressed in a legal way. To design to do, and to do, are not the same. The act implies and embraces the intention, but the mere naked intention does not include and comprise the act.

But passing from express to implied revocations, we find the doctrine of implied revocation placed at times upon a presumed intention to revoke, derived from certain acts and circumstances; but apart from such acts and circumstances no consideration has ever been given to mere intention. At other times the doctrine of implied revocation has been placed upon the ground of a tacit condition annexed to the will at the moment of celebration, that it should not take effect under certain circumstances. But however the courts may have differed as to the speculative reasoning upon which the legal rule was founded, there is no difficulty in ascertaining what circumstances have been adjudged sufficient to constitute an implied revocation; and having reached and defined that standard, we shall have nothing more to do than to apply the test to the case in hand.

At common law there were two classes of implied revocations: first, such as were declared by the law in view of a change in the testator's circumstances, especially his family relations, since the execution of the will, and which effected a total revocation of the will and all its dispositions. This class was received in consideration by the probate courts. The doctrine on this point was derived from the Roman jurisprudence, and adopted with some modification. The civil law evinced a tender regard for the protection of children from the carelessness, caprice, or injustice of parents, and for this purpose it was required in order to exclude a son from the inheritance, that he should be expressly disin-

herited. (*Inst.*, lib. 2, tit. 13.) This privilege was ultimately extended by Justinian to all the children, female as well as male. (*Id.*, § 5.) The birth of offspring operated therefore to revoke an antecedent will, and even the adoption of a child effected the same result. (*Id.*, lib. 17, § 1.) The principle involved in these laws was so far received by the probate courts of England, which proceeded generally according to the course of the civil law, that marriage and the birth of issue were held to work an implied revocation of a previous will. The rule spread from the spiritual to the common-law courts, and after some hesitation was finally acknowledged as applicable to devises of real estate. In this State it was sanctioned after full deliberation, by that profound and enlightened jurist Chancellor Kent, and was subsequently incorporated in the Revised Statutes. There are cases in England and in this State, where the birth of children (without a subsequent marriage), in conjunction with other alterations in the testator's circumstances, has been held sufficient to establish an implied revocation of a previous will. But I am not aware of any decision in the whole range of the law of the probate courts, declaring a will revoked and refusing sentence of probate, on account of alteration in the testator's circumstances, where that alteration did not include as one of its essential ingredients either marriage or the birth of issue after the will was made. Without these elements, or one of them, no change of circumstances, however great, can effectuate an implied revocation at common law, so as to debar probate and annul the instrument.

The second class of implied revocations at common law, were revocations by alienation or such acts of the testator in regard to his property, as indicated an intention to exempt the property dealt with or attempted to be dealt with, from the dominion of the will. These revocations sprang from dealing with the property which was the subject of testamentary gift, and their extent was consequently commensurate with the dealing. So far as relates to particular devises or bequests which become inoperative before the testator's

death, by reason of the previous decease of donees, or the disposition by the testator in his lifetime of the property devised or .bequeathed, these are circumstances which never work a revocation of the will as a valid testamentary instrument *per se.* They regard the effect of the will in giving title, not its proof as a subsisting will. They relate to an interruption of the devise, because there is no devisee to take, or nothing to be taken. Even in the case of an attempt to alienate, from which the courts presumed an intention to revoke, the revocation was limited to the specific property sought to be alienated, and if any other property remained on which the will could act, there was only a partial revocation. This class of revocations therefore never came within the purview of the probate courts. They relate to the subject-matter of the will, and not to the will itself, and their consideration has been limited to the courts of construction.

Where I guided then by the rule of the common law, I should be compelled to decide that the will of Mr. Parish made in 1842, was not revoked by any change of circumstances, there being no subsequent marriage or birth of issue, and no such acts in regard to his property as would in any court exempt his entire estate from the dominion of the will.

But the whole subject has been definitely determined by the statutes of this State. In the Statute of Wills (34 Henry VIII., c. 5) there was no provision respecting revocations, and the courts continued to allow parol proof, as before, of revocation, until by the Statute of Frauds (29 Charles II., c. 5) it was prohibited. A long struggle ensued, to escape from a rigid application of the statute, and it became so evident that an exact compliance with its provisions, occasionally effected great injustice and hardship, that the judges were led to adopt the rule that implied revocations were not within its purview. As in all cases of such expedients, the remedy was worse than the disease. In the effort to overcome the inconvenience of a literal compliance with the law, in particular instances presenting strong inducements for equitable interference, the tribunals opened a wide field for

the exercise of judicial discretion and interposition, until
evils were developed far exceeding those sought to be averted ; and an exception to the statute introduced in the first
instance for the purpose of carrying out a presumed intention
of the testator, was often applied so as to thwart and frustrate his real intention.   No portion of the history of the law
illustrates more pertinently the injudicious policy of an attempt by the courts of justice to escape the plain injunctions
of the legislative authority.   The law on this subject was in
so lamentable a condition at the time of the revision of our
statutes, that legislative interference was imperatively necessary.   To meet the difficulty the revisers recommended two
measures—first, a statutory specification of the cases in which
implied revocations should be admitted ; and, secondly, the
utter exclusion of the courts from declaring any other implied revocations than those specified in the statute.   To understand the scope and intent of these recommendations, the
notes of the revisers to the sections reported, and which were
before the Legislature when these provisions were adopted,
afford most valuable assistance.   These sections, they say,
" it is believed, dispose of the whole doctrine of implied revocations."   " The object of the revisers is to prevent a constructive repeal of the Statute of Wills, and to secure to
testators the power of disposing of their property to the same
extent in which the Legislature meant to confer it.   The law
respecting implied revocations is in its present state a fruitful
source of difficult and expensive litigation.   It abounds with
arbitrary rules and subtle refinements, the existence of which
none but lawyers would be at all likely to suspect, and which
are constantly applied not to carry into effect, but to defeat
the intention of testators.   That such is the actual state of
the law has been acknowledged and lamented by the most
eminent judges."   After quoting Lord Mansfield to the effect
that some of the decisions were " shocking," had " brought a
scandal on the law," and were " founded on artificial and
absurd reasoning," and after pointing out certain cases justifying these severe charges, the revisers proceeded to say that

the provisions reported by them to the Legislature would, in their judgment, " close many sources of expensive and protracted litigation, and in numerous cases prevent the manifest intention of testators from being frustrated by the application of rules apparently revolting to common sense, and unintelligible to all not versed in the mysteries of feudal learning." They add : " The principle which has guided the revisers in the alterations which they propose is, that where a change has occurred in the domestic relations of a testator, where new objects, having peculiar and natural claims to his bounty, have come into existence, it is a presumption justified by reason and experience that his will is intended to be revoked ; but that where no such event has occurred it is equally reasonable to believe, that a will not expressly and plainly revoked, is meant to have effect. In conclusion the revisers avow their conviction that a valuable service will be rendered the community if those cases in which alone implied revocations may be allowed, shall be defined by legislative authority. Experience may indeed discover that the enumeration is defective, and that cases now omitted ought to be included, but should this prove to be the case, the Legislature will be competent to apply the remedy. By new enactments they may supply the defects of the Statute of Wills, in the same manner as they are accustomed to amend and extend the provisions of other laws. To leave it to courts of justice, however learned and respectable, to declare in their discretion when implied revocations shall be admitted, is to involve the whole subject in doubt and perplexity. It is to commit to them the power, not of interpreting, but of repealing statutes, and to invest them with an authority paramount to the will of the Legislature, and often exercised in direct opposition to the will of the testator." (3 *Rev. Stat.*, 632.)

This is plain and pointed language, and it presented to the law-making power in the clearest manner the evil to be cured and the mode of curing it. The sections recommended for this purpose were adopted precisely as reported, except-

ing a modification of section forty-four, which relates to the effect of marriage on the will of a woman made when a *feme sole*. This, in my opinion, disposes of the whole subject of implied revocation. The statute declares the effect of marriage, of birth of issue, of contracts to convey, of charges, incumbrances, conveyances, settlements, deeds, or other acts of the testator, by which his interest in property previously devised or bequeathed shall be altered, but not wholly devested, and determines when a revocation shall be effected, and when not. It precedes all these provisions by declaring that " No will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked or altered otherwise than by some other will in writing, or some other writing of the testator declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated, or destroyed, with the intent and for the purpose of revoking the same, by the testator himself or by another person in his presence, by his direction and consent, and when so done by another person, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses." (2 *Rev. Stat.*, 64, § 42.) The Statute of Frauds (29 Car. II.) did not consider implied revocations; the Revised Statutes do, specifying the cases and circumstances, and expressly pronouncing that " except" in those " cases" no will in writing shall be revoked, unless by writing or act equivalent to physical cancellation. I am clear, therefore, that there can be no testamentary revocation except in the cases enumerated. In the teeth of the law so written, and in direct opposition to the intent by these enactments, of preventing courts "repealing" the Statute of Wills, by admitting implied revocations, were I to admit another exception, over and beyond those mentioned, I should inaugurate a new career of judicial discretion, " paramount to the will of the Legislature," and which it was the very design of these provisions to check. The statute is, in my judgment, then,

a full and complete answer to the proposition that the will of Mr. Parish was revoked by implication.

II. By the will the testator's two brothers were constituted residuary devisees and legatees. The residue, which at that date, 1842, was estimated under forty thousand dollars, had increased very largely in 1849, and continued to accumulate rapidly until the testator's decease. The dispositions contained in the codicils, which were all made after the stroke of apoplexy in 1849, are all in favor of Mrs. Parish, with the exception of gifts to charitable uses amounting to fifty thousand dollars. Are these codicils, or is either of them, valid? The determination of this question involves primarily an ascertainment of the mental condition of Mr. Parish, in connection with his bodily condition : for though it be true that *in eo qui testatur, integritas mentis non corporis exigenda est*, yet in the present instance the rational was intimately associated with the physical state.

Mr. Parish was attacked in the month of July, 1849, with a stroke of apoplexy and paralysis. After the seizure " he soon began to exhibit confused consciousness ;" " he recovered somewhat rapidly from this condition," and in the course of two or three weeks was able to sit up. From about the first of August, according to the evidence of Dr. F. U. Johnson, his progress in convalescence was " regular and rather more rapid than ordinary." The first codicil was executed on the twenty-ninth of August. Prior to this time, Dr. Johnson was able to communicate with him in propounding " simple questions as to the condition of his health and his symptoms," which " he appeared to understand," and " to answer intelligibly" by " a nod of the head and an attempt to say yes," or by " a shake of the head and a similar attempt to say no." The Doctor says: " He looked at me attentively while questioning him, apparently with intelligence ;" his answers " were given promptly and decidedly ;" " he appeared to understand simple questions regarding his health ; I cannot say that he might not have understood questions equally simple regarding other affairs." Dr. Delafield states

that Mr. Parish "continued to improve irregularly up to about the first of October," when he was seized with severe and alarming disease in the bowels. Dr. Markoe testifies that Mr. Parish "improved steadily and regularly" during the months of July and August, and after the October illness rapidly, considering the grave nature of the complaint. At this time, and probably in the month of November, he was seized with epileptic spasms or convulsions, recurring at periods of eight or ten days, gradually diminishing to three or four weeks during the year 1850; intervals somewhat longer in 1851; once in four or six weeks in 1852, until at last six months or a year intervened. During these attacks "his face would redden violently, the whole body would be convulsed, and if not supported he would sink down." "The convulsion proper would pass in a few minutes; certain convulsive actions consequent upon it would last some hours," during which he would be "insensible, or nearly so." Dr. Delafield expressed the opinion that these symptoms "were connected with the condition of the brain left by the apoplectic attack," in which view Dr. Markoe coincided. In regard to the state of his physical appearance and health, the facial muscles were slightly drawn on one side, but this affection mainly disappeared in a few months. The power of speech was almost totally lost, never extended beyond a few monosyllables, which ultimately degenerated into guttural or inarticulate sounds; the left leg, arm, and hand were not affected by the paralysis; the right arm, hand, and leg were; the right arm became utterly useless, but he recovered in some measure the use of his right leg, so that it could be dragged along without its being lifted by another person; he walked slowly with a crutch and the aid of an attendant; his sense of hearing was good; the power of vision in his left eye was lost before his illness, that of the right eye continued sufficient for all ordinary purposes with the use of glasses. From November, 1849, his general physical health improved, and, with occasional exceptions, remained good until a short period before his decease. The most important of these excep-

tions were the epileptic spasms, and several attacks of inflammation of the lungs. The immediate disease of which he died seemed to be congestion of the lungs, "as a main feature;" "a complicated disease," says Dr. Markoe, "depending, I should say, as we supposed upon the condition of the brain." During the entire period after his attack, Mr. Parish was dependent for all his physical wants upon the assistance of other persons; at morning in rising and dressing, during the day in walking, at night in undressing. All his customary business avocations ceased; he no longer attended his counting-house; he joined in no social engagements beyond his own home; he did not attend church; he could neither write nor speak in the ordinary acceptation of those acts; the sounds supposed to indicate the affirmative or negative were repetitions and generally inarticulate; his means of originating topics, necessarily limited, were not improved by artificial modes; he evinced greater emotional susceptibility than before his seizure; and his condition generally was marked by the symptoms of confirmed paralysis. On the other hand, he was addressed by his family and by friends, as intelligent; in conversation he was treated as comprehending what was said to him; facts were communicated in which it was conceived he would be interested; he was read to, and it was believed that he could read; accounts and documents were placed before him; his approbation or disapproval was solicited in various matters, some of them of great magnitude and importance; he attended, and it was thought participated in family prayers; he was baptized and partook of the Holy Communion; and, in fine, was treated as possessing understanding, by persons of the highest character, who have testified before me to their conviction of his capacity.

It is not necessary for the exposition of my view of the case to exhibit a minute analysis of the special circumstances upon which the witnesses based their judgment as to the absence or presence of intelligence; nor to canvass the opposing medical opinions given by professional experts. I

am not at all surprised that there should have been a differ-
ence of opinion. There is no department of scientific inves-
tigation so uncertain, in the glimmering light it affords, as
that which concerns the relations of mental manifestations to
the organism of the brain, and I should feel intimidated, were
it essential for the solution of the question submitted to my
judgment, to grope through those dark and mysterious re-
cesses where lie hidden the subtle connections of mind with
matter. The medical opinions and scientific theories in re-
spect to the condition of Mr. Parish, the progress of his
malady, the portion of the brain affected, and the mode in
which the cerebral functions were involved, present an inter-
esting discussion concerning the functions of the brain and
nerves, and the effect of disease upon the intellectual mani-
festations. But yet for all practical purposes we must come
down to the special phenomena which characterize this par-
ticular case, we must examine the apparent physical and
rational symptoms by the light of such general physiological
and mental laws as are ascertained, and thus endeavor to de-
termine the degree of mental faculty possessed by the testa-
tor. I have already indicated the leading features which
marked the invasion and course of the disease, and, with oc-
casional exceptions, the observations I have to make do not
require a more special symptomatic description.

III. "We may safely assume," observes Sir Benjamin
Brodie, "as an established fact, that it is only through the
instrumentality of the central parts of the nervous system
that the mind maintains its communication with the external
world." When therefore disease invades this nervous centre,
we may expect, and we ordinarily find, some degree of dis-
ordered mental action. The weight of authority and obser-
vation is in favor of the position that apoplectic hemiplegia
is accompanied with more or less disturbance of the intel-
lectual faculties, and if the paralysis become permanent and
severe, it is associated with symptoms of enfeebled mind.
The same tendency is observed likewise in epilepsy. It is
probable, therefore, that the faculties of the testator were

in some measure weakened, in view of the obstinate character of his malady. Do the facts proved repel this probability? There are many acts in the ordinary course of daily life which are apparently intelligent, and yet do not indicate rationality proper. "Imbecility," says Duranton, "is that feebleness of mind which, without depriving entirely the person of the use of his reason, leaves only the faculty of conceiving ideas the most common, and which relate almost always to physical wants and habits." (Liv. 1, tit. 11, § 713.) In the animal creation, we find the senses, instincts, power of motion, some degree of memory, discrimination or preference, expression by sound, action, or signs, and traces of apparent intelligence often astonishing the curious observer, and presenting analogies to the action of the human mind. It was upon such phenomena a distinguished metaphysician based his distinction between the understanding and the reason, defining the former as the faculty which judges according to sense, and conceding its possession common to man and animals. We should not therefore attach much, if any importance, to a class of facts which in no respect betokens the possession of the rational powers proper. The same remark applies to acts conformable merely to the ordinary previous habit of life. The influence of long-continued practice or repetition leads to the unconscious and almost involuntary and unintelligent performance of an act which, taken singly, is generally the result of clear volition. "Habit," says Dr. Reid, "will operate without intention." "I conceive it to be a part of our constitution, that what we have been accustomed to do, we acquire not only a facility, but a proneness to do on like occasions, so that it requires a particular will and effort to forbear it; but to do it very often requires no will at all. We are carried by habit, as by a stream in swimming, if we make no resistance." The winding of a watch is ordinarily an act of the will, but by force of the repetition at stated hours or occasions it comes to be performed unconsciously and mechanically. Keeping in view these results of observation we find a large class of facts in the history of

Mr. Parish after his attack, which do not indicate ideas beyond the range of "physical wants and habits," and which are not therefore inconsistent with an enfeebled mental condition.

When we approach other acts of greater significance, we are embarrassed with the difficulty arising out of the absence of definite means of communication. The proposition on the one side, that the testator's mind continued clear, sound, and in normal condition, that he comprehended, and his only inability consisted in the loss of the usual mode of expression, were it true, is not, from the nature of the case, capable of satisfactory demonstration. On the other hand, this very fact of the abrogation of speech is attributed, not to a mere paralysis of the organs of the voice, but to mental weakness. One theory refers the phenomena to mental and the other to physical difficulty. A man may be unable to speak either because he has no ideas, or because he has no efficient vocal organs—because there is nothing to express, or no power of expression. The probability in favor of either view must be determined by other considerations, and on other evidence than the mere absence of the power of speech.

IV. Let us take the case of a person of fair capacity and intelligence, decision of character, and firm will, accustomed to read and write, suddenly deprived of speech. The mind is imprisoned in its full vigor and its unabated powers, and there is an instinctive and immediate effort towards expression in the usual modes by words and sounds, and these failing, by signs and gestures. The desire for communication is one of the first impulses of our nature. To be cut off from all expression of thought and sentiment, to be deprived of the means of moral, social, and intellectual communion, to be shut up in the chambers of the soul without the power of telling to the objects of our affections or friendship our wants, sorrows, joys, and hopes, is so terrible a calamity that all the powers of the mind and all the resources of ingenuity are called into action to devise the means of escape. We accordingly find in cases where the faculties are not impaired,

that arbitrary signs are readily invented and resorted to, and artificial means of communication established in the place of those which have been interrupted. The obstacles interposed to the expression of ideas by defects in the organs of speech are usually overcome without much difficulty, when the mind continues in a sound and vigorous condition. Constant inducement was presented to Mr. Parish in regard to the ordinary affairs of domestic life, matters of personal comfort, relief from bodily ailment, the momentous concerns of religion, and the anxieties incident to temporal interests of great magnitude, to contrive some mode of manifesting his will with freedom. Indeed, various methods were suggested and urged upon his attention, any one of which if adopted would measurably have relieved his necessities. The first thought was of writing. He had his sight, was supposed to be able to read, and to understand letters and numerals. To all appearances he retained the use of his left arm and power of control over the action of the hand and fingers. That the habit of writing legibly with the left hand may be acquired where the right side is paralyzed, is shown by the evidence afforded in the cases of Dr. Brownlee, Mr. Delaplaine, and Mr. McDonald. Efforts to induce a similar habit with Mr. Parish were repeatedly made, and in various ways, with pencil, paper, and slate. A blackboard was placed before him, the process of writing on which requires rather a motion of the lower arm, than a special or complicated action of the fingers. A copy for imitation was occasionally at hand, the attempt was again and again made, and yet, with the exception of a few letters, he utterly failed, and no result of any general practical value was obtained. He was invited to other methods which demanded the mere act of pointing out letters and words, and the simplest process of mental combination, but he declined the effort. Whatever may be said therefore as to the abolition of the power of speech being attributable to paralysis of the organs or nerves, it seems to be clear that there was no physical impediment to each and every one of the other means of communication proposed or

attempted.   He was understood at times to be earnest and
anxious in the desire to have some particular thought or
wish expressed; his friends sought to afford relief by numer-
ous and continued suggestions, and this struggle occasionally
lasted for hours, if not days.   Here then was the present
pressing want, and can we believe that if the intellectual
power had been existing in full force, means of expression
would not have been adopted from among those placed be-
fore him?   We know so little of the action of the mind, in
its physical relations, that one should hesitate in positive af-
firmations as to its condition, in the absence of the usual
modes of expression.   But still judgment, in default of cer-
tain proof, must be based upon the most probable grounds;
and in view of all the circumstances of the case, I think that
by fair and reasonable inference the failure of Mr. Parish to
communicate by some arbitrary or artificial means, is at-
tributable to mental weakness.   To what extent this existed
it is impossible to indicate with any measure of accuracy.
Where speech is preserved, it is frequently difficult to fix
what d'Aguesseau terms "the doubtful and uncertain point
where reason vanishes and incapacity appears;" but the
trouble is largely increased when there are no signs of a cer-
tain and determinate character by which the thoughts are
definitely manifested.   I am not indifferent to the argument
that many proofs of intelligence are indicated by the expres-
sion of the countenance, in the play of the features, linea-
ments, and muscles.   In this respect nature has a language
interpretable though voiceless, but it is very obvious that its
scope is limited, and the absence of any precise standard
renders it an uncertain method of communication.   It de-
pends much upon individual opinion and construction, al-
lows large room for the imagination of the observer without
a test to correct his errors, and is therefore exceedingly
liable to misapprehension and misapplication.   Nor are the
means of judging greatly amplified by the fact that the sub-
ject of observation appears to give affirmative and negative
answers to interrogations, for notwithstanding the reply may

seem sensible, it affords but little opportunity of judging whether the response is one of mere acquiescence, or has involved some considerable action of the intellectual faculties. While therefore in this branch of the case I feel bound to respect the opinions of witnesses whose observations and judgment are entitled to great weight and consideration, I am still conscious of resting more on the ground of conjecture than of certainty. The doubt as to the condition of the testator's mind, and the extent to which it was weakened, cannot, from the nature of the case, be clearly and satisfactorily resolved by evidence of this nature, though the best and most reliable of its kind.

V. Not possessing the means of communication, Mr. Parish was evidently void of the power of indicating such ideas as his mind was capable of conceiving, and of carrying out his wishes into actions, unless by signs or expressions he could direct the ingenuity of those around him to the ·suggestion of the idea to him, so as to call for his answer. He could therefore perform no act requiring the intervention of others, unless the volition had first passed through the mind of another, and been returned to him—and then, to be the proper expression of his mind, the thought so returned must be the exact counterpart of his. If it varied, he had no power to modify it or to invite a new suggestion, except by total rejection; and yet it might be as far from his wish to reject it totally, as to adopt it wholly, and to do either would endanger or destroy the chance of its repetition in a modified form. To answer in the negative or in the affirmative might be equally aside of his purpose. He was therefore substantially deprived of the power of spontaneous action, or indeed of any action at all except within the narrow boundary of assent or dissent to interrogative propositions; unless the object of his wishes were placed within his view, and then he was incapable of expressing any complicated thought. This is true—however strong may have been his desires or his determination, or however rational the action of his mind; but, if his mental faculties were weakened, then, in addition

to the impossibility of communication, would exist a tendency passively to acquiesce in the suggestions of others. It is manifest, therefore, that in such a matter as the disposition of his property, whatever might be proposed to him was the emanation of the mind and will of some other person. A will by interrogation is not favored. "If," says the Touch-stone, "some friends of a sick man, of their own heads, shall make a will, and bring it to a man in extremity of sickness, and read it to him, and ask him whether this shall be his will, and he say yea, . . . . the testimony is very suspicious." The essence of the act is volition. The will is the centre of the soul and the source of all intelligent action. Though moving rationally, the vigor of the will may be so impaired, and the degree of weakness be so low, that mere suggestion may determine the movement, the presentation of a thought may be sufficient to guide the sluggish current into acquiescence. In such a case it is not the will of the testator, not the self-originated, independent, spontaneous result of his own voli-tion, but the reverberation, the echo of a stronger mind. While the law sacredly and tenderly regards the right of the owner to dispose of his property, with full and absolute power of dominion, so that his will stands as the reason of his acts; yet when the mental faculties are enfeebled, the same tender regard for his will leads to careful scrutiny and rigorous examination, to guard against its invasion and surrender to a stronger power. The weaker the volition, the more jealous watch is set against all external interference.

By the Roman law it was ordained that the writer of an-other's testament should not mark down a legacy for himself. (*Suet. Ner.*, 17, Dig. 1. 48, 34.) Although this was not adopted as an absolute rule in the spiritual courts of England, yet it has been constantly recognized in testamentary cases to the extent of requiring a different degree of proof where the will has been made by the intervention of the party profiting by its provisions, and occupying relations of confidence and influence towards a testator of weak or doubtful capacity. For example, where the parties are in the

relation of guardian and ward, principal and agent, trustee and *cestui que trust*, attorney and client, the court is exact and scrutinizing in its requisition of the plainest evidence of volition and capacity. The decisions on this point show, in the language of Sir John Nicoll, "how extremely jealous the law is to protect the unwary against undue influence and control. Where that relation of confidence exists, and where the party frames the instrument for his own advantage and benefit, every presumption arises against the transaction.' In such a case, he adds, "it is not necessary to prove fraud and circumvention," but the proponent "must remove the suspicion by clear and satisfactory proof." I think it would be more accurate to classify this among the rules of evidence applicable to testamentary clauses, than to declare that from a certain state of facts the court presumes fraud; for while there can be no reasonable doubt of the salutary tendency of such a rule, and the propriety of its application, there may exist just cause for hesitation in pronouncing judgment of actual fraud. It is obvious that the failure to produce the supplementary evidence which the law thus demands, may arise from accident or the peculiar circumstances of the case, and that the conclusion may not therefore necessarily involve the existence of fraud in fact. In passing sentence of probate the court must be satisfied that the instrument propounded contains the true will of the deceased. The mere *factum* of the instrument is ordinarily sufficient for this purpose; but when the proofs indicate the danger of relying upon such a presumption, the law demands more evidence. The principle involved in this rule is of the greatest consequence in the administration of justice; and its practical application is commended by considerations of public policy, as well as a due regard for the proper exercise of the testamentary power. It requires from a party presenting to the probate court, for judicial ratification, a will made through his instrumentality, and disturbing for his benefit the usual course of inheritance and succession, by a decedent of weak or doubtful capacity, dependent more or less upon the beneficiary, evidence out-

side of the document itself, that the contents were understood by the decedent, and were conformable to his real wishes, that the act was the result of free volition, the actual will, *voluntas ipsa*, of a competent mind. The writing itself does not afford enough proof, but additional, independent, extrinsic evidence must be supplied; and if from any cause that fail, probate must be denied. The security of property, the protection of heirs, wise public policy, as well as the principles of reason and justice, indicate this as a rational rule of evidence. It has found place in every system of enlightened jurisprudence, and is of familiar application in courts of equity as well as in the ecclesiastical tribunals.

VI. There is, of course, no arbitrary standard of what constitutes satisfactory extrinsic evidence; for as the object is to ascertain whether the alleged disposition conforms to the intent of the decedent, regard must be had to his special condition, the state of his family relations, the condition of his fortune, the natural objects of his bounty, his expressed declarations, his previous testamentary acts, and many other circumstances tending to inform the mind of the court whether the will propounded was a reasonable and probable act.

In respect to the first codicil, two circumstances incline me to admit it to probate. In the first place, it is rather in confirmation of the dispositions of the previous will than in hostility to them. By the will the testator had given to Mrs. Parish his residence in Barclay-street, together with the house adjoining, after Mrs. Payne's decease. He subsequently sold this property, and the value of other devises in her favor had somewhat diminished. From the testimony of Mr. Havens, it is clear that the testator was anxious " to make a very ample and liberal provision for his wife;" his expressions on this point were repeated and emphatic. It was quite natural, therefore, that when he had purchased the land on Union Square, as a site for a new residence, he should propose a change in his will conformable to this new plan.

We accordingly find that after his return from Europe he communicated with Mr. Havens on this subject, and inquired " whether the making of a codicil would in any way affect the main features of the will, affect the will itself, except as altered by the codicil." Mr. Havens says : " He either stated to me, or I have a distinct impression from what he said, . . . that he did not contemplate any very material alteration of his will. The only subject I recollect his speaking particularly of, was the Barclay-street house and the Union Place property. I can't say that I have a distinct recollection of what he said in relation to these pieces of property, but my impression is very strongly this, that he wished to substitute the Union Place property for the Barclay-street property in the provision for his wife, in consequence of Barclay-street not being a desirable place of residence for his widow." A provision for the continued occupation of the family mansion by the widow, and for the adequate support of the establishment, usually appears in the wills of testators in comfortable or affluent circumstances ; it harmonizes with the domestic affections, and with those sentiments that gather around our home and inspire us with a desire for its continued preservation. This feeling was not likely to be diminished in the present case, because the new mansion had been constructed by Mr. Parish, and been adorned in a style corresponding with his great wealth. The evidence tends to show that he thought the former residence unsuitable for his wife, and that he consulted her pleasure in the erection and arrangement of the new edifice. Under the circumstances, it would have been remarkable had he contemplated that on his decease his home should pass away from the possession of his widow into other hands, and she be compelled to leave that which had been prepared and embellished with so much care. He had not designed this in respect to the more humble residence, and it is consonant with every reasonable probability that it was not his purpose in regard to his new abode. The " ample and liberal provision" adequate for the support of the establishment in Barclay-

street might reasonably be enlarged to correspond with the expenses attendant upon the residence in Union Square. At an interview on the 25th of August, 1849, between Mrs. Parish and Mr. Folsom, who had long been Mr. Parish's confidential clerk, the latter expressed the opinion that Mrs. Parish desired to obtain the Union Square property; to which that lady replied, "Mr. Parish always told me that he intended to give me the Wall-street and Union Square properties." Mr. Folsom offered to ask the question, and they accordingly proceeded into Mr. Parish's presence. The inquiry was made, "Should any thing occur to you, do you wish this property to revert to Mrs. Parish?" and the same form was repeated as to the Wall-street lot; to each of which questions Mr. Parish made a negative motion of the head. On Mrs. Parish observing that the questions were not properly put, they were framed in this mode: "In case of your death, do you wish to give this property to your wife?" and was repeated in the same manner as to the Wall-street lot; to each of which Mr. Parish made a nod of the head. It is not impossible that the use of the term "revert" in the first instance, and of "gift" in the last, was the reason for varying the reply. In this connection it is proper to mention, that shortly after recovering consciousness subsequent to his first attack, and while still lying in bed, Mr. Parish was supposed to indicate anxiety to make some communication: a pencil was put in his hand, and he made efforts to write with his left hand. "The characters were always the same, and were construed to mean the word 'wills.'" The writing is in evidence, and presents some features favoring the conjecture.

I am inclined to think more favorably of the condition of the testator's mind prior to the illness of October, 1849, and to the appearance of the epileptic spasms, than afterwards. The first action of the apoplectic stroke upon the brain is of a mechanical character. The authorities favor the conclusion that on the absorption of the blood and removal of the pressure, in ordinary cases of apoplectic effusion, we may "look for a fair degree of recovery in the course of a few weeks."

Where the recovery is not complete, secondary consequences ensue, indicating disease of the brain, "developed in consequence of the apoplexy and the healing process." On the first revival of the patient from the shock, on the return of consciousness, and the restoration of physical strength, his mental faculties would seem to be nearer a normal condition than after symptoms of a secondary nature are exhibited. However this may be, I am of the opinion, upon the evidence, that Mr. Parish, at the time of the execution of the first codicil, possessed testamentary capacity, though enfeebled; that the codicil, in its scope and effect, was reasonable and probable; that the subjects of the disposition were simple and easy of comprehension; and especially that as to one of the leading features of the devise, the gift of the residence on Union Square, there is proof, after the making of the will, of an intention to substitute this property in place of the Barclay-street residence.

VII. As to the remaining codicils there is no such extrinsic evidence, and from the nature of the case there could be none, as the subjects of disposition substantially accrued after July, 1849, and the means of communication, after that date, were interrupted. But it is claimed that the proportion of his estate bequeathed to Mrs. Parish, according to its value in 1842, rendered it probable that when his property appreciated so largely, he would proportionately increase the provisions in her favor. This may or may not be. It is mere conjecture, founded on the notion that the will was only a temporary or conditional adjustment. The whole tenor of the evidence on this point, however, gives a different impression.

Though made on the eve of a contemplated voyage to Europe, the will was prepared with careful reflection. There were frequent and almost daily consultations between Mr. Parish and the counsel employed, during a period of about two weeks; and, to use the language of Mr. Havens, "the matter was done with the utmost deliberation and consideration—much more than in any other case which occurred

during my practice." A man of large estate, arrived at the age of fifty-four, without children, his social and domestic relations definitely marked, and the general plan of his testamentary intentions not likely to change, devises a plan of disposition which embraces numerous objects of bounty, and which presents the appearance of being a permanent scheme for the division of his estate, by providing for various contingencies, among which is the further acquisition of property. It was urged on the argument, that as the amount of the residuary estate remaining, after all other testamentary provisions at the time of the execution of the will, did not exceed the sum of forty thousand dollars, the testator did not contemplate that under that residuary clause his brothers Daniel and James should ultimately receive an amount, which, by reason of the increase of his estate, immensely exceeded the residue at the date of the will. It must readily be admitted that the testator did not foresee the actual result of this residuary clause, but this does not detract from the force of his general intent. The will was made under the advice of competent counsel, and the legal effect of a general residuary devise and bequest, it is proper to presume, was presented to his mind. The will speaks at the time of death, and it is the very nature of a residuary clause to be prospective. But as if to remove every possible doubt, to make this point clear and beyond misconception, and to show he did not intend to limit the gift to his two brothers to the residue as it then stood, the fourteenth section especially declares, "It is my will and intention that all the property, real and personal, that I may own or possess at the time of my decease, shall pass under this will;" and still to increase the certainty, it proceeds, "whether the same be now owned or possessed by me, or may be hereafter acquired by purchase, descent, distribution, or otherwise." How any language could more exactly and explicitly express an intention to pass whatever residue might be existing at the time of his death, it is difficult to conceive. The legal effect of the residuary clause is expressly stated to be his testamentary

intention, in the full and declared prospect of an increase of his estate by purchase or otherwise. He was then in the vigor of health—the prolongation of his life, and the advancement of his fortune, were probable contingencies, and in view of them he pronounces emphatically that the disposition then made, had in view whatever property he might subsequently acquire and own at the time of his decease. An instrument prepared with such grave consideration and mature reflection, embracing gifts to numerous relatives and friends in minute detail; providing against lapse by death, and in terms looking beyond the estate he then had to what he might possess at the time of his decease; must be regarded, not as a temporary or provisional arrangement, but as a definitive disposition—a plan designed in its prominent features and general tenor to be permanent. Full scope must be given both to its legal effect and the intention manifestly declared; and there is no more ground for asserting that it was not the intent to bestow upon his brothers all the residue existing at the time of his death, than for impeaching any special devise or bequest contained in the document. A will made so deliberately, when the testator was in full vigor of mind and body, and which remained unaltered for seven years, though circumstances had occurred calling for modification, presents in itself a strong presumption against changes made when the mind had become weakened by disease. In the absence of all extrinsic proof rendering such changes probable, in default of any evidence outside of the codicils, and superior in degree to that which the codicils themselves afford, effect cannot be given to those instruments.

The testamentary power has always enjoyed the highest degree of favor from the law. It has come down to us through a long series of ages from the fountains of Roman jurisprudence, with sanctions, guards, and muniments designed to secure as well the liberty of the testator as the peace and the welfare of society. Experience and high considerations of public policy have manifested the necessity of certain rules for its exercise, not only as to substantial requirements, but

as to forms and ceremonials, and modes of proof. First, and above all, and as the very essence of the act, as the element which gives it all its character and importance, is its entire and absolute freedom, that independence which must accompany every voluntary action. So much is this regarded, that it gives the name to the act—the will. When this is ascertained in a legal way, the law gives it effect without inquiring into the motives and reasons. In this position stands the will made by Mr. Parish in 1842 ; when his mental faculties were sound, his mind was unclouded, and his power of expression perfect. But when the condition of the testator's mind involves the inquiry whether the instrument propounded as his will really conforms to his sentiments and wishes, and when his faculty of communication is so far gone as substantially to annihilate the means of imparting ideas and originating the terms of a testamentary act, rules of evidence come into operation, based upon sound general principles and considerations of expediency, having relation to the ordinary motives of human action. The result of their application in a particular case may seem more or less just or unfortunate, but they cannot be swerved from to meet possible hardships, or be swayed to and fro at the arbitrary discretion of the judge. I have applied these principles as I understand them, to the case now before me, and the general conclusions to which I have arrived may thus be summarily stated.

1. The will, bearing date 20th September, 1842, was a valid subsisting testamentary instrument at the time of the decedent's death, and remained unaltered and unrevoked, except to the precise extent and degree it was modified by acts of the decedent subsequent to its date.

2. The decedent by his attack in July, 1849, was not permanently deprived of testamentary capacity. His faculties, however, were enfeebled and impaired, and his power of mental manifestation was greatly affected.

3. In a case of this kind it becomes necessary to satisfy the court, beyond the mere *factum* of the instrument, that

its provisions were the free expression of the decedent's will.

4. It is proper therefore to inquire whether the act was reasonable, natural, and probable; whether it was conformable to his known affections and dispositions, and consistent with his previous declarations and intentions; whether it was in favor of parties occupying positions of influence; and who were active in its suggestion, and participated in its performance; whether the decedent was dependent upon the beneficiaries in his ordinary habits of life, and the management of his property and affairs; and whether he was capable of giving, and did give instructions, and originate the provisions. Through these various lines of examination a conclusion may be attained, whether there is or is not affirmative proof in aid of the instrument.

5. Placing my judgment upon these principles, and their application to the proofs, I have determined that the evidence in respect to the codicils of September 15th, 1853, and June 15th, 1854, does not justify their establishment: that in view of the time of the execution of the codicil of August 29th, 1849, the circumstances, previous, attendant, and subsequent —the state of the decedent's mind at that stage of his disease, and with a due regard to the subject of that instrument (the dwelling-house on Union Square and the Wall-street premises), there is reason to conclude upon the evidence that the provisions of this codicil were in harmony with his wishes.

There must be sentence admitting the will and the first codicil, and rejecting the other instruments propounded. The costs of the parties will be paid out of the estate.

---

The proponent, Joseph Delafield, as executor and legatee, and Mrs. Parish, as legatee, appealed to the Supreme Court from that part of the Surrogate's decree which rejected the second and third codicils. The Supreme Court, at General Term, affirmed the Surrogate's decree, with opinion by DAVIES, J.

An appeal was then taken to the Court of Appeals, where the judgments below were affirmed, with opinions by DAVIES, SELDEN, and GOULD, JJ.

Those opinions are here given from a desire to preserve the unity of this interesting and important case, and present it entire to the profession. The cause was argued in the Court of Appeals by ALEXANDER S. JOHNSON, for the appellants, and by JOHN K. PORTER, for the respondents.

DAVIES; J., delivered the opinion of the court.

This is an appellate tribunal, and its ordinary duty is to review the decisions of the court from which appeals lie to it, solely on questions of law. There is a class of cases, however, where it is incumbent on us to review questions of fact, and the present cases are of that character. We are called upon, by the appeals taken therein, to affirm, or reverse, the decree of the surrogate of New York, which on appeal has been affirmed by the Supreme Court of the First Judicial District. By that decision the surrogate refused to admit to probate two codicils to the will of Henry Parish, deceased, alleged to have been made by him, one on the 15th of September, 1853, and the other on the 15th of June, 1854.

It appears that Mr. Parish, while in conceded health, in the full possession of all his faculties, and after much deliberation, frequent consultation and discussion with his counsel, on the 20th of September, 1842, made and executed his last will and testament. Although his attention seems to have been afterwards, on several occasions, attracted to its provisions, and although he must have been aware that the devise to his wife of two pieces of real estate, in the city of New York (one of which was the dwelling-house occupied by them), had been rendered inoperative by the sale of them, and although he was equally conscious that his estate had been greatly augmented, and was constantly increasing by its annual accumulations, yet while in health he intentionally and deliberately declined to make any alterations in its provisions, and for nearly seven years, notwithstanding these and other changes, persistently adhered to it, as originally framed and executed. It is seldom that so much intelligent consid-

eration, fixedness of purpose, and adherence to conclusions, are evinced in the preparation and execution of a will.

On the 19th of July, 1849, Mr. Parish, while in the apparent enjoyment of full health, was struck with an attack of paralysis, described by the physician as hemiplegia. Whether or not he had testamentary capacity after that period, has been the subject of the elaborate investigation, and the learned, able, and extended discussions in these cases.

At the time the will of 1842 was made, the testator had no child, and made no provision for any. He never had one. He estimated the total of his estate, real and personal then, to be $732,879. By this will he gave to his wife $331,000, including the two pieces of real estate subsequently sold by him, and which he estimated at $23,000. To the relatives of his wife he gave specific legacies amounting to $95,000. At the time of his attack, although he had reduced the provision made for his wife, $23,000, by the sale of the two pieces of real estate mentioned, yet he had increased the value of the New Orleans real estate given to her, by an expenditure thereon amounting to $21,500, and by addition to his furniture, paintings, statuary, silver, &c., equal to about the sum of $25,000, all which, by the provisions of the will, were given to her. He had therefore kept good the amount secured to Mrs. Parish by the will, and had enhanced it in the manner indicated, so that on the 1st of July, 1849, it amounted, according to his estimate, to about the sum of $350,000.

He thus, on grave deliberation, gave to his wife and her relations nearly two-thirds of his whole estate as it then existed. By his will he also gave specific legacies to various relatives of his own blood, and to personal friends, amounting in the aggregate to the sum of $270,000, and then *gave the residue and remainder of his estate to his two only and surviving brothers, Daniel Parish and James Parish.* The amount they would have taken, according to the testator's estimate of his estate, at the date of his will, if it had then taken effect by his death (an event which it is apparent he did not then contemplate as likely soon to happen, being

then 54 years of age, and in apparent good health), would be about the sum of $18,000 to each, less than the amount of the legacies given to each of his sisters. The small sum given to his brothers, in comparison to the amount given to others, and the language used in the will, as applicable to this residuary devise, are convincing evidence to our minds of the testator's intention to give permanency to the disposition of his property then made by him, and of his expectation that this residue would ultimately secure to his brothers such an ample portion of his estate, as would evince his affection for them, and satisfy them that their just and natural right to share in his estate had been fully recognized by him. His solicitude, in the first place, to make ample provision for his wife, is clearly apparent from the testimony of Mr. Havens. He was not only desirous of securing her such a portion of his estate as would enable her to maintain her established position in society, and supply to her all the wants and luxuries to which she had been accustomed, but he was also anxious that the provision should be so ample, that a carping and fault-finding world should so esteem it. As already observed, by his will, he constituted his two brothers his residuary devisees, and declared (and such declaration controls this residuary clause) that he intends his will not only to apply to the property then owned by him, "*but to all that may be thereafter acquired, by purchase, descent, distribution, or otherwise.*"

At this time the testator's income was about $60,000 annually, and his expenses were about $10,000 a year. Without any extraordinary expenses or outlays on his part, the testator must have been aware that his estate would be augmented by its natural increase by about the sum of $50,000 annually, and this entirely independent of the additions by profitable investments, and other uses of his means, which it is apparent were employed by him to increase his wealth. The inventory of his estate made by him July 1, 1849, shows it had increased in seven years, at the valuation he then put upon the various items of his property,

about the sum of $200,000; and add thereto the expenditure
on the Union Place property over and above his estimate of
its value, $52,000, and the actual increase was over $250,000.
He was, therefore, well aware, that by the terms of his will,
these augmentations of his estate would fall into the residuary
clause, and go to his brothers. Their portion of his estate,
he must have seen, would be munificent, and such as brothers
in these circumstances would naturally expect from a wealthy
brother, dying without issue, after making ample provision
for his widow. The testator witnessed this augmentation
with full knowledge of its destination, and with the certainty
of its continuance and increase, for the period of seven years,
without any intimation of a change of his purposes, or ex-
pressing any wish to divert it to different objects.

Such was the permanent character of the disposition made
by the testator of his estate, in full health, and such his final
and settled purpose in reference to it, down to the time of his
attack in July, 1849. From thence till his death, in March,
1856, the wife of the deceased was hardly ever absent from
his presence, and she and her relatives were his constant
companions and attendants, to the exclusion almost wholly
of his own relations, with whom, up to this period, it would
appear, he had always lived on terms of intimacy and cor-
diality.

Mr. Parish having recovered from the severity of his attack,
a codicil was prepared at the suggestion of Mrs. Parish, for
him to execute, and which was executed on the 29th of
August, 1849, whereby the testator gave to his wife certain
real estate, amounting in value to about the sum of $200,000.
The learned counsel who drew this codicil at the request of
the devisee, and superintended its execution, having, as he
says, fears that others might have doubts of the testamentary
capacity of the testator, recommended that it should be re-
executed when his health and mind should have improved;
and it being supposed that such improvement had taken
place, it was accordingly re-executed on the 17th of Decem-
ber, 1849.

In September, 1853, Mrs. Parish and her brother having made an estimate of the estate of Mr. Parish as it then was, and valuing the same at $1,186,960, Mrs. Parish drew up instructions for the disposition of about $500,000 of personal property, and employed the same counsel who had drawn the codicil of 1849, to prepare another for Mr. Parish to execute, disposing of this amount of personal estate, all of which was to be given to Mrs. Parish, except the sum of $52,000 invested in stocks, to be given to certain charities. It was claimed by Mrs. Parish that nearly all of this property was then hers, by virtue of gifts from her husband since his attack, *inter vivos*, and the nominal title to which had been changed by her from his name into hers. This codicil was doubtless prepared in consequence of the suggestion of the counsel, that grave doubts were entertained of the validity of these gifts, *inter vivos*. A codicil was accordingly prepared (incorporating into it the codicil of 1849), by which personal property amounting to $349,460 was given to Mrs. Parish, and $50,000 to be divided among certain enumerated charitable institutions. It also revoked the appointment of Daniel Parish as one of the executors of the will of 1842, and the legacy of $10,000 given to him by that will.

On the 15th of June, 1854, a third codicil was prepared by the same counsel at Mrs. Parish's suggestion, and which was executed on that day, which revoked the residuary gift and devise in the will of 1842 to the brothers Daniel and James, and installed Mrs. Parish in their place as the devisee of the whole residue of his estate.

It would seem from the testimony, if Mr. Parish's signs and gestures were correctly interpreted, that it was his will, at the time of the re-execution of the codicil in December, 1849, to revoke and annul the specific legacies, amounting to the sum of $130,000, given by the original will to the children of his brothers Daniel and James; and it appears he was only deterred from insisting that it should then be done, by the remark of the counsel, " that he wished it might not then be done; that it would fatigue and disturb Mr. Parish;

that it would require a great deal of deliberation;" and by the assurance given by the counsel "that he could come and do it at some other time." At the time of the preparation and execution of the codicil of September, 1853, in the numerous interviews and consultations had in reference to it, it does not appear from the testimony that any suggestion was made by the counsel to Mr. or Mrs. Parish in reference to the revocation of these legacies, or that the subject was alluded to by either Mr. or Mrs. Parish. At the time of the preparation of the codicil of June, 1854, in an interview between Mrs. Parish and the counsel, in Mr. Parish's presence, she again suggested that Mr. Parish wished to revoke these legacies, and the counsel understood Mr. Parish as so desiring; but on a suggestion of the counsel, that "it would be harsh to do so," the subject was dropped. It is apparent, if Mr. Parish had a wish on this subject, and it was correctly understood, it was not carried into effect by those around him, and who were alone competent, or had the power to impart vigor and give effect to his wishes. At any rate, their revocation was not incorporated into either of the codicils of December, 1849, or of June, 1854. It is therefore undeniable, that if these codicils expressed *a portion* of his wishes as to the disposition of his property, they failed to give expression to *the whole* of them, and that, as to this large sum of money, it took a direction, if Mr. Parish's gestures and signs were correctly interpreted, contrary to his expressed and earnest intentions; and his acquiescence in the suggestions made, if he did so acquiesce, shows conclusively the feebleness of his purposes, and his ready submission to the will of others.

The surrogate of New York, after a most protracted examination of witnesses, with the opportunity of hearing, and himself taking down their testimony, carefully weighing and arranging it as the investigation proceeded, scrutinizing each witness, and his manner on the stand, with the great advantage of personally seeing the intelligence, candor, accuracy, and truthfulness of each; aided by the elaborate discussions

and critical analysis of the facts by the able and distinguished counsel employed in the case—found and decided as matter of fact that the testator had not testamentary capacity on the 15th of September, 1853, or on the 15th of June, 1854, to make the two codicils of those dates respectively, and that they were not his will or any part thereof, and he refused to admit the same to probate. This decree has been affirmed by the general term of the Supreme Court, and from that decision, those claiming the codicils to be valid, have appealed to this court.

Before proceeding to the examination of the facts in the present case, it may aid us in arriving at a correct conclusion to advert to a few rules of law, which it is deemed are well recognized and long established.

It is provided by the statute law of this State, that "all persons, except idiots, persons of unsound mind, married women, and infants, may devise their real estate, by a last will and testament," duly executed, in accordance with the formalities prescribed by law (2 *Rev. Stat.*, 57, § 1); and that "every male person of the age of eighteen years or upwards, and every female not being a married woman, of the age of sixteen years and upwards, of sound mind and memory, and no other, may give and bequeath his or her personal estate by will, in writing" (2 *Rev. Stat.*, 60, § 21); and the Statute of Wills of 34 & 35 Hen. VIII., declares that no will of lands shall be valid if made by any "idiot, or by any person of *non sane* memory." But competency to execute a testament does not exist, unless the alleged testator has reason and understanding sufficient to comprehend such an act. (*Swinburne on Wills*, part 2, § 4; *Marquis of Winchester Case*, 6 *Rep.*, 23 a; *Combe's Case, Moore*, 759; *Herbert* v. *Lows*, 1 *Ch. R.*, 12, 13; *Mountain* v. *Bennett*, 1 *Cox*, 353.) In the Marquis of Winchester Case, it is said that "by law it is not sufficient that the testator be of memory, when he makes his will, to answer familiar and usual questions; but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason,

and that is such a memory which the law calls sound and perfect memory." In *Mountain* v. *Bennett* (1 *Cox*, 353), the Lord Chief-Baron said: "Two things must be made out, in the first instance, by those who support the will—the formality of the instrument, and the sanity of the person making it; that, if a party impeaching a will relies upon actual force being used upon the testator, it is incumbent on him to show it;" and he adds that "there is another ground, which, though not so distinct as that of actual force, nor so easy to be proved, yet if it should be made out, would certainly destroy the will—that is, if a dominion was acquired by any person over a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind." Lord KENYON, in addressing the jury in *Greenwood* v. *Greenwood* (3 *Curteis*, app. 2), says: "I take it, mind and memory competent to dispose of his property, when it is a little explained, perhaps may stand thus: having that degree of recollection about him that would enable him to look about the property he had to dispose of, and the persons to whom he wishes to dispose of it; if he had the power of summoning up in his mind so as to know what his property was, and who those persons were that then were the objects of his bounty, then he was competent to make his will."

In *Marsh* v. *Tyrrell* (2 *Hagg.*, 122), that experienced and learned judge, Sir JOHN NICHOLL, said: "It is a great but not uncommon error, to suppose, that, because a person can understand a question put to him, and can give a rational answer to such a question, he is of perfect sound mind, and is capable of making a will for any purpose whatever; whereas the rule of law, and it is the rule of common sense, is far otherwise: the competency of the mind must be judged of by the nature of the act to be done, from a consideration of all the circumstances of the case."

The observations of ERSKINE, J. (*Harwood* v. *Baker*, 3

*Moore P. C.*, 282–290), a case not unlike that now under consideration in some of its leading features, are worthy of note.   He says : " But their lordships are of opinion, that, in order to constitute a sound, disposing mind, a testator must not only be able to understand that he is by his will giving the whole of his property to one object of his regard, but that he must have also capacity to comprehend the extent of .his property, and.the nature of the claims of others, whom, by his will, he is excluding from all participation in 'that property ;" and he justly and truthfully adds, " that the protection of the law is in no cases more needed than it is in those where the mind has become too' much enfeebled to comprehend more objects than one, and most especially when that one object may be so forced upon the attention.of the invalid as to shut out all others that might require consideration ; and therefore the question which their lordships propòse to decide in this case, is not, whether Mr. Baker knew when he was giving all his property to his wife, and excluding all his other relations from any share in it; but whether he was at that time capable of recollecting who those relations were, of understanding their respective claims upon his regard and bounty, and of deliberately forming an intelligent purpose of excluding them from any share of his property." Mr. Justice WASHINGTON, in *Harrison* v. *Rowan* (3 *Wash. C. C.*, 385, 386), speaking of the capacity of a testator necessary to a valid will, remarks : " He must, in the language of the law, have a sound and disposing mind and memory.   In other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who are the objects of his bounty, and the manner in which it is to be distributed between them."

In *Den* v. *Johnson* (2 *Southard*, 454), the chief-justice, in charging the jury on this point, said, " that a disposing mind and memory is a mind and memory which has the capacity of recollecting, discerning, and feeling the relations, connections, and obligations of family and blood; that, though it

has been sometimes said, as had been stated, from the books, that if one could correctly tell his name, say the day of the week, or even ask for food, it is a sufficient evidence of a disposing mind; yet such sayings, though they show that wills are not likely to be set aside on suggestions of incapacity, can and ought to have but little weight with rational men, investigating the truth upon their oaths; that if, upon the whole, they should be of opinion that the mental powers of the testatrix were so far enfeebled and broken as that she could not make a discreet disposition of her affairs herself, and that the will in question was devised by other persons, and only assented to by her upon being asked, without the power of understanding it, then they ought to find for the plaintiff;" that is, that it was not her will.

In *Boyd* v. *Eby* (8 *Watts*, 66), SERGEANT, J., in delivering the opinion of the court, says: "The great, broad, and intelligible question is, whether the mind was restored so as to be sound, whole, *compos;* or whether a portion of its thinking and judging powers, as connected with the subject of the will, remained mangled and perverted at the time of making the codicil, so as to leave it incapable of interfering with his former disposition of his estate, with judgment and discretion." In *Shropshire* v. *Reno* (5 *J. J. Marsh.*, 91), ROBERTSON, Ch. J., observed that the facts in that case led the court to the opinion " that the testator had not a disposing mind; or that, if he ever had, it was not in a disposing state. He was not superannuated, nor was he absolutely *stultus* or *fatuus;* but all the facts combined tend to show that he had not a sound memory, nor sufficient mind, nor a mind in a proper state for disposing of his estate with reason, or according to any fixed judgment or settled purpose of his own. This we consider the true test, established not only by philosophy, but by law." *Converse* v. *Converse* (21 *Vermont*, 168) lays down the rule, " that if the testator, when he made the will, was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the will was composed, and the disposition of his property as

therein provided for, both as to the property he meant to dispose of by his will and the persons to whom he meant to convey it, and the manner in which it was to be distributed between them, then he possessed a sound and disposing mind and memory." This rule was approved by REDFIELD, J., who added : "He must undoubtedly retain sufficient active memory to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them." In 1828, Chancellor WALWORTH, in *Clarke* v. *Fisher* (1 *Paige*, 171), said : "The general principles in relation to the capacity of a person to make a will are well understood. He must be of sound and disposing mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty." In that case the chancellor reversed the decision of the surrogate, which admitted the will of John Fisher to probate. The testamentary capacity of John Fisher was again the subject of a judicial investigation before Vice-chancellor Sandford, in 1845 and 1846 (3 *Sandf. Ch.*, 351), and he held that he had testamentary capacity. This decree was reversed on appeal by the chancellor, who held the will void, and this court on appeal affirmed the decree of the chancellor (2 *N. Y.*, [2 *Comst.*] 498). It is stated in a note by the reporter, that a majority of this court were of the opinion, upon all the facts, that the chancellor had properly set aside the will, but without passing upon the question as to the degree of mental capacity necessary to make a will, affirming the proposition that the testator in that case had not testamentary capacity. SHANKLAND, J., said : "That regarding as he did the cases of *Stewart* v. *Lispenard* (26 *Wend.*, 255) and *Blanchard* v. *Nestle* (3 *Den.*, 37) as fixing the standard of testable capacity at any point above that of the idiot and lunatic, the will can-

not be declared void for the want of a sound disposing mind. The case of *Stewart* v. *Lispenard* has challenged much discussion in this State, and has not been regarded with favor by the bench or the bar. The circumstances under which it was heard and decided on the part of the court, are such as to carry with it little, if any, weight of authority. In that case, the will of a person conceded to be but a slight remove, in intellectual power, above an idiot was, by the decree of that court, directed to be admitted to probate. The argument of the case was commenced in that court on the 21st of December, 1841, and concluded on the 24th. On the 31st of that month, the last day of the official term of one-fourth of the senate, the case came up for decision, and was decided, with little opportunity for an examination of the facts, which the report says were contained in a voluminous case of upwards of 300 pages, and without the benefit of any written opinion, except that of Senator LIVINGSTON (and which has since been published), or any suggestions even from the judges of the Supreme Court;—the only justice of that court being present by courtesy to form a quorum, stating that he had no written opinion to present, not having had leisure, since the argument was closed, to digest the facts of the case, or even to read the numerous authorities which had been cited, amounting to nearly or quite a hundred cases, and he declined to deliver an opinion. Senator VERPLANCK orally stated his reasons for reversal, and thereupon the court, composed exclusively of senators, by a vote 12 to 6, reversed the decree of the chancellor, which affirmed the judgment of the circuit judge, who affirmed the decree of the surrogate refusing to admit the will to probate; and the court, by a vote of 11 to 8, made a decree directing the will to be admitted to probate. After the breaking up of the court, the learned opinions of two of the senators who voted to reverse the decree of the three courts below were published, and appear in our reports; but they must be regarded as containing the views of the distinguished senators, and not those of the court. We fully concur in what is said by Mr. Justice

CLERKE in *Thompson* v. *Thompson* (21 *Barb.*, 116), that
"the opinions of these learned and distinguished senators in
this case are not binding authority." It was not an inappro-
priate commentary upon this case to add, that subsequent to
the decision of the Court of Errors, in an action of ejectment
in the Superior Court of New York, before Chief-justice
Oakley and a jury, the jury, under instructions from the
court, found that this same Alice Lispenard was an idiot,
and had no testamentary capacity, thus annulling this same
will as to real estate. This verdict was rendered after a pro-
tracted investigation, and the examination of a large number
of witnesses. *Blanchard* v. *Nestle* (3 *Den.*, 37) was decided
in the Supreme Court in 1846, and affirmed the doctrine of
*Stewart* v. *Lispenard*, and mainly on the authority of that
case, that mere imbecility of mind in a testator, however
great, will not avail against his will, provided he be not an
idiot or a lunatic. In *Stanton* v. *Weatherwax* (16 *Barb.*, 259)
the Supreme Court of the Fifth District reversed a judg-
ment of the surrogate, in which he applied to the testator
the rule in reference to idiots and imbeciles, as stated and
illustrated in the Lispenard case. The court say, that "per-
haps the unsoundness of the testator's mind extended to so
many subjects, and perverted his judgment in relation to so
many topics as to obscure and distort his entire mental facul-
ties, and to amount to a general unsoundness of mind, which
would entirely incapacitate him from making a rational or
valid disposition of his property."

In *Newhouse* v. *Godwin* (17 *Barb.*, 236), STRONG, J., thinks
the rule established, referring to the Lispenard case, and
*Blanchard* v. *Nestle*, that the wills of excessively weak per-
sons,—and by those he says he means persons of the lowest
degree of mental capacity, where there is a glimmer rather
than light,—are to be sustained; and he says "we must sub-
mit to it, whatever may be our opinion as to its necessity,
propriety, or expediency." This court, in two late cases un-
der its consideration (*Buel* v. *McGregor*, and in the *Matter
of the Will of Richard Ustick*), has not considered this rule

as of obligatory force upon it, but has been disposed to give the language used in the statute its natural and obvious import and meaning. We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the Statute of Wills, a person of sound mind and memory, and is competent to dispose of his estate by will.

We are next to consider upon whom the law casts the burden of establishing the will of a deceased person. The party producing the paper, or the proponent of a will, makes the allegation that it is the will or the wish of a free and competent testator, and the *onus probandi* is upon the party propounding the alleged testamentary paper. The conscience of the court is to be satisfied by the party setting up the will, that it is the will of a free and capable testator. This clearly recognized rule is well expressed by PARKE, B., in delivering the judgment of the Judicial Committee of the Privy Council in *Barry* v. *Butlin* (1 *Curt.*, 637 ; 2 *Moore P. C.*, 480), where he says : " The rules of law, according to which cases of this nature are to be decided, do not admit of any dispute, and they have been acquiesced in on both sides. These rules are two : the first, the *onus probandi*, lies in every case upon the party propounding the will, and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator." Again : " In all cases, this *onus probandi* is imposed on the party propounding a will." In the late case of *Broming* v. *Budd* (6

*Moore P. C.*, 430), the same learned judge said: "Their lordships have to apply to the facts of the case the established rule on this subject laid down in *Parke* v. *Ollatt* (2 *Phil.*, 323), and fully explained in the case of *Barry* v. *Butlin* (2 *Moore P. C.*, 480), viz., that the burden of proof lies upon the party propounding a will, and that a court of probate is not to pronounce in its favor unless it is judicially satisfied that the instrument propounded is the last will of a free and capable testator."

In *Panton* v. *Williams* (2 *Curt.*, 530; 2 *Notes of Cases*, supplement, 21–29), certain papers propounded as the will and codicils of a party deceased, opposed on the grounds of forgery and fraud, were pronounced for by the Prerogative Court, but with great doubt and difficulty. That sentence was reversed by the judicial committee of the Privy Council, further evidence having been admitted. Lord BROUGHAM, in delivering the opinion (2 *Notes of Cases*, supplement, 29), said: " It is of itself not immaterial to consider that the contention of those who are setting up these papers is incumbered with so much difficulty; for whether the question arises between a will and an alleged intestacy, or, as in the present case, between one will and another of a prior date, the proof being upon the party propounding any testamentary writing, the course of administration directed by the law is to prevail against him who cannot satisfy the conscience of the court of probate that he has established a will, or the prior instrument which is liable to no doubt, is to be established in preference to the posterior one, which cannot be so proved to speak the testator's intentions, as to leave the court in no doubt that it declares those intentions. There is no duty cast upon the court to strain after probate, and to grant it where grave doubts remain wholly unremoved, and great difficulties oppose themselves to our progress, which we are quite unable to surmount." Again, he says: " It may suffice to say, that the proof eminently lies on him who sets up a will; and further, that it is more fatal than to his adversary if he leaves difficulties entirely without explanations." He adds:

"It is much less material that those who seek to impeach a testamentary instrument should be unable to explain certain things in their case, and should be forced to admit that their argument is not in every point consistent with all the facts, than that they, who seek to establish the will, should give no rational, consistent, or intelligible solution of those difficulties which incumber their suppositions, and obstruct the path towards the conclusion they would have us arrive at. . . . We are of the opinion that grave suspicions rest upon material parts of the case, which it was necessary should be removed before probate could be given, and that they have not been removed; that the testimony of the witnesses relied upon does not counteract the weight which the undoubted facts of the transaction fling into the other scale—nay, that there is no great difficulty in reconciling much of that testimony, indeed all its most important portion, with the undisputed facts to which, upon a superficial view, it might seem repugnant."

In *Baker* v. *Batt* (2 *Moore P. C.*, 317), PARKE, B., said: "No rule has been acted upon in the court below which has not been long observed, not only in the ecclesiastical courts, but those of common law. . . . . For if the party upon whom the burden of the proof of any fact lies, either upon his own case, where there is no conflicting testimony, or upon the balance of evidence, fails to satisfy the tribunal of the truth of the proposition which he has to maintain, he must fail in his suit, and that in a court of probate where the *onus probandi* most undoubtedly lies upon the party propounding the will, if the conscience of the judge, upon a careful and accurate consideration of all the evidence on both sides, is not judicially satisfied that the paper in question does contain the last will and testament of the deceased, the court is bound to pronounce its opinion, that the instrument is not entitled to probate; and it may frequently happen that this may be the result of an inquiry, in cases of doubtful competency in particular, without the imputation of wilful perjury on either side; or it may be, the judge may not be satisfied on which side the perjury is committed, or whether it certainly exists."

The same rule is distinctly recognized and enunciated by the Supreme Court of Massachusetts, in *Crowninshield* v. *Crowninshield* (2 *Gray*, 526). It was there held, in accordance with the universal rule, that the burden of proving the sanity of the testator is upon him who offers the will for probate, and this burden does not shift upon evidence of his sanity being given by the subscribing witnesses. THOMAS, J., in an able and learned opinion, says: "When one dies owning real and personal estate, the law fixes its descent and distribution. Under certain conditions, however, it gives to such owner the power to make a disposition of his property, to take effect after his death. This is done by a last will and testament. To make such will, certain capacities are requisite in the maker, and certain formalities for its due execution. . . . . . When, therefore, a will is offered for probate, to establish it, to entitle it to such probate, it must be shown that the supposed testator had the requisite legal capacities to make the will; to wit, that he was of full age and of sound mind, and that in making it the requisite formalities have been observed. The heirs-at-law rest securely upon the statutes of descent and distributions until some legal act has been done by which their rights under the statutes have been lost or impaired. . . . Upon whom, then, is the affirmative? The party offering the will for probate says in effect, This instrument was executed with the requisite formalities, by one of full age and of sound mind,—and he must prove it; and this is to be done, not by showing merely that the testament was in writing—that it bears the signature of the deceased, and that it was attested in his presence by three witnesses; but also that it was signed by one capable of being a testator, one to whom the law had given the power of making disposition of his property by will." The learned judge further adds: "There are strong reasons why the same presumption as to sanity should not attach to wills as to deeds in ordinary contracts. Wills are supposed to be made *in extremis.* In point of fact, a large proportion of them are made when the mind is to some extent enfeebled by sickness or old age. It

is for this reason that the execution of the will and the proof of its execution are invested with more solemnity, the statute requiring it to be attested by three or more competent witnesses; making void all beneficial devises, legacies, or gifts to such interested witnesses, and requiring the presence of the three in probate court for its proof." In conclusion, he says: "On the whole matter, we are of opinion that where a will is offered for probate, the burden of proof in this commonwealth is on the executor or other persons seeking probate, to show that the testator was, at the time of its execution, of sound mind; that if the general presumption of sanity applicable to other contracts is to be applied to wills, it does not change the burden of proof; that the burden of proof does not shift in the progress of the trial, the issue throughout being one and the same; and that if, upon the whole evidence, it is left uncertain whether the testator was of sound mind or not, then it is left uncertain whether there was under the statute a person capable of making the will, and the will cannot be proved."

We have quoted thus largely from this opinion, for the reason that it is, to our mind, one of the most able and satisfactory upon the points under consideration in this case with which we have met. It is most carefully considered, ably reasoned, and fully sustained by authority. Its results command our entire assent. (See, also, *Quick* v. *Mason*, 22 *Maine*, 438; *Cilley* v. *Cilley*, 34 *Id.*, 162; *Wallis* v. *Hodgson*, 2 *Atk.*, 56; 1 *Powell on Devises*, Jarman's ed., 81; *Newhouse* v. *Godwin*, *supra*; *Clarke* v. *Sawyer*, *supra*.) In this connection, it may be well to add a few remarks from the opinion of Mr. Justice ERSKINE, in the case of *Harwood* v. *Baker* (3 *Moore P. C.*, 382). They are in point, and lay down with accuracy the principles which should govern us in the examination of the evidence in this cause. He says: "Keeping in mind the principle, that in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does contain the last will and testament of the deceased, and that this obligation is more especially

cast upon him when the evidence in the case shows that the mind of the testator was generally, about the time of the execution, incompetent to the exertion required for such a purpose; and further, keeping in mind that the disposition in question was not in accordance with any purpose deliberately formed before his mind became enfeebled by disease, we come to the examination of the witnesses whose evidence is relied on as proving that at the time of executing the will in question, he was fully competent to form, and did deliberately form, the intention of leaving to his wife the whole of his property."

It seems to us that these cases fully establish the following propositions:

1. That in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does declare the will of the deceased; and that the supposed testator was, at the time of making and publishing the document propounded as his will, of sound and disposing mind and memory.

2. That this burden is not shifted during the progress of the trial, and is not removed by proof of the *factum* of the will, and the testamentary competency by the attesting witnesses, but remains with the party setting up the will.

3. That if, upon a careful and accurate consideration of all the evidence on both sides, the conscience of the court is not judicially satisfied that the paper in question does contain the last will of the deceased, the court is bound to pronounce its opinion that the instrument is not entitled to probate.

4. That when it is sought to establish a posterior will, to overthrow a prior one made by the testator in health, and under circumstances of deliberation and care, and which is free from all suspision, and when the subsequent will was made in enfeebled health, and in hostility to the provisions of the first one; in such case the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the court of probate that he has established a will. And also the prior will is to prevail, unless the subsequent

one is so proven to speak the testator's intentions, as to leave no doubt that it does so speak them,

5. That it is not the duty of the court to strain after probate, nor in any case to grant it, where grave doubts remain unremoved, and great difficulties oppose themselves to so doing.

6. That the heirs of a deceased person can rest securely upon the statutes of descents and distributions, and that the rights thus secured to them can only be divested by those claiming under a will and in hostility to them, by showing that the will was executed with the formalities required by law, and by a testator possessing a sound and disposing mind and memory.

The maxim, *Qui se scripsit hæredem*, has imposed by law an additional burden on those claiming to establish a will under circumstances which call for the application of that rule, and the court in such a case justly requires proof of a more clear and satisfactory character. Such a condition is exhibited by the testimony in the present case. The two codicils under consideration were exclusively for the benefit of Mrs. Parish, with the exception of the charitable gifts; and although they were not actually written by her, yet they were drawn up at her suggestion, upon her procurement, and by counsel employed by her. She prepared and gave the instructions for them, and in judgment of law they must be regarded as written by herself: *Facit per alium, facit per se.* The rule which should govern the court in such a case is enunciated in *Barry* v. *Butlin* (1 *Curt.*, 637). It is there said, that if a party writes or prepares a will under which he takes a benefit, that it is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased. By the civil law such a will was rendered void, and it may be well doubted whether we have

acted wisely in departing from its just and rational provisions in this respect; and it is well said by the court, in *Crispell* v. *Dubois* (4 *Barb.*, 393), that, though this rule of the civil law has not been adopted in our courts, yet they do demand satisfactory proof in such cases that the party executing the will clearly understood and freely intended to make that disposition of his property which the instrument purports to direct. The doctrine is well stated in *Parke* v. *Ollatt* (2 *Phill.*, 323), that " where a person who prepares the instrument and conducts the execution of it, is himself an interested person, propriety and delicacy would infer that he should not conduct the transaction."

In this case, conceding that Mr. Parish had some mind, it must also be conceded that it was greatly enfeebled ; and it is undeniable that he was very much in the power of those by whom he was surrounded, unable to communicate except by their aid and through their interpretation, and in answer to questions which they saw fit to make, and by assenting to or dissenting from such suggestions as were made to him. Mrs. Parish was for all purposes his only channel of communication, and his sole interpreter, and the only person from whom all suggestions fruitful of results came; and it follows, conceding she might not have been the actual scrivener, or even not the employer as principal of the scrivener, that the same rule should apply as in cases when the scribe is the chief beneficiary under the will. The reason of this rule would require that these codicils should be fortified and supported to the same extent, and in the same way, as if she had drawn them herself.

Having, as we think, distinctly and satisfactorily ascertained the principles of law which should govern courts in the determination of testamentary cases, and which we have been thus careful to announce as safeguards for the protection of the community, we now proceed to the application of those principles to the testimony in the present case. Such an examination must necessarily in this discussion be confined to its more salient parts. The testimony occupies three octavo

volumes, and a brief reference to that portion of it deemed the most significant is all that can be done here.  We shall now regard this court for the purpose of such investigation, as sitting as the primary tribunal, before which the application may be considered as pending, to admit to probate the two codicils in controversy.  If it shall be found that the testimony is of such a character that no doubt remains that the two papers propounded express the will of a free and capable testator, then the codicils must be admitted to probate.  If, however, the conscience of the court, upon a careful and accurate consideration of all the evidence on both sides, is not judicially satisfied that the papers in question do contain the last will and testament of the deceased, the court is bound to pronounce its opinion that the instruments are not entitled to probate.

It is impossible, within any reasonable or practicable limits, to review in detail the mass of testimony taken in the present case.  A very large portion of it is occupied with the opinions of many highly intelligent and respectable gentlemen, having more or less opportunities for observation of the mental vigor of Mr. Parish after his attack, and their conviction that he understood what was said to him, by signs and gestures, and in some instances by the use, as they understood him, of the monosyllables "yes" and "no," thereby communicating his thoughts and wishes to those around him.  Opinions of witnesses, however respectable, can only have weight and value when accompanied with the facts upon which they are based, and, having the facts, it is for the jury, or the tribunal called upon to scan and consider the testimony, to see if the conclusions and opinions of the witnesses are sustained by the facts detailed by them.   Opinions without facts are of but little importance.  (*Clarke* v. *Sawyer*, 3 *Sandf. Ch.*, 351 ; *Cilley* v. *Cilley, supra ;  De Witt* v. *Barly*, 17 *N. Y.* [3 *Smith*], 340.)

We shall advert only to such portions of the testimony as have impressed our minds as of peculiar significance, and have led us irresistibly to the conclusions at which we have

arrived.   Before doing this, however, it is well to consider
for a moment the condition in life, the associations, and
social position of Mr. Parish previous to the attack in July,
1849.   We have a full and minute account of his life from
his youth upward.   It seems to have been peculiarly blame-
less and free from reproach.   The breath of scandal never
tarnished his fair name, and his conduct seems to have been
in the highest degree circumspect, and such as became a
gentleman of the most fastidious tastes and refined associa-
tions.   In 1829, occupying then a high social position, and
having accumulated a fortune which was then deemed ample
and large, he was married to Miss Susan Maria Delafield.
She was an accomplished lady, moving in the highest social
circles of the city, and of a family distinguished by the intel-
lectual vigor of its members, and by the high professional
position of her distinguished brothers.   To this circle Mr.
Parish was welcomed with cordiality and affection.   It is
proven in the case that her mother loved him as a son, and
her brothers regarded him as a brother.   For twenty years
Mr. Parish lived and moved in this circle and with these as-
sociations, "*sans peur et sans reproche.*"   He gained upon
the affections and the respect of his wife's family, and its
members seem to have been his most intimate friends and
constant associates ; and their friendship and attachment to
him were apparently never weakened, but greatly strength-
ened.   His house was the abode of hospitality, and at his
table and at his feasts were gathered the most refined, polite,
and intellectual of New York society.   Mr. Kernochan, his
life-long associate and intimate friend, his almost daily com-
panion from boyhood until the hour of his death; with bet-
ter and fuller opportunities of knowing him than any other
man (except perhaps his brother Daniel), and most compe-
tent from his intelligence and acquaintance with men to form
an accurate and reliable judgment, says of him, " he was the
most placid and unexcitable man I ever knew, of great self-
respect, and great command of temper."   Dr. Delafield says,
" he was of studious courtesy and propriety of demeanor."

Col. Richard Delafield says, "his manners were mild, gentle, and unruffled." Mr. Henry Delafield, who knew him intimately, from residing part of every year in the same house with him for twenty years, says "he was exceeding affable and courteous." And Dr. Taylor, the eminent rector of Grace Church, where Mr. Parish constantly worshipped for more than twenty years, and who was on terms of intimate association with him, says: "His conduct was marked most decidedly by great self-respect and strict observance of decorum, and, in his intercourse with others, great courtesy and affability of manner." This was the daily walk and carriage, and such the estimate of the gentlemanly bearing of Henry Parish, up to July 19, 1849.

How utterly changed did he become after that day, is conclusively established by the uncontradicted testimony of many witnesses. We shall only advert to a few of the most remarkable and striking incidents, indicating unmistakably the total transmutation, from that day, of his character and habits. The review is painful and would willingly be omitted. In the view we take of this case, it is quite controlling, and it cannot therefore be avoided. The facts narrated show the changed man, and the inferences to be drawn from them are conclusive. In March, 1850, as related by Dr. Taylor, this scene occurred at Mr. Parish's house after he had administered the communion to Mr. and Mrs. Parish and their attendant Mary Ann Greene. As Dr. Taylor was going away, Mrs. Parish took out of her pocket three gold pieces of $5 each, and handed them to Mr. Parish to be given by him to Dr. Taylor. Then "Mr. Parish evinced strong displeasure by his looks and contemptuous mode of expression, frowning, and saying 'yah, yah, yah,' shaking his head at Mrs. Parish, scolding in his way, and refusing to hand" Dr. Taylor the money. She smiled and said, "give it to the doctor." He threw the money back to her, it fell on the floor—she picked it up and gave it to the doctor, and he left.

The interview between Mr. Parish and Mr. Daniel Parish at the house in December, 1850, furnishes another striking

illustration of the change in Mr. Parish's manners and character. The testimony clearly shows that the brothers Henry and Daniel had ever lived together on terms of more than ordinary fraternal intimacy. Daniel was the younger brother, and had, in early life, been taken from home by him, and associated with him in business, and had thus opened up to him his subsequent laudable career. We cannot see that any cloud had ever obscured their friendly regard for each other, and as their natures seem to have been peculiarly undemonstrative, we have but few evidences of outward manifestations of their interest in, or affection for each other, except as we gather them from circumstances. We cannot fail to see, however, underneath a calm and unruffled exterior, a deep current of warm affection for each other, and Henry manifested this feeling towards his brother Daniel on many marked occasions. His sympathy for his brother, at the period of his pecuniary losses, and the delicate and inoffensive way in which Henry contributed from his own means to repair them, may be cited as evidences of his warm feelings for and interest in Daniel and his family. We see no reliable evidence in the case, that any change was ever wrought in Mr. Henry Parish's mind towards his brother. The trifling incidents referred to as causes for the suggested change of sentiment, are wholly inadequate to produce such a result. It is incontrovertible that Mrs. Parish, for some cause, had certainly not the most friendly feelings towards Mr. Daniel Parish. If she had formed the designs attributed to her, it is not unnatural that she should have desired to exclude Mr. Daniel Parish from the society and house of her husband, that she should have received, with distrust and suspicion, his every act of omission or commission, and she should have hoped and expected that her husband would have participated in and sympathized with her in her animosity to Mr. Daniel Parish. It is upon this hypothesis that we may credit the testimony of Quin that, on the next day after Mr. Parish's attack, she gave orders to exclude from the house Daniel Parish and the members of his family.

That such exclusion did actually take place is uncontradicted. No mention was made as to James Parish, and the reason may be that, as he lived in the country and was partially blind and not in the habit of visiting the city, it was supposed no effort would be made by him to see his brother, and any attempt to exclude him was uncalled for. It is certain that he did not visit his brother Henry, and whether his failure to do so was prompted by knowledge of the exclusion of his brother Daniel, and the natural inference that he would also be excluded, or from inability to travel, does not appear. There is no evidence in the case of any expression of dissatisfaction towards him by Mr. Henry Parish on account of such omission, or any exhibition of unfriendly feeling towards him or his family, if we except the wish said to have been expressed by Mr. Parish, as interpreted by Mrs. Parish to Mr. Lord, that he desired to revoke the legacies to the children of James.

In this place it may be well to remark upon the interviews, and the only ones had by Mr. Daniel Parish with his brother after his attack. The first one was about the 20th of August, 1849, as near as it can be stated from the testimony; when, on calling at the house to inquire as to the condition of his brother, Quin, the waiter, let him in, having heard the doctor say that his brother was " very low, he was afraid he would do no good." Quin, thinking he would not live, told Mr. Daniel Parish, in disobedience of his instructions, "to go right up and see his brother now, that when he would call again he would not see him alive." Mr. Parish proceeded immediately to his brother's sick-room, and, as he was about entering, he met Mrs. Parish, who objected to his going in, saying " he was not in a condition to be seen." He went in, notwithstanding, and this first interview of the brothers would seem to have been of the most friendly character on the part of both. A servant was sent into the room to report to Mrs. Parish what Mr. Daniel Parish was doing there, and he saw him (Daniel) " having hold of his brother in the bed by his hand." There is no evidence that Mr. Henry Parish

evinced any displeasure at this visit. When Mr. Daniel Parish left the house, Mrs. Parish gave instructions to Quin "to be particular not to let him in again." About the middle of October, 1849, Mr. Parish was very feeble, and Dr. Taylor thought it very probable that he would shortly die. On the 16th, Mr. Daniel Parish called to see him, and was admitted by Mrs. Parish, and if he then saw his brother, which is left by the testimony in some doubt, this was the second interview. We have no statement of what occurred (if it took place), and only know it was short. This may be well supposed, as it was expected Mr. Parish would not long survive. On the 8th of January following, Mr. Henry Parish was driven down to the office, where for many years he and his brother and their partners had transacted business, and then Daniel Parish came up to him, shook hands with him, and said: "How do you do, Henry?" There is no evidence on this occasion that Mr. Parish evinced any unfriendly or hostile feeling to his brother Daniel. Between this period and May 1, 1850 (from the testimony, the latter part of January), Henry Parish again visited the counting-house in Water-street, and met there his brother Daniel. He came forward and shook hands with his brother Henry, and inquired after his health. There is no evidence of any unfriendly feeling exhibited on this occasion by Henry Parish to his brother. About the last of February, 1850, Henry Parish was severely attacked with a convulsion, and Dr. Delafield, his physician, deeming his condition alarming, and considering his recovery to be nearly hopeless, it would appear, without consulting Mrs. Parish, dispatched a messenger immediately for his brother Daniel. What transpired on the occasion of this visit, does not appear. Daniel Parish, on his return from Europe in November or December, 1850, calls on his brother Henry with his two daughters, was kindly received by him, and went with him into the drawing-room. While there, Mrs. Parish came in, and soon evinced her displeasure at the presence there of Mr. Daniel Parish, and ordered him to leave the house. This is the last time Henry and Daniel

ever met, and, so far from Henry exhibiting any unkind feeling towards Daniel in any of these interviews, it is shown that he evinced the utmost excitement and anger towards his wife, for her apparent harsh and unkind treatment of him on the occasion.of this last visit. The case is, therefore, without a scintilla of evidence that Henry Parish, on any occasion, gave expression to any hostility to his brother Daniel, or of any change of feeling towards him.

We resume the narration of acts and conduct of Mr. Henry Parish. At the interview at the house in the latter part of 1850, just referred to, Henry Parish manifestly thought that Mrs. Parish was treating his brother with rudeness and impropriety, if he had mind to comprehend what was transpiring; at any rate, he saw something was going on offensive to him, and that.Mrs. Parish's manner to Daniel was unfriendly and harsh. If he could understand what was said, he heard her order his brother to leave *her* house, and saw her follow him down stairs, as if intending herself to see that he promptly obeyed her commands. At this, Henry Parish became greatly excited, and the witness, his attendant at the time, says: " Mr. Henry Parish got quite outrageous in my hands. Mr. Parish had his crutch; he raised it with the intention of hitting Mrs. Parish, who stood in the front hall; just as he raised his crutch, I swung him round from the right side, and got him into the dining-room." It is not a little extraordinary that, if Henry Parish then entertained towards his brother Daniel the unfriendly and hostile sentiments now alleged and claimed, and if he heard and understood all that was transpiring, he should not have sought to inflict chastisement *upon that brother*, whom, on this hypothesis, he must have greatly disliked, if not hated, and who had in his presence insulted his wife; rather than *upon her*, the advocate and avenger of *his* wrongs, and the object of contumely on his account.

Again we have a striking illustration of Mr. Parish's condition, from the statement of Austin, the poulterer at Washington market. What transpired there is referred to in

another connection, and need not be here detailed.   Mr. Parish was sent almost daily, with an attendant, to a market in the vicinity of his residence, not, it would appear, for the purpose of making purchases, but to amuse him and occupy his time.   He does not seem to have had an intelligent object in going, nor did Mrs. Parish or his attendant, or the persons at the market, pay much heed to what he did or was supposed to communicate.   This attendant, in 1850 and 1851, in describing his daily habits, says: "Mr. Parish would take the game and put it to his mouth, the same as he did his pants."   The extraordinary proceedings in the carriage, as detailed by the coachman, Clark, when he threatened the demolition of the carriage-windows because he was not taken down town, and the noise and commotion created in the street, and which was quieted by the shallow and successful trick of Clark to deceive him, and make him believe he had been down town, when, in fact, he had only driven him a short distance and back, are quite inharmonious with any thing developed in his character prior to the attack.   The melancholy exhibition at Buchanan's flower-garden, as detailed by Clark, shows the changed man, and the forgetfulness of the gentleman, and the habits of the imbecile.   His inability to control the calls of nature is a marked and prominent fact in this case, and such inability has ever been regarded as a distinguishing evidence of the loss of mental power.   On this occasion such absence of control was peculiarly offensive and improper, and no sense of shame, mortification, or of regret, seems to have been produced in him by the occurrence.   Mrs. Parish was excited, and found fault with the attendants.   They thought to justify themselves by throwing the whole blame on Mr. Parish, and he at length became excited also.   Clark says: "He made noises and sounds both, but I disremember what they were.   I wasn't looking him over my shoulder at all, but I heard him hollowing and bawling."   As an evidence of the total insensibility of Mr. Parish to all the decencies and proprieties of life, a simple reference to his condition of nudity, in rushing into

the presence of his wife and seeking her garments for his, and, in this condition, sinking in exhaustion from excitement on the floor, will suffice. He had to be raised from it by Mrs. Parish and the servants. His search for his garments, in the place appropriated for hers, occurred five or six times. The scenes which daily transpired, as detailed by Clark, one of his attendants, while Mr. Parish occupied the room on the ground-floor, fronting on 17th-street, are of the same general character. He says: "In the morning, when I would be dressing (meaning Mr. Parish), he wished to have the windows open, would sign to have the blinds and all open; he would look that way out, and I would say, 'It is wrong for you to expose yourself against the windows.' He would say then, 'Yanne, yanne, yanne,' raising his hand that it should open, shaking his head; the windows then couldn't be shut, Mrs. Parish insisting they should be kept shut. Mrs. Parish came several mornings to shut them herself. Mr. Parish would shake his head this way, and would not have it, raising his left hand and moving it towards the windows as if to have them opened, saying, 'Neay, neay, neay.' Then Mrs. Parish by-and-by came in again, and drew over the curtains behind Mr. Parish's back, to keep the people from looking in. Then Mr. Parish by-and-by turns round his head, and sees the curtains drawn, and has them opened again in the same way. Then Mrs. Parish comes and says to him, 'Mr. Parish, won't you keep them shut?' he then lifted up his hand and gave Mrs. Parish a drive, saying, 'Neay, neay, neay,' as if to put her away from him."

On a cold winter's night the following occurrence took place. The witness says Mr. Parish was sitting in the library with Mr. Delafield and Mrs. Parish. "He seemed to be very weary and unhappy in his mind, and I was sent for and took him by the arm, and went out into the front hall. He was determined apparently to go out, and I told Mrs. Parish: she came out into the hall with his hat, and put it on his head, and said, if he was going out he had better have his hat on. He raised his left hand and threw his hat right off

his head in the hall, and we went out the front door, and Mrs. Parish closed both doors after us, and shut us out, as it was a very cold winter's night, and she did not wish to have the doors open.   There had been some men working in front of the house during the daytime, and there was a very large hole about four and a half feet deep or thereabouts, to the right-hand side of the front door, and that is the very place to which Mr. Parish wanted to go.   I catched hold of Mr. Parish by the collar of the coat, and told him I would not let him go one foot further.   He held very much against me ; I told him of the danger we both were in—falling into this hole.   It was covered over with boards, and I was standing upon two of them at the time.   I got Mr. Parish turned back to the front door, and rung the bell, and got Mr. Parish into the library.   I then told Mrs. Parish, in the presence of Mr. Delafield, what had happened.   I don't know that there was any answer."   One other incident ought not in this connection to be omitted.   It is detailed by Mr. Campbell, a witness in no way connected with any of the parties in these causes, and without bias or prejudice of any kind.   It is the attempt of Mr. Parish to climb the leader in front of his own mansion, facing Union Square.   It is detailed in vol. iii., fols. 1875–82.   Mr. Parish did not succeed in the enterprise, and but for the interference of Mrs. Parish and his nurse, who forcibly removed him into the house, the consequences to him might have been most serious.   This was in 1852.   He was compelled to abandon the effort by physical force, which he struggled in vain to resist.   It cannot be necessary to refer in this connection to the numerous eccentricities of Mr. Parish during the period of his mental weakness and obscurity intervening between the date of his attack and his death.   Reference need only be made to the many instances when he was guilty of the indecorum and gross rudeness of assaults upon and threats to Mrs. Parish, a lady entitled to, and who had on all occasions prior to his prostration, received from him the most marked and distinguished courtesy.

And can this be the same gentleman of whom Col. Dela-

field says that, prior to July, 1849, he was mild, gentle, unruffled, yet decided in all matters to which he gave his personal attention? Mr. Kernochan, his friend and associate, says of him in respect to the same period : " Mr. Parish was certainly a high-minded gentleman, and would never do any act unbecoming a gentleman ; he had a great deal of self-respect, and great command of temper. I never knew him to do any thing under excitement." As these two witnesses describe Henry Parish, such beyond all doubt and controversy he was anterior to July 19th, 1849 ; and from the testimony already referred to, we see what the same individual was after that date, and up to the period of his death. How entire and complete is the change! How diametrically opposite to the previous conduct of his whole life is that now exhibited. And the inquiry forces itself upon the mind, What cause has produced such results? Can such totally inconsistent and opposite characters be reconciled with the theory that the faculties, the mind, the moral perceptions of Mr. Parish underwent no change, but were the same after July 19th, 1849, as they were before that day? That after that period his reason was unclouded, and that his intelligence was undimmed? That he understood all that was said to him, comprehended the relations of things, and was in the full possession of all his intellectual powers?

We confess ourselves wholly unable to assent to any such theory. The conviction on our mind is clear that these facts and circumstances show unerringly, that the attack of July 19th obliterated the mental powers, the moral perceptions, the refined and gentle susceptibilities of Henry Parish ; that after that period he ceased to be the mild, intelligent, and unruffled man he had been theretofore, and that thereafter he was not morally responsible for the unbecoming and ungentlemanly conduct he so frequently exhibited. *He then ceased to be Henry Parish, and was no longer an accountable being.* We find much less difficulty in reconciling our minds to this view of the case than to adopt the theory of the proponents, that Mr. Parish, up to the period of his death, pos-

sessed an unclouded intellect, retaining its pristine vigor and activity, was conscious of all that was transpiring around him, and understood all' that was said to him ; comprehended the minute details of the complicated and important business transacted for seven years in his name, and often in his presence, and was capable of communicating, and did communicate his thoughts and wishes to others. It is much easier for us to believe that those who, we doubt not, honestly think that Mr. Parish understood what was said to him, and that they comprehended the operations of his mind and the expression of his wishes, are mistaken in their suppositions, than to reconcile his actions after his attack with the fact that he was still in possession of all his mental faculties.

When the means of arriving at the knowledge whether Mr. Parish was understood or not are examined, it will be found that they were very imperfect, and very liable to misapprehension. It is to be observed, also, that all who speak on this subject applied no test to determine the accuracy of their impressions. They saw Mr. Parish mainly when in apparent good physical health, and visited him under the impression and with the preconceived idea that he understood what was said to him, and they naturally construed the signs and gestures made by him as indications of intelligence, and responsive to suggestions made by them. But the accustomed mode of conveying thought by speech was denied to Mr. Parish. Some of the witnesses think he made use of the words " Yes" and " No," and one or two other words ; but the weight of the testimony greatly preponderates in favor of the position that, after his attack, he never uttered an intelligible word. This is the testimony of Mr. Kernochan, who saw him more frequently than any person other than the members of his family. Mr. John Ward, whose intercourse with him was very frequent, says distinctly that he never heard him utter a distinct and intelligible word after his attack. He was therefore denied the usual manner of communicating his thoughts and wishes. What remained were signs and gestures, and the expressions of his face, to com-

municate with those around him.   Some of the witnesses
suppose that they obtained his meaning by the expression of
his face.   Now it is to be remembered that the only agents
conveying such expressions are the mouth and the eyes.
Mr. Parish had no use whatever of the former organ for this
purpose.   His face was always peculiarly unimpressive and
undemonstrative, but after his attacks, the muscles of his
mouth became firm and rigid.   His eyes afforded but little
aid in this particular.   He had nearly lost the sight of one
of them, and the other was opaque by the operation of cata-
ract, and both were generally covered by spectacles of great
convexity.   He could, therefore, neither speak nor use the
muscles of his face to give expression to his thoughts, and the
gestures made by him with the left hand and its fingers were
irregular, unmeaning, and contradictory, and often conceded
to be misunderstood.

   With these imperfect and uncertain media for ascertaining
the thoughts of Mr. Parish, it is doing no injustice to any
one to assume that they have been mistaken in supposing
that they correctly understood him.   We more naturally and
readily come to this result, because we find that all who had
any intercourse with Mr. Parish, on many occasions, found
great difficulty in understanding his wishes and thoughts, if
they even understood them at all ; and the instances are fre-
quent and clearly established where he often made an af-
firmative and negative motion of his head immediately suc-
ceeding each other, to the same question, leaving the inquirer
in perplexity which he really intended.   The testimony is
conclusive that Mrs. Parish herself frequently acknowledged
that she could not understand him, and there is some testi-
mony tending to show that, on some occasions at least, she
thought he did not at all understand what was said to him,
and that, in her opinion, the effort would be useless to make
him understand.

   As an illustration.   In the interview with Austin at the
Washington market, a man well acquainted with Mr. Parish,
and who had dealt with him for years, he said to Mrs. Par-

ish, "I would like to see him (Mr. Parish, who was then sitting in the carriage outside the market)—I will take him out something that he will like. I showed her the articles I was going to take out. She told me not to take the canvas-backs, but to take the red-heads, as he could not tell the difference : and woodcock I had ; she said they were too high—to carry him some snipe, that would come cheaper. I took them to his carriage, and spoke to him. He looked at me, after speaking to him two or three times. I held up in my hands the birds, for him to pick out what he wanted. He took his cane, and flurried it around, and scared me. I stepped back from the carriage door. I then stepped up, and tried to make him understand me, and I went into the market again. Mrs. Parish bought what she saw fit." It is not a little difficult to see, if Mr. Parish was in full possession of his mental faculties, why he could not tell the difference between canvas-back ducks and red-heads as well as Mrs. Parish. It is apparent from the testimony, that Austin had selected canvas-backs to take out to Mr. Parish, and that, by Mrs. Parish's direction, they were changed for the red-heads. She must therefore be undoubtedly correct, if the views we entertain of Mr. Parish's mental condition be sound, in saying that Mr. Parish did not "understand the difference," for it is clear from Austin's testimony that he did not understand any thing about the object of the visit to the market, or what Austin meant by exhibiting game to him. It would seem, if he understood any thing about it, and had any idea on the subject, he supposed such exhibition was either to ridicule or insult him. When Mr. Parish went through the ceremony of going himself to the market, in the vicinity of his own house, Simmons, his attendant, says "the butcher asked me what Mr. Parish wanted. I told the butcher what I heard Mrs. Parish tell the cook, and he would send it home." Wingrove, another attendant, says, "Mr. Parish would never point to any thing in the store that he wanted." Mr. Case, the butcher and keeper of the market, says, "Mr. Parish was brought to the market by his attendant, and he would sit him down in a

chair; he never could tell when he was through; he would sit there till the waiter would take him away. Mrs. Parish told him (Case) that he must not send the articles Mr. Parish had indicated by motions and gestures he wanted, for Mr. Parish did not know what he wanted." This witness further said, he "never could find out rightly what Mr. Parish wanted."

Numerous other witnesses who have testified in this case, on both sides, say that on many occasions Mr. Parish could not be understood. Mr. Charles A. Davis says: "I have stopped my inquiries endeavoring to find out his meaning; Mrs. Parish failed to find it out." Folsom, long Mr. Parish's confidential clerk, says: "I failed to find out what he wanted." Wingrove, one of his attendants, says: "I never found out what he wanted, searching for his clothes, nor why he put his clothes and game to his mouth. Neither myself nor Mrs. Parish could find out where he wanted to drive; neither what part of the newspaper he wanted read. That Mrs. Parish often, after making repeated efforts to understand him, gave it up." Simmons, another of his attendants, says: "I could not ascertain his wishes from his motions, sounds, or gestures." James Clark, another attendant, says: "I and Mrs. Parish would spend an hour or two, and fail to get his meaning." Dr. Delafield, his physician, gives a long description of his attempts and failures to understand Mr. Parish. Rev. Dr. Taylor, when he proposed first to administer the communion to him, could not understand why he did not wish it done. Mr. Tileston, president of the Phœnix Bank, says that Mrs. Parish stated to him, on the occasion of the interview between him and Mr. Parish, in her presence, that "she was entirely unable to convey or understand what Mr. Parish meant." This was in December, 1853. He adds, that he "could not understand him in any way." Dr. Wheaton, a medical man, and intimate friend of Mr. Parish, says he "could not interpret at all his meaning, without aid from Mrs. Parish." Fisher, another of his attendants, says: "That in August, 1849, Mrs. Parish could not understand him, and Mr. Parish gave up in despair the effort to make

her, and was in consequence troubled all day that she could not find out what he wanted." That he, Fisher, "sometimes failed entirely to make out his meaning." Brown, an attendant, tried three days to find out his meaning, and failed many times to do so. Nichols, the carpenter, could not find out what he wanted done. Mr. Grinnell could not understand what he meant about investing money. Dr. Markoe, one of his physicians, says: "Two or three times I failed to get at his meaning; occasionally failed altogether." He also said: "Mr. Parish had no power to say he wanted to destroy a will; he had not the power to say any thing; could express no thought except by asking questions." All the testimony shows that he could only indicate with his fingers and hand, or by sounds, that he wanted something, or that something was the matter, and which motions or sounds were construed by those around him as evidences of his wish to put a question, whereupon they began to suggest various topics, and when they thought they perceived that they had hit upon the subject in his mind they supposed he wished to inquire about, they put such questions as suggested themselves to them, and to which they supposed they had received affirmative or negative answers. If Mr. Parish had no power to express a wish to destroy a will, it follows he had none to create one, and the manifestation of his wishes depended entirely upon the interpreter, and the integrity of the interpretation. Henry Delafield, who occupied the house with him, says, that as to ordinary affairs, he frequently failed to ascertain his meaning. Jones, the tailor, could not understand what he wanted as to his clothes, even with Mrs. Parish's aid. She could not understand him; he nodded his head, and immediately after changed to the shake of it. Mr. Gasquet, his old friend and partner, could not understand at all what he meant. Mr. Ogden, the Cashier of the Phœnix Bank, where Mr. Parish for years had been a director, and who knew him well, in an interview at the bank with Mr. Parish, in Mrs. Parish's presence, said to her: "Mrs. Parish, I cannot understand him." He understood nothing from his

motions: "they were unmeaning." This was in October, 1849. John Ward, long an intimate acquaintance, and with whom Mr. Parish transacted a large amount of business in Mrs. Parish's presence, from the period of his attack until his death, says that he addressed himself generally to Mr. Parish, but he does not remember that Mr. Parish ever made any answer, by sign or motion, until Mrs. Parish had spoken to him; and he emphatically says, that in all his negotiations with Mr. and Mrs. Parish, to the best of his recollection, he "never heard Mr. Parish utter a word after his attack." Mr. Parish's faithful and true friend, Mr. Kernochan, and who was almost his daily visitor during this long period of his affliction, in answer to the question, "Did you ever understand or attach any meaning to the motions of his hands, or the sounds accompanying them?" says: "I certainly never understood them; I attached no definite meaning to them of my own observation. There was never any distinct articulation in any case; not even of a single word."

It is thus seen that great difficulties and uncertainty, to say the least of it, attended any expression of the thoughts or wishes of Mr. Parish, and that a large number of those having business or intercourse with him, utterly failed to attach or obtain any meaning to his signs, sounds, motions, or gestures. The natural and obvious deductions to be made from all these facts and circumstances are, that Mr. Parish had no ideas to communicate, or if he had any, that the means of doing so, with certainty and beyond all cavil or doubt, were denied to him. If some, with the aid of an interpreter, and always the same, indulged the charitable thought that they correctly apprehended his wishes, it is clear that others, equally intelligent, with adequate and equal opportunities of judging, and with the same aids, utterly failed to comprehend him.

The facts testified to are of such a character, giving full and proper weight to all the evidence, regarding it in the most favorable light to the proponents, as to leave great doubt on the mind that Mr. Parish, after his attack, was any thing more than the creature of habit the reflex of the opin-

ions and wishes of others, the clày in the hands of the potter, to be moulded into any shape or form desired. His hearing was good; the sight of one of his eyes, although impaired, was not seriously affected, and he had the perfect use of his left hand and arm. Nothing was more natural, therefore, than that those who entertained the idea that he possessed intellect, would resort to the obvious facilities and aids to enable him to give it expression. The power of speech, it is manifest, was denied to him; if he possessed any, it was exercised most imperfectly, and with no practical advantage. This, the obvious · and usual method of communicating thought, he had not. None could fail to know, that, if Mr. Parish had thoughts, the great and controlling anxiety of his life would be to give them expression, and to manifest them to his friends. Independently of the social gratification attendant upon such successful effort, he had great interests to manage, a large property to look after, and the accumulation and management of which had been the absorbing object of his life. A large estate had accumulated and was accumulating, which, if he knew any thing, he must have known was taking a direction, as the proponents allege, hostile to his wishes, to those from whom he was alienated, and away from the cherished objects of his regard and affections. Every conceivable motive and consideration pressed upon him, therefore, to keep up intercourse with his family and friends, if the thing was possible. No man having the power thus to communicate, and having thoughts and wishes to express, thus circumstanced, would remain in a living grave for seven years, without making superhuman efforts to be understood by those around him. Those friends rightly assumed, therefore, that Mr. Parish would be most solicitous to maintain intercourse with them, if it were possible so to do. The first attempt, and the most obvious one, was to have Mr. Parish write with his left hand. He had the perfect use of it; could write well; had done it all his life. We all know from experience how simple this process is, and how easy of execution. We can see how effectual it would

have been in enabling Mr. Parish to express his wishes, and keep up his intercourse with his friends, and retain the management and control of his affairs, and make such disposition of his estate as he then desired.   This expedient, though effectually tried and persistently urged upon Mr. Parish, utterly failed of accomplishing any satisfactory result.   One of the witnesses thinks, that on one occasion he succeeded in writing the word "horse," and the same witness says he wrote several times the word "wills."   The latter efforts were preserved, and are produced and made exhibits in the cause.   An inspection of them will show that there is no propriety in interpreting them as "wills," or any other word ; they are nothing but imperfect, unmeaning scrawls, such as any child might make who had strength to hold a pen.   They unmistakably show that there was no mind to guide the hand, or if there was any, not of sufficient force to control the will, and second its determinations.   If Mr. Parish had any mind capable of operation, and of forming conclusions, his faculty of hearing remaining unimpaired, it would have been the easiest thing imaginable for him to have written the word "Yes," in response to any question he desired to answer in the affirmative, and the word "No," to any he desired to answer in the negative.   This could have been done with much less effort than was required to write the words "horse" and "wills."

This attempt to have Mr. Parish communicate by writing, having proved fruitless, resort was had to block-letters, a very simple and facile mode of communicating thought by those who are deprived of the natural use of doing so by speech.   If he had any thoughts to communicate, he had thus at hand an easy, certain, and effective means of doing so with accuracy and beyond the peradventure of mistake.   The slightest exertion only was required—no fatigue could ensue.   This attempt, also, produced no results.   Another effort was also made with the letters of the alphabet in another form, and it also was unsuccessful.

A further and different mode was suggested by some of his

friends, which, if the theory of some of the witnesses for the proponents is correct, afforded a safe, sure, and easy method of communication.   It was the use of a dictionary by Mr. Parish.   This process had two advantages : it would have enabled him to suggest topics of inquiry, and insured intelligent and certain answers to the questions put to him.   A moment's reflection will satisfy any mind, that no process could have been devised more certain and satisfactory than this, for holding intercourse with an intelligent mind, to which was denied the power of giving expression to its emotions and thoughts in the form of speech.   No results were obtained from this source, and the inference from the testimony is, that no efforts were made to afford Mr. Parish the opportunity of trying this method of communicating his thoughts.

And this omission greatly strengthens the impression conveyed by the testimony, that he did not and could not read at all after his attack.   It is true that he was seen *to look* at newspapers, accounts, ledgers, check-books, notes, &c., but that *his mind* took in and comprehended what his visual organs discerned, the evidence in this case will not warrant us in assuming.   It is natural to suppose, that, if Mr. Parish could read, he would have desired himself to peruse these codicils, and they would have been placed before him for that purpose ; and, on the assumption that he could, the inquiry presses upon us, Why were they not given to him for perusal ?   If it had been established that he could read intelligently, and it had appeared that these codicils had been read over by him, it would have furnished much more satisfactory evidence than any we now have, that they expressed his wishes.   If he could read, and had intellect to understand what his eyes beheld, why is it that there is an entire absence of evidence that he was ever seen reading, with apparent understanding, a letter? of his ever having been seen, on any one occasion during his long confinement, with a book in his hand, perusing it ?   Is it to be believed, that if Mr. Parish could read, and had a mind to comprehend what he read, that he would not, during these whole seven years, when he

was almost entirely excluded from intercourse with the world, have once resorted to books for amusement and instruction? It is incredible.   We all know that no greater solace is available to an invalid, and none more universally sought after. They are companions always at hand, of the most soothing, agreeable, and entertaining character; and it cannot be doubted, that, if Mr. Parish could read, and had intellectual capacity sufficient to understand what he read, that books would have been his daily and constant companions.   These views press themselves on us with great force, if we concur in the opinion of Dr. Taylor, that Mr. Parish, after his attack, became a devout and sincere Christian, and was anxiously and inquiringly seeking to make his peace with his Maker, whom he must have expected soon to meet.   Where would an intelligent Christian sooner turn for advice, direction, and consolation, than to the Bible?   This book, we all know, is printed in type so that all, of any degree of vision, can peruse it.   Nay, those totally deprived of sight are not precluded from resorting to it for comfort and direction.   We have looked in vain through the testimony in this case to find any evidence that Mr. Parish ever read his Bible, that one was ever procured for him, or that any effort was ever made to induce him to peruse it, or that he ever indicated a wish to do so.

To what result does this review of the facts and circumstances in this case, adverted to and commented on, lead the mind?   On a careful consideration of them all, with a most anxious desire to arrive at a just and correct conclusion, *we are clearly of the opinion that the attack of Mr. Parish on the 19th of July,* 1849, *extinguished his intellectual powers, so obliterated and blotted out his mental faculties, that after that period he was not a man of sound mind and memory within the meaning and language of the statutes, and was therefore incompetent to make a will,* and that the *codicils* of September, 1853, and of June, 1854, *were not his will,* and formed no part thereof.

We have endeavored to give just and due weight to the

arguments and suggestions so eloquently and ably urged upon our consideration by the counsel for the proponents. Neither are we unmindful that, in coming to this conclusion, we differ with many witnesses of intelligence, who have expressed the opinion under oath that Mr. Parish, at the time he executed those codicils, understood their import and effect. With the highest respect for those gentlemen, our duty calls upon us to consider all the facts presented by the testimony, to scan and weigh their testimony as well as that of the other witnesses in the cause, and, after a careful and accurate examination of the testimony on both sides, to say whether the papers propounded should be admitted to probate. We have a clear conviction, and one which we have arrived at without hesitancy or doubt, that they ought not. We think that, in a case presenting so many obstacles on the part of the proponents, and which, we are compelled to say, have not been removed, the surrogate decided correctly in refusing to admit these codicils to probate.

We are impressed with the soundness of the rules of law, before adverted to, that it is much less material that those who seek to impeach a testamentary instrument, should not be able to explain certain things in their case, should be forced to admit that their argument is not in every part consistent with all the facts, than that they who seek to establish the will, should give no rational, consistent, or intelligible solution of those difficulties which incumber their suppositions, and obstruct the path towards the conclusion that they would have us arrive at; that it is not the duty of the court to strain after probate, and especially to seek to establish a posterior will, made in conceded enfeebled health, unsustained by previous declarations of intention, over a prior will made in health, and with care and deliberation, when the provisions of the posterior will are in direct hostility and conflict with those of the prior one; that heirs and distributees may rest securely upon the statutes of descent and distributions, and that their rights are not to be taken from them, unless by an instrument executed in conformity with the formalities

prescribed by statute, and by a person authorized by it to make and execute such instrument; that it would be in violation of long and well established principles, and an almost uniform and unbroken current of decisions in England and in this country, to admit to probate testamentary papers, prepared and executed under the circumstances which these were, by a man who was in apparent full physical health, and possessing nearly his natural strength, who could not or would not write, who could not or would not speak, who could not or would not use the letters of the alphabet, or even a dictionary, for the purpose of conveying his wishes, upon proof solely that they were supposed to express the testator's wishes, from signs, gestures, and motions made by him, and especially when it appeared that such signs, gestures, and motions were often contradictory, uncertain, frequently misunderstood, and often not comprehended at all. It is not to be forgotten that, during the whole period intervening between the attack of Mr. Parish and his death, there is no evidence that he, by himself, ever performed a single business transaction, ever made a purchase or sale of property, or ever expended a single dollar, or was ever intrusted with one, although the owner of a million. These facts are instructive, as showing that he was treated and regarded by those around him as *non compos*, and his condition undoubtedly was that of utter, certain, and absolute *dementia*.

If, however, these views are stronger than the facts will warrant, there is another proposition which is undeniable, and that is,—if, on due consideration of all the testimony and the arguments, the mind of the court is *in equilibrio*, then the proposed codicils must be pronounced against. In the present case, as already observed, there is a will free from all question and all controversy. It was made by the testator after peculiar deliberation, and certainly disposes of his property not unnaturally or inequitably. No change in the circumstances of the testator's family having occurred, and a condition of bodily and mental weakness having supervened, certainly well calculated to create grave doubts of the

testator's soundness of mind, codicils are produced, claimed to be his last will and testament, revoking previous dispositions, and giving an entirely different direction to the great bulk of his estate, without any apparent or assigned cause. The language of Lord BROUGHAM in *Panton* v. *Williams* (*supra*), is apposite and may well be followed: "That when the question arises between one will and another of a prior date, the proof being upon the party propounding any testamentary writing, the course of administration directed by the law is to prevail against him who cannot satisfy the court of probate that he has established a will; or the prior instrument which is liable to no doubt is to be established in preference to the posterior one which cannot be proved to speak the testator's intentions so as to leave the court in no doubt that it declares those intentions."

The argument has been much pressed upon us, that the concentration of the great mass of the testator's estate in Mrs. Parish, is supported by several collateral circumstances, and that therefore the court should be less exacting in the quantum of proof to sustain such bequests, than it would demand when they were not thus supported. It is said that it might well be supposed that the testator would desire to keep up and have maintained his family establishment the same after his death as before. The answer to that argument is, that he had made most abundant provision for this in his will of 1842, by leaving to Mrs. Parish an income of about $23,000 annually, while the current expenses of both in his lifetime had never exceeded $10,000. He had, therefore, provided for her singly more than double the amount required annually for both.

It is also urged that the alienation of his feelings towards his brother Daniel afforded a sufficient reason for revoking his appointment as executor and the legacy to him of $10,000, and the revocation of the residuary clause in the will of 1842 in favor of his brothers Daniel and James; and that this alienation is confirmed by the efforts made by him on two several and distinct occasions to annul the legacies to his unof-

fending nieces and nephews, the children of those brothers. It is believed that it has already been conclusively shown that there is no evidence in the case tending to show any such alienation of affection on the part of Mr. Parish towards his brother Daniel; but on the contrary, it distinctly appears that in all the interviews between them after his attack, no evidences of such alienation were exhibited, but every thing was in harmony with their previous relations. But if it were so as to Daniel Parish, the cause assigned is wholly inadequate, for any such unfriendly feelings towards James Parish, as to withdraw from him or his children, or those of Daniel even, what had been secured to them with so much care and deliberation and natural propriety.

It is also claimed that it is manifest, from the framework of the original will, that the testator did not intend that his brothers should have any considerable portion of his estate. This argument has in part already been answered, and, in addition, it may be observed that the peculiar and careful language of the will is such, that it conveyed to the residuary devisees all the property, real and personal, of the testator which he might own or be possessed of at the time of his death, not specifically given or disposed of by the will. He had disposed of $331,000 to his wife. This was absolutely hers, or subject to her disposal. He had specifically given property amounting to $60,000 to three young gentleman, kinsmen and friends, and legacies in the aggregate to $290,000. On his return from Europe in 1844, having ascertained that two of the legatees, whose legacies amounted to $20,000, children of his brother James, had died, he called on Mr. Havens, the counsel who prepared his will, to ascertain, among other things, what effect their deaths would have upon its provisions. It is not to be forgotten that Mr. Parish always kept a duplicate of his will with him, and it is not to be doubted that it was often referred to, and its contents the subject of his frequent meditations. Mr. Havens correctly informed him that the death of any of the legatees in his lifetime, under age or without issue or an appointment,

would lapse the legacies, and that they would then fall into the residuum of the estate, and pass to the residuary devisees. With this he was satisfied. Two other children of his brother James died before his attack, whereby the residuary fund was increased $40,000, and by reason of the reduction in the estimated value of his property made by the testator himself on the first of July, 1849, the apparent increase in his estate since 1842 had only been $165,857. Its real increase was in fact much more, as the Union Place property had cost him $112,000, and was actually then worth that, or more, but was estimated by him at only $60,000. On the first of July, 1849, the testator saw that his brothers would take under the will, the amount, as estimated value of the residue,—in 1842, $36,879 ; lapsed legacies, $40,000 ; increase of estate, $165,857 ; under-estimate of Union Place house, $52,000 ; total, $294,736 ; which would be nearly $150,000 to each, and which might be enhanced, and obviously would be, by other legacies falling in, and the natural increase of his estate. With these results clearly before him, he made no change in the framework of his will.

It is also urged that the codicils made by Mr. Parish after his attack were made to evince to Mrs. Parish his increased affection for her, and his grateful appreciation of her kind and assiduous attentions to him during his protracted illness. This argument has, we think, no force whatever, so far as it presents an inducement for the execution of the first codicil. That was prepared and signed within a few days after returning consciousness from the blow of July 19; and in regard to the other two codicils, the testimony does not contain any indications of an increase of affection on the part of Mr. Parish for his wife after his attack. On the contrary, if he was a conscious and responsible man, the inference would be that the affections of the husband had been much weakened, that he evinced no tender or growing regard for her, and had no grateful appreciation of her watchfulness and care of him. On the theory of his intelligence and testamentary capacity, his treatment of her was strange and unaccountable, and

would lead us to expect that he would have sought to have reduced the provision which he once thought ample and munificent for her, rather than devolve upon her nearly the whole of his estate, to the entire disherison of all those of his own blood, some of whom had the strongest claims upon his bounty and his affections.

Much stress is also laid upon the circumstances testified to by Mr. Ward in reference to the purchase of notes by Mr. and Mrs. Parish, and one inference is drawn, that in purchasing the notes, Mr. Parish relied upon his own knowledge of the mercantile standing of the makers, and that the same was made upon his judgment solely. Mr. Ward's testimony will hardly bear that construction, and a moment's reflection will make it obvious that if Mr. Parish purchased notes upon the information he possessed of the mercantile standing of the makers, he must have done it very blindly. He had been excluded for years from intercourse with the mercantile world, and would necessarily know, if he knew any thing, but little of the changes and losses of business houses. We have too many instances of firms, having wealth and unbounded credit one week, plunged into hopeless insolvency the next, to place much reliance on the judgment formed on knowledge obtained in, and previous to, 1849, as to the responsibility of firms in 1854 and 1855. It was more simple and easy to determine the value of the securities of a corporation whose resources and property were matters of public notoriety, than the means of private individuals. Here, real and apparent are far from being the same. A careful examination of Mr. Ward's testimony will leave the impression that Mr. Parish never, except perhaps on two occasions, and then by nods of assent, made any answer to any suggestions from Mr. Ward until Mrs. Parish had spoken. It has been shown that very little reliance could be placed on Mr. Parish's motions of assent or dissent. There is nothing in the case to show that Mrs. Parish would have permitted important purchases to be made predicated upon them, unless she had been satisfied of their wisdom and propriety. In fact, it is incontrovertible that

she placed no confidence in the manifestations of his wishes and opinions in trivial matters, and so frequently stated; and it is impossible, with this evidence before us, to believe that she acted upon any indications made by him in matters involving the disposition and safety of thousands of dollars.

We have not thought it necessary to discuss the learned and able medical opinions furnished on both sides to the court for its perusal and consideration. We do not understand that the parties have agreed that they should be regarded as testimony in the case with the same effect as though the writers had been examined as witnesses. They are valuable disquisitions upon the subject treated, and evince the highest grade of professional talent and knowledge. While they have been instructive to the court, they cannot strictly be regarded as evidence in chief in the case. Opinions, however respectable, and coming even from the most intelligent minds, are not the sources from which the judicial mind seeks enlightenment. The law, for wise purposes, has precluded it from relying on facts not communicated under the solemnity of an oath, and it is the duty of every tribunal called upon to pass on a question of fact, to confine its investigations to such facts as are verified in a legal manner. If it then fails in arriving at the truth, it will have done its whole duty, and the result must be attributed to the imperfections of our judicial system, and the inadequate tests which the mind is capable of applying to discover it. We have not, therefore, considered as evidence the mere opinions of these medical gentlemen, and we have accordingly examined their disquisitions in the same manner, and for the same object, that we would examine any medical treatises on the same subject. Their value consists mainly in the arguments and reasons they contain, as applicable to the facts developed in the present case, and we have so regarded them. They have been to us sources of great instruction, and are valuable contributions to the study of medical jurisprudence, and exhaust the *medico-legal* aspects of the intricate diseases of the brain arising from apoplexy, paralysis, and epilepsy.

In the consideration of cases like the present, in reviewing the findings of the surrogate on questions of fact as well as his conclusions of law, we regard the matter as *res nova* with us. It is true, we have not the living witnesses before us, but we have their testimony, taken with all the safeguards which the law affords, and we have all the facilities of arriving at the truth which the Court of Chancery, or the ecclesiastical courts, ever had. It certainly affords us gratification, then, on the careful examination of all the testimony in the case, aided by an extended discussion by able and learned counsel, and the mature consideration which has been given to the case, to have arrived at the same conclusion as that of the learned and intelligent surrogate who heard it in the first instance, and whose decision was affirmed by the Supreme Court. In the examination of the peculiar features of the present controversy, we have also been assisted and gratified by the profound and elaborate preparation, as well as by the learned and interesting discussions of the eminent counsel who have addressed the court. It is one of those cases in reference to which Mr. Justice ERSKINE wisely and justly said, " that the protection of the law is in no cases more needed than it is in those where the mind has been too much enfeebled to comprehend more objects than one, and most especially where that one object may be so forced upon the attention of the invalid as to shut out all others that might require consideration." These views lead to the establishment of the will of 1842, unaffected by, and in no wise impaired by the codicils of September, 1853, and June, 1854.

We are of the opinion that the judgments in each of the two above-entitled causes should be affirmed, without costs to either party in the first, but with costs in the second cause.

DENIO, WRIGHT, ALLEN, and SMITH, Justices, concurred.

GOULD, J., concurred in the conclusions, but not in the opinion of the majority of the court. He held that Mr. Parish was competent within the rule laid down in the case of

*Stewart* v. *Lispenard* (26 *Wend.*, 255). That, while an idiot cannot make a valid will, yet one who has any mind at all, however low his grade of intellect, may do so; that the law does not distinguish between different degrees of intelligence, and that to deprive a man of testamentary capacity, he must be totally destitute of reason and understanding. This decision he considered to be binding on this court. He held, however, that the mind of Mr. Parish was very much enfeebled, and that the codicils were void by reason of the fraud and undue influence of Mrs. Parish; that they were her codicils, and not his.

SELDEN, Ch. J. (dissenting).—This case, with its voluminous proofs, its extended medical arguments, and elaborate briefs, has swollen to such a size, that it is quite impossible for the court, in an opinion of reasonable length, to take a complete and comprehensive view of all the various aspects in which it is presented. I shall attempt no more than barely to group a few of its prominent features, in as brief a space as possible, selecting such points, as, while they may not appear to others the most striking and important, seem, nevertheless, to me, to be not only pertinent, but entirely decisive of the case.

Were we at liberty to entertain, at the outset, a wish as to the conclusion to which we are ultimately to arrive, it would undoubtedly be, that although we might find that the codicils were invalid, we might also find that the will itself was revoked, and that Henry Parish died intestate. This result, while it would give to the widow a very bountiful provision during her life, and a large estate to be transmitted to her relatives upon her death, would, at the same time, place the brothers and sisters of Mr. Parish upon a footing of equality as to the residue. But notwithstanding the very ingenious argument of the counsel for the sisters of Mr. Parish, and a natural inclination to give to that argument its fullest force, I have been unable to see how it can, with propriety, be held that the will was revoked. Admitting the soundness of the argument, that testamentary capacity may be divided into

the power to conceive ideas, and the power to express them: that the latter is as essential to the competency of the testator as the former, and that a person may well be capable of expressing the simple desire to revoke a will, and yet quite incapable of adequately communicating his wishes in regard to the complex provisions of a new will, still it can hardly help the counsel's case.

The argument applies solely to express, and not at all to implied, revocations. The only express revocations here, are those contained in the second and third codicils, of the legacy to Daniel, and of the residuary clause in favor of Daniel and James Parish. Now, conceding that in a case where a testator, apparently intelligent, but whose powers of communicating his ideas were limited, had, in proper form, revoked a previous will, and then by a subsequent and distinct act had made another will, it would be possible to hold the revocation valid, on the ground that the intention to revoke was clear, and the second will invalid, on the ground that it did not sufficiently appear that its provisions were in accordance with the real wishes of the testator; still, the doctrine cannot, I apprehend, apply to a case where the revocation and the new provisions are contained in the same instrument, and are part and parcel of the same transaction; for the very plain reason, that it would be impossible, in such a case, to say that the testator would have wished to revoke the former will, except in connection with the new disposition made of the estate. The codicils cannot, therefore, be held valid as to the revocations which they contain, and void for want of testamentary capacity as to the residue.

The revocations, whether total or partial, in this case, then, if any, must be *implied.* Without examining the question whether the circumstances relied upon by the counsel would amount to an implied revocation at the common law, it seems to me that our statute (2 *Rev. Stat.*, 64, § 43, *et seq.*), presents an insurmountable obstacle to the establishment of such a revocation here. The notes of the revisers upon those sections, show conclusively that it was their intention to preclude

all implied revocations, except such as were expressly recognized. They say, in terms, that the provisions contained in the sections referred to, "it is believed dispose of the whole doctrine of implied revocations." The effect of these provisions was considered by this court, in the case of *Langdon* v. *Astor* (16 *N. Y.* [2 *Smith*], 9), where a distinction was taken between the ademption and the revocation of a legacy ; and where, although the court held that there might still be an ademption or *ante-mortem* satisfaction of a legacy, it was nevertheless conceded, that, since the statute, there could be no implied revocation except such as the statute contemplated. Judge Denio, by whom the opinion of the court was delivered, after stating the nature of the implied revocations enumerated in the statute, and the distinction between such revocations and ademptions, says : "The courts cannot, consistently with the statute, hold that any other mere change of circumstances will amount to an implied revocation."

The counsel suggests a long list of cases in which he supposes there must, of necessity, be a revocation, notwithstanding the statute. But these are mostly cases where the devise or legacy has become inoperative by reason of the destruction or alienation of the subject-matter of the devise, &c., prior to the testator's death. Circumstances of this sort do not necessarily work a revocation of the will, but merely operate to prevent the beneficiary from enjoying its fruits. The will may, nevertheless, be proved, leaving its effect to be determined when the devisee or legatee prefers his claim. As to the testator's expressed intention, or wish, to revoke or change his will, upon which the counsel seems to rely, nothing can be clearer than that such an intention, to be of any avail, must be carried into effect in the manner prescribed by the statute. As a mere auxiliary to circumstances tending to effectuate an implied revocation, it is useless, as there can be no such revocation except in the cases for which the statute provides. It is impossible, therefore, to sustain the appeal of the two sisters of Mr. Parish.

The remaining questions relate to the validity of the second

and third codicils to the original will. It is insisted that those two codicils are void, on the grounds: *First*, that the testator was mentally incompetent, at the time they were executed, to make any alteration of his will; and, *Secondly*, that they were obtained by the fraud and improper influence of Mrs. Parish. It did not appear from the oral arguments of the counsel at the hearing, that they differed essentially as to the degree of intelligence required to enable one to make a will. But their printed briefs present very opposite theories on the subject, and I cannot consent to pass the question without remark, as I am unwilling to have it inferred that I assent to the rule, in respect to testamentary capacity, supposed to have been established by several cases in this State, especially the case of *Stewart* v. *Lispenard* (26 *Wend.*, 255). That rule is said to be, that while an idiot cannot make a valid will, yet one who has any mind at all, however low his grade of intellect, may do so : that the law on this subject does not distinguish between different degrees of intelligence, and that to deprive a man of testamentary capacity, he must be *totally* destitute of reason and understanding. Considered philosophically, it is manifest that this rule cannot be sustained. It assumes that it is possible to draw a definite and precise line of distinction between idiocy and mental power. The fallacy of this assumption it requires no argument to prove. If, as I suppose, every perception is an act, and every idea a state of the mind, then to distinguish a man from a tree, or a house from a horse, is indicative of mind. But I desire to· test this rule, not by any mere metaphysical reasoning, but by facts and principles familiar to all. Almost every one of ordinary experience, has known various persons who were classed both in common parlance and in law, as idiots, and must have observed, that while some of these persons have more, and some less, intelligence, few, if any, are entirely destitute ; that most of them know their friends from strangers, manifesting affection for the one and aversion for the other, and that many have the power of speech, not imitative merely, like that of the parrot,

but expressive, to some extent, of thought, of feeling, and of will. All this requires intelligence, and intelligence proves mind. Idiots, therefore, have mind, and the difference between them and a Bacon or a Newton, is a difference in degree alone.

It is said, that this rule having been established in this State by repeated decisions, it is too late now to call it in question. But no amount of authority can establish a rule which is self-contradictory. If it be, as I deem it to be, undeniable, that idiots, or if not all, at least some persons belonging properly to that class, have more or less understanding, then the rule in question both affirms and denies, that such persons have capacity to make wills. There is, and can be, no doubt that courts, in passing upon questions of testamentary capacity, will and must distinguish between different grades of intelligence, and that, in cases like the present, the inquiry is, not whether the testator possessed *some* intelligence, and *some* mind, but whether he possessed that *degree* of intelligence which would qualify him to dispose of his estate by will. It by no means follows, however, that when the inquiry relates to idiocy or mental imbecility, and there is no allegation of insanity, that it is necessary to bring the capacity of the testator up to the standard of what may be called, in any just or even technical sense, " a sound mind." This phrase has two significations. In common parlance, it means a mind of more than ordinary strength, discreet and well balanced. In law, it means a mind not affected with *insanity* in any form. In neither of these senses can it by possibility be made a test of mere mental imbecility. It is said to have a third signification, and to be used as synonymous with *compos mentis*, and to express the idea of legal competency. It has no doubt been sometimes vaguely used in this sense ; but such use is obviously inaccurate, and tends strongly to mislead. Take the case of one but just elevated above the grade of idiocy, who has barely sense enough to escape a commission, and is it not absurd to speak of him as a person of sound mind ?

It is held in the case of *Stewart* v. *Lispenard*,—and to that, under the authorities in this State, I feel bound to assent,—that a man may be capable of making a valid will, and yet incapable of executing a deed, or making a contract for the purchase or sale of property. Our statute, which allows wills to be executed at the age of sixteen by females, and eighteen by males, tends to support the idea. A court of equity, therefore, may commit the estate of such person to the charge of a committee, and yet, after his death, give effect to his will. We may properly say of such a person that he is *compos mentis* in one respect, and *non compos mentis* in another; that is, that he has a mind competent to make a will, but incompetent to make a contract; but we cannot say that he has a mind *sound* for one purpose and *unsound* for another, without doing gross violence to language. It is obvious that " *non compos mentis*" and " of unsound mind " are not, as the counsel seem to suppose, convertible terms; and that the words " sound " and " unsound " have no appropriate relation to questions of idiocy or mental imbecility.

If we would have clear and definite ideas on this subject, we must not abandon all precision in the use of phraseology. *Non compos mentis* is a general term, embracing all who are deemed legally incompetent to transact business. It includes three separate classes, viz. : idiots, persons of unsound mind, and persons of unsound memory. Each of these classes is entirely distinct from both the others. The first embraces not only congenital idiots, or idiots from birth, but also such as have subsequently become mentally imbecile from sickness or other causes. The second class comprises all who suffer from aberration of mind, whether they are lunatics, monomaniacs, or generally deranged. The third is confined to a peculiar class, composed mostly of persons whose memories are impaired by age. To mingle these separate classes, each of which has its distinct features, as is frequently done, tends inevitably to confusion. We have already seen that idiots cannot be classed with persons of unsound mind, in the

technical sense of the latter phrase. It is equally clear that persons of unsound memory belong to a different class from either of the others. Although an unsound memory is proof of an unsound mind, yet the converse is not true. The mind may be unsound in other respects, while the memory remains perfect. Every one of experience in life knows that in advanced age the memory sometimes becomes impaired to such · a degree that the individual forgets his friends and kindred, and is unable ordinarily to tell the names or number of his children, or whether they are alive or dead, and yet this same individual may, under some sudden stimulus or strong excitement, exhibit for a time his mental powers, memory included, in all, or nearly all, their former vigor. I have had occasion, in one instance, to pass judicially upon a will where the testator appeared to be substantially in this condition. It was sought in that case, which is not reported, to apply the rule laid down in *Stewart* v. *Lispenard;* but nothing can be plainer than that this rule could have no application to such a case.

It may be objected to the classification here given, that it does not comport with the language of our statutes on the subject. It is true that the statute concerning wills of real estate, in its enumeration of persons incapable of making a valid devise, specifies only idiots and persons of unsound mind, and omits to name, specifically, persons of unsound *memory ;* and that the statute concerning wills of personal property provides that every person of " sound mind and memory, and *no other*," may make a valid bequest. These statutes do, no doubt, imply that, in some enlarged and comprehensive sense, the term " unsound mind" may be held to embrace both idiots and persons of impaired memory; but when taken together they also recognize the very distinctions for which I contend. The first distinguishes between idiots and persons of unsound mind ; and the second treats an unsound memory as something distinct from general mental unsoundness. That these distinctions are real, is too plain to be denied ; and it proves nothing against their existence, that

legislators and judges have not always observed them. Baron COMYN has used the terms "idiots" and "of *non sane* memory" as embracing every class of persons who are to be regarded as *non compos mentis*. (See *Com. Digest*, tit. *Idiot.*) The Statute of Wills (34 and 35 Henry VIII.) does the same, by providing that no will of lands shall be valid if made by any "idiot, or by any person of *non sane* memory;" but this only shows a want of just discrimination in the use of terms. It is nevertheless clear, that a mere monomaniac, whose mind is perfectly sound aside from a single hallucinated idea, cannot *properly* be said to be of unsound *memory*.

It is plain, from what has been said, that persons deemed in law *non compos mentis* are properly divisible into classes, and that such a division is indispensable to a clear understanding of the subject. It is equally plain that the competency of persons belonging to one of these classes cannot be determined by rules specially applicable to another class. The question in this case relates to the idiocy or mental imbecility of the testator; and in determining this question, it is unnecessary to inquire whether he was possessed of a *sound* mind, or a *sound* memory, but only whether he retained that moderate degree of reason and understanding which is required to enable one to dispose of his property by will. It is not enough that he should be found to have possessed *some* degree of intelligence and mind. He must have had sufficient mind to comprehend the nature and effect of the act he was performing, the relation he held to the various individuals who might naturally be expected to become the objects of his bounty, and to be capable of making a rational selection among them. If he had this amount of intelligence, then the codicils which were rejected by the surrogate are valid, and should have been admitted to probate, unless it appears that they were obtained by the fraud or undue influence of Mrs. Parish.

The positions taken by the counsel for James and Daniel Parish, are: 1. That the testator, Henry Parish, at the time of the execution of the codicils in question, and for the last

six years of his life, was a perfect imbecile, without rea-
son or understanding, and absolutely incapable of any ra-
tional act; and 2. That if he can be supposed to have had
any capacity, he was, in making the codicils, completely
under the control of his wife, by whose fraudulent practices
they were obtained.

I have no intention of entering into any analysis of the
mass of evidence which has been adduced, bearing upon
these questions, but will barely advert to a few items which
appear to me of a striking character. There is no doubt that
the opinions of intelligent witnesses, although not experts,
are to be received upon such an issue. It would be utterly
impossible to describe in words the air and manner, the tones
of voice, and expression of face, from which, to a great de-
gree, the conclusion must be drawn. Personal observation
is almost indispensable to accuracy of judgment in such a
case, and hence the reception of opinion in evidence becomes
a necessity. Among the witnesses called by Mrs. Parish to
support the codicils, are her brothers, Edward, Henry, and
Richard Delafield; Mr. Lord, who drew the codicils; Mr.
Taylor, a minister, and rector of Grace Church; Mr. Tileston,
president of the Phœnix Bank; and Gov. Bradish, president
of the Bible Society. All these are conceded, by the counsel,
to be men of the highest character and intelligence. Of the
three brothers of Mrs. Parish, Edward was the physician of
Mr. Parish, and in constant attendance upon him during the
whole six years of his illness. Henry, a merchant, lived in
the house with him during this time, and was with him a
great part of nearly every day. Richard, a major in the
United States army, and superintendent of the Military
Academy at West Point, had frequent opportunities of in-
tercourse with him during the same period. Mr. Taylor was
also a frequent visitor of Mr. Parish, administering the sac-
rament to him upon many occasions, and had other religious
intercourse, and various financial transactions with him.
Mr. Lord drew the codicils, was many times in consultation
with the testator in regard to them, and witnessed their exe-

cution. Mr. Tileston was president of the bank in which Mr. Parish was a large stockholder, saw the latter frequently, and negotiated with him upon some matters of business of great importance. Gov. Bradish was a friend of Mr. Parish, visited him several times during his sickness, and received from him personally a large subscription to the funds of the Bible Society. All these witnesses, without exception, express the most decided conviction that the testator had intelligence, and that he perfectly understood the various matters to which their intercourse with him related. Mr. Lord, in answer to a question as to the state of the testator's mind upon the execution of the second codicil, said, " I had no doubt, I have not any, of his entire capacity to understand what he was doing, and the effect of it." In reply to a similar inquiry as to the mental capacity of the testator upon executing the third codicil, he said, " In my judgment it was perfect for the purpose of making a codicil of this kind; he fully understood it, and fully agreed to it." Mr. Taylor, whose interviews with Mr. Parish were very frequent during the time of his sickness, said, in reply to a similar question, relating to that whole period, " I had not, myself, the least doubt of the soundness of his mind, nor could I have supposed that any intelligent person could doubt its soundness." Mr. Tileston had various interviews, and some very important negotiations with Mr. Parish, and to an inquiry as to the condition of his mind and understanding, after his attack in July, 1849, he answered : " In all transactions between us, I thought he appeared to understand himself perfectly." Gov. Bradish, who saw Mr. Parish upon several occasions, and obtained from him a large subscription to the funds of the Bible Society, upon being inquired of as to the condition of Mr. Parish's mind, replied, that in his opinion the latter " was capable of understanding, and did understand, what the witness said to him, and that his, Mr. Parish's, expressions of affirmation and of negation were very strong, very marked, very decided generally, indicating intelligence, judgment, and decision." It is certainly very difficult to suppose

that the four highly-cultivated and intelligent gentlemen last named could have had the interviews and intercourse they describe with a man who was substantially an idiot, and not be aware of the fact. I can myself frame no hypothesis upon which such a thing would seem to be at all probable. But if we assume that these gentlemen might have all been deceived, it is quite impossible to believe that the three brothers of Mrs. Parish could have been mistaken. That they should have had daily, and almost hourly, communication with Mr. Parish for six years, and not know whether he could understand the remarks addressed to him by themselves, is inconceivable. Intelligence, or the want of it, is manifested, not by speech alone, but by gestures, air, manner, and countenance. An accidental occurrence of these might deceive for a time, but not for a series of years, or even days. That the Messrs. Delafield supposed that Mr. Parish had intelligence is proven, if they are considered in the slightest degree honest, not merely by their own testimony in this case, but by their whole treatment of him as disclosed by the other evidence. They addressed him as they would have done before his attack, conversed with him, consulted him, read to him from the daily papers, told him the news of the day, &c., &c.; and never discontinued this practice until the close of his life. That they could have pursued this course for six years, towards a man without understanding, and still suppose him to be intelligent, can never be believed.

The counsel for the respondents, James and Daniel Parish, evidently felt the force of this aspect of the case, and we will see how he meets it. In speaking of Mrs. Parish, and the frauds and contrivances by which, as he insists, she obtained the execution of the codicils, he says: "We shall find her watching her husband's person day and night, never permitting any intercourse between him and others, which might reveal the true condition of his mind. We shall find her interpreting, according to her own purposes, his signs and gestures to selected persons, chosen to have this nominal intercourse with him. We shall find her preparing such per-

sons to play the humble part of dupes, by appeals to their self-interest or their vanity, or by palpably untrue representations and impostures practised upon them. We shall find her desecrating to the purposes of fraud and deception, the sacred name and the sacred observances of religion, the holy cause of charity. We shall find her ensnaring her own highly respectable kinsmen in such a net-work, that they are at length constrained in desperation to become the instruments of her will, to forget, to prevaricate, to misrepresent. The learned and eminent counsel is drawn in by one artifice; the pious minister by another; the sexton falls by one piece of practice, the bank president and the president of the Bible Society by another; and finally, to fill up, by direct and unmistakable untruth, every remaining chink in the barricade behind which her plunder was to be intrenchèd, a desperate wanderer from truth and rectitude is obtained as a witness, and induced to out-Herod Herod."

This is a most forcible and eloquent summary of the positions which it is incumbent upon the respondent to maintain, in order to invalidate these codicils for the want of testamentary capacity. The counsel is clearly right in his conception of the burdens which the case imposes upon him. He sees that it is quite impossible that all these intelligent witnesses should have failed to detect idiocy if it existed, and has taken his position accordingly. These positions are maintained by a vigor of logic, a force of rhetoric, and a perfection of art, which I cannot refrain from saying, has, in my judgment, rarely been surpassed. But is it possible to assent to them? They attribute to Mrs. Parish not merely the wickedness, but the power, of a demon. Women have no doubt existed who were sufficiently vile; but I certainly have never known, and think I have never heard of one who could have accomplished what is here supposed; who could have carried on a game of fraud and deception for six years without a misstep; who could have practised her wiles with such success as utterly to subvert the moral sense of a whole family, consisting of such men as her brothers are admitted

to be; and, not only so, but to "draw in," as the counsel expresses it, and make "dupes" of lawyers, ministers, and financiers, among the most eminent which the country affords. Is all this credible? One man may be deceived and another suborned; but that a dozen of the shrewdest and most high-minded men in the city of New York, should be thus cheated, cajoled, and corrupted, surpasses belief.

The witnesses I have named are by no means all who had intercourse with Mr. Parish and believed in his intelligence. Those named were selected, because they were specially referred to in the paragraph quoted from the counsel's argument. There were many others, belonging to the same intelligent class: among them I may mention Charles A. Davis and Moses H. Grinnell, both eminent merchants; Leroy M. Wiley, a Southern planter, and former partner of Mr. Parish, and James Watson Webb, editor of the *New York Courier and Enquirer;* all of whom testified to their entire confidence in the intelligence of Mr. Parish. Mr. Wiley, who had a great deal of intercourse with him during his illness, upon matters of business, when asked as to the condition of his mind, said: "As far as I could judge, his mind appeared to be well regulated as to business he was familiar with, or had been familiar with, when in good health." Mr. Grinnell, upon being inquired of whether, in his intercourse with Mr. Parish, after his attack, he supposed the latter understood what was said to him, replied, "I never had any doubt but what he understood distinctly."

The witnesses called on the part of the respondents are far from expressing the same confident opinion. Mr. Kernochan, the leading witness and the former partner and intimate friend of the testator, did not think the latter "had much mind." In his efforts to communicate with Mr. Parish he was never "perfectly satisfied" that the latter understood him. Mr. Folsom, the clerk of Mr. Parish, before and after his sickness, and one of the principal witnesses for the respondents, in answer to an inquiry as to the mental condition of Mr. Parish during his sickness, said: "I think, through

that whole period, he was not *far removed* from an imbecile, still retaining some memory, some lingering ideas of former business habits, constant efforts to express himself, without the ability so to do, without the mind to enable him so to do." Mr. Ogden, cashier of the Phœnix Bank, had an interview with Mr. Parish upon matters of business, and " could not understand him." These are fair specimens of the testimony upon that side of the case. So far, therefore, as the opinions of witnesses are entitled to weight, the evidence, no doubt, greatly preponderates in favor of the testator's competency.

But opinions are of no importance, if they are contradicted by facts. It is necessary, therefore, in attempting to dispose of this case, to look into the history of the appearance and conduct of the testator during his illness, which is given by the testimony with the greatest minuteness of detail. This I have done, but shall not attempt to reproduce it here. Some of the circumstances which are clearly established, and about which there is no dispute, must, no doubt, be regarded as somewhat extraordinary, upon the supposition that the testator possessed any considerable mental capacity. Those which it appears to me most difficult to reconcile with this hypothesis are: 1. That, although his embarrassment in endeavoring to make his thoughts and wishes known, his power of speech being limited to uttering the words, " yes" and " no," must have been a constant source of irritation and annoyance, he either could not, or would not, learn to write with his left hand, of which, for other purposes, he still had the use; and 2. That he would not, or did not, communicate his ideas by the use of block letters. Various hypotheses might be suggested for the purpose of explaining those circumstances, some of which it would seem to me quite possible to adopt.

But whatever may be the difficulty of accounting for these facts, it can hardly be sufficient to counterbalance the great weight of the evidence which goes to show intelligence. In addition to the force of the opinions referred to, and of the suggestions already made as to the absolute impossibility of

believing that educated and intelligent men could have daily intercourse, for six years, with an idiot, talking to him, interrogating him, watching his countenance, observing and scrutinizing his actions, and still believe him to be a man of intellect, there is much direct evidence of the testator's intelligence. I shall not attempt to give a summary of this evidence, but shall simply refer to one or two items which appear to me worthy of special notice. Mr. Charles A. Davis was in the habit of visiting Mr. and Mrs. Parish; upon one of these occasions, as he testifies, in the course of a general conversation, Mr. Parish suddenly interposed an inquiry in his usual mode, directing it apparently to him, the witness. He, supposing the inquiry to relate to the subject then under discussion, made various suggestions, which were all met with a "no," and a shake of the head. After similar efforts on the part of Mrs. Parish, but equally without success, Mr. Parish gave the usual indication of his unwillingness to continue the trial longer. It then occurred to Mr. Davis, that he had a few weeks before spoken to Mr. Parish about a valuable piece of property which he was about to sell, and had afterwards sold, and thinking that the inquiry might relate to the price obtained for that property, he said to Mr. Parish, "I know now what you are after, you want to know what that property brought at the corner of Broadway and Franklin streets." Mr. Parish, as the witness says, instantly exclaimed, "'Yes, yes,' repeating it several times, patting me upon the arm, and expressing great gratification at being at last understood." Mr. Davis had previously testified, that the subjects which seemed most to interest Mr. Parish "had relation to property—sales and values."

I will mention here one other item of evidence, which appears to me still more significant. From the constantly accruing income of Mr. Parish's estate during his illness, there were large sums to be invested; many of these investments were made through the agency of Mr. John Ward, a prominent broker of Wall-street, who testifies that his business interviews with Mr. and Mrs. Parish were had in Wall-

street, to which they came together in a carriage, stopping in front of his office. He would go to the carriage and speak to them, and, when informed that they wished to invest, would propose to them, while sitting in their carriage, various securities for purchase, such as stocks, railroad bonds, and notes of mercantile firms in the city. When stock or bonds were offered, time was usually taken to make inquiries. They would ascertain one day what securities could be had, and return in a day or two and decide whether to take them. But Mr. Ward expressly says, that this was not usually the case in respect to notes. He says that when notes were offered, they were generally accepted or rejected at once. Upon cross-examination, Mr. Ward was unable to specify, from recollection, more than one note which he could be certain Mr. Parish accepted when offered; and also one which had been in like manner rejected; but stated his impression to be that there were others. To the question, "Was it not the usual practice, in these transactions with your house, for Mrs. Parish to ascertain at one call, what notes or securities you had, or proposed to sell, and return the next day, or at some subsequent period, and take or not as was determined upon?" the witness answered, "I think that was often the case; *it was not usually the case in respect to notes*, as I believe." According to the testimony of Mr. Ward, the offer on these occasions was made directly to Mr. Parish, and when the latter accepted, he did so by a nod directly to the witness. Mr. Ward expressly says, that the choice or selection in these cases appeared to be that of Mr. Parish himself.

Now the great, and,—if Mr. Ward is not mistaken in his recollection,—controlling importance of this testimony will be readily seen. The stocks and bonds offered, were mostly those of companies recently organized, the credit and responsibility of which Mr. Parish, from his having been somewhat secluded from the business arena, for a considerable time, could not be expected to have much knowledge; concerning these it was necessary to make inquiries. But when the note of a mercantile firm in the city, with the character

and standing of which he was familiar, was offered, he was prepared to accept or reject it at once. It is difficult to suppose that Mrs. Parish had that intimate knowledge of the business firms of the city, which would enable her to decide thus promptly. The decision must, as it would seem, have been made, as Mr. Ward supposes it to have been made, by Mr. Parish himself. This testimony proves, not only that Mr. Parish had sufficient intelligence to comprehend a matter of business, but that he had self-reliance, decision, and will. It also, if reliable, affords unmistakable evidence that Mrs. Parish had confidence in her husband's intelligence, and was willing to rely, in matters involving many thousands of dollars, upon his judgment. These facts, if they occurred, cannot by possibility be reconciled with the supposition, that the testator was an imbecile. Their effect can only be obviated by assuming, that Mr. Ward is mistaken in his recollections, or that he misunderstood what transpired. The fact, however, that any distinction at all was made between notes, and bonds or stocks, about which he seems to be confident, and in regard to which we can hardly suppose him to be mistaken, tends to corroborate his recollections in other respects.

I have referred to these items in the testimony of Mr. Davis and Mr. Ward as specimens, merely, of the evidence in the case. Numerous other circumstances are detailed by the witnesses, having the same tendency to support the opinions of those who have expressed their belief in the intelligence and capacity of Mr. Parish. The facts of this character having an opposite tendency, are few and comparatively insignificant. The evidence of incapacity rests mainly upon his failure to learn to write or to communicate by the use of block letters, upon his great physical weakness in some respects, and upon the somewhat qualified opinions of the witnesses introduced by the contestants. The counsel, for the purpose of adding to the force of the evidence, have introduced, by way of *addenda* to their briefs, the written opinions of several medical gentlemen of great eminence. Although these opinions are not under oath, yet, considering

the character of the authors, the nature of the subject, and the fact, that the reasons for the opinions are in each case so fully given, they are entitled, perhaps, to about the same weight as if sworn to. I shall treat them, therefore, as a part of the evidence in the case.

To estimate rightly the force of these opinions, it is necessary to divide them into two parts; that is, to separate the part which is purely scientific from the residue. To ascertain the physical condition of a person in any respect, from all the visible indications of that condition, is the appropriate duty of the physician: to gather together and combine all the external symptoms bearing upon the state of the brain, or any other organ, and to infer from those symptoms its actual condition, is of course within their province. So, also, from the ascertained physical condition of an organ, to infer its functional powers, is obviously within the range of medical·science. When a physician, therefore, from personal observation, or an authentic description of the symptoms of a case, has arrived at the same conclusion, that there is a lesion or deterioration of the substance of the brain, his opinion as to the necessary effect of this injury upon the intellectual powers, is received as evidence. But it is obvious, that, to make this opinion of any special value as a scientific opinion, upon a question of mental capacity, the conclusion as to the injury to the brain, must be drawn from indications other than such as are purely intellectual.

If a medical witness comes to the conclusion from the mental manifestations of an individual that his mind is disordered, that he is insane or imbecile, and from that infers that his brain is diseased, and then tells us that this disease of the brain must necessarily destroy the intellectual powers, we have gained nothing whatever from medical science. We have simply reasoned in a circle; we had arrived at the end of the inquiry as to the mental capacity before touching upon the connection between the mind and the brain, which connection alone brings the question within the scope of that science. Physicians are not necessarily metaphysicians; their

science relates to the physical man, and to his moral and mental condition only as connected with his physical. Their opinions, therefore, can be considered as properly scientific, only to the extent in which this connection is involved. So far, then, as the individual opinions in this case bear upon the degree of cerebral disease indicated by the apoplexy, the paralysis, the loss of speech, the convulsions, and other physical symptoms, they are to be regarded as the opinions of experts. But in so far as they rest upon the evidence going to show a want of intellect *directly*, and not merely as the result of disease of the brain, they derive very little, if any force, from the professional education of the witnesses. A very large portion of these medical opinions is of the latter description: it is impossible frequently to appreciate their force without observing the distinction here made. It is unnecessary to review these opinions at large. I will advert only to that of Dr. Watson, which is the most elaborate of them all. A considerable portion of this opinion is devoted to showing what must have been the physical condition of Mr. Parish's brain, as deduced from his complaints prior to July, 1849, from the attack at that time, and its immediate effects of paralysis, loss of speech, &c., &c., from his subsequent ailments, such as periodical convulsions, &c., &c. All this falls legitimately within the province of the physician, and from my examination of this portion of the opinion, I must say, that it seems to me, in general, so far as I am qualified to judge of its merits, able and well-reasoned, although open, no doubt, to some criticism, as Dr. Clark has very clearly shown. All the medical witnesses concur in stating, that when the disease is simply what is called *hemiplegia*— that is, when the lesion of the brain is confined to one of its hemispheres, as is usually the case where one side only is paralyzed—the mind is generally but slightly affected. Those called on the part of Mrs. Parish, think that the disease of Mr. Parish was of this nature, and that only one-half of the brain was involved. Dr. Watson, on the other hand, and those who concur with him, contend that the symptoms

prove a serious disease of both hemispheres. I should find it somewhat difficult to decide between these opposing opinions. Both are maintained with ability, and with some show of authority. If, therefore, the case were found to turn upon this question, its determination might depend entirely upon the *onus probandi.* But I deem it unnecessary to decide which of these two opposing opinions is correct. It is true, if we adopt the conclusion of Dr. Watson, that the whole brain was affected, it would follow that the powers of the mind were more or less impaired. But this would not prove that sufficient intelligence might not still remain to enable Mr. Parish to make a valid will, or even to transact any ordinary business. What Dr. Watson says, is this: "No brain can be *extensively* diseased on both sides of the medium plane, without impairment of mind sufficient to be at once *recognizable* by the medical observer."

Now, although it may be regarded as clear, in this case, that the left hemisphere of the brain was seriously diseased, yet how far the right hemisphere was implicated, is, under the evidence, to say the least, doubtful. It certainly cannot be considered as incontrovertibly established, that the brain, to use the language of Dr. Watson, was "*extensively* diseased on both sides." But even if it was, the only conclusion drawn from it by Dr. Watson himself, is, that the impairment of mind would be such as to be recognizable by a medical observer. This clearly is not enough to render a man incapable of making a will. A man's mind may be perceptibly weakened, and he still possess that degree of intelligence which the law requires in a testator. In any view, therefore, which can be taken of that portion of the medical opinions which assumes to deduce the state of the mind from the condition of the brain, it cannot be considered as in any manner decisive of the question at issue.

There is another portion of the opinion of Dr. Watson, which is of an entirely different character. He recites the testimony of the various witnesses, and comments at length upon it, with a view to its bearing, not upon the physical

condition of the brain, but directly upon the question of intelligence. I will refer to his mode of dealing with one portion of the evidence, which seems to me of the greatest importance. Many of the witnesses speak of the countenance of Mr. Parish; of its changes of expression; of the play of his features, and expressions of pleasure, or the reverse. Mr. Taylor says: "His face was as expressive as usual—as it ever had been;" and in answer to the question, "How did he manifest the pleasure you have spoken of?" he replied: "There was an expression of pleasure beaming from his countenance, and he continued to nod his head approvingly." Mr. Tileston says: "His countenance changed from time to time, as he was pleased or displeased, on this and all other interviews I had with him." Mr. Bradish, upon being asked whether the expression of Mr. Parish's face was of a uniform character, replied: "I should think not, from my present recollection; it would vary, according to the various occasions of the excitement or interest." Mr. Webb says, on this subject: "His expression was as intelligent as I ever knew it to be, and as responsive to any remark I made." These are merely examples of the manner in which the witnesses generally speak of the expression of face.

Dr. Watson, in reference to this portion of the testimony, uses this language: "I do not know that I ever witnessed an instance, where the *dementia* supervened late in life, in which the patient's faculties were so completely overwhelmed by the disease of the brain, that he could not, while yet conscious, and enjoying his sense of sight and hearing, respond by look, or by the play of features, *to the countenance*, if not to the words, of those who were addressing. Now, it is this *reflection of ourselves* in the faces of others, with whom we come in contact, that is so apt to mislead us in our intercourse with the lunatic, the idiot, and the imbecile." This can hardly be considered a satisfactory explanation of this vital point in the evidence. It supposes that the intelligent witness here named, and many others of the same class, with every opportunity for observing, were unable to discriminate

between the instinctive conformity to their own expression of face; the reflex images of their own countenances, and an intelligent play of features, obviously responsive to the thoughts suggested. This supposition is inadmissible. It cannot be true. They might be misled in a single interview; but that, after a business and social intercourse of years, they should still be deceived, is utterly incredible.

I deem it unnecessary to determine the question of the burden of proof; that is, whether a testator of the requisite age is to be presumed to be *compos mentis* until the contrary appears, or whether it is incumbent upon the proponent of the will, to give evidence in the first instance on this subject, whenever the fact is contested, because, in my view of the case, the evidence greatly preponderates in favor of the position that Mr. Parish at the time of the execution of the codicils, instead of being an utter imbecile, was possessed of considerable capacity and judgment; and more than the law requires to enable a testator to make a valid will. I do not suppose, however, that he retained all his original vigor of intellect; and the question remains, whether advantage was taken of his mental and physical weakness to obtain by fraud, coercion, or the exercise of an improper influence, a will which he would not have made, if left to the spontaneous suggestions of his own mind.

This question, although not as clear in point of fact, as that already considered, for the reason that the capacity of the testator is proved by affirmative evidence, while a conclusion that there was no fraud, would depend, mostly, upon the absence of evidence, is nevertheless, equally clear in law. Fraud and undue influence must be proved. They may no doubt be inferred from circumstances, and the nature of the will may be taken into consideration in determining the point. But I see nothing in the fact that the testator, by the codicils in question, gave the accumulations of his estate to his wife, rather than to his brothers, from which it would be safe to infer fraud. Neither she nor they stood in need of it. She was very munificently provided for by the original will

and the first codicil, and certainly could have had no apology for making any undue efforts to increase the provision. There may be reason to suspect that she desired to obtain the whole estate, and that she entertained some jealousy of Daniel Parish, and of his influence with his brother, and some dislike towards him and his family. But this, although proof of some human weakness, would not be enough to invalidate the codicils; and this, as it seems to me, is the utmost that can be claimed upon this point. There is no proof that she misrepresented Daniel Parish to his brother, or that she practised any fraud or artifice to create prejudice in the mind of the latter against him, and without this her jealousy and dislike of Daniel Parish, although it may seem to raise a suspicion, amounts to nothing more.

Mrs. Parish's assiduous and constant attendance upon her husband, cannot be permitted to weigh against her. If it could, it would never, in such cases, be safe to act in accordance with the promptings of affection, and a high sense of duty.

There is considerable direct evidence in the case to show that Mr. Parish was not under his wife's control. I will mention only what occurred upon the execution of the second codicil, in relation to the charitable gifts. It having been ascertained, or at least assumed, that Mr. Parish was anxious to give about the sum of fifty thousand dollars to charitable objects, the question arose as to what particular charities should be made the recipients of his bounty. Mrs. Parish's brother Edward was at the head of, and deeply interested in the prosperity of, the N. Y. Eye and Ear Infirmary, and she proposed that the whole sum should be given to that institution; but Mr. Parish at once refused, and persisted in this refusal to the last; finally consenting, after selecting several other objects, to give the sum of twenty thousand dollars, instead of fifty, to the Eye and Ear Infirmary. This, unless Mr. Lord was practised upon to a degree that, in respect to a man of his intelligence, is almost inconceivable, affords very strong proof that Mr. Parish, in making those codicils, ex-

ercised an independent will. Upon the whole case, I think it quite impossible to hold, that fraud or undue influence, operating upon the mind of Mr. Parish, is established by the proof. The counsel for the respondents, James and Daniel Parish, himself rejects the idea. He argues with great earnestness, that the affection of Mr. Parish for his wife was not increased after his attack in 1849, and to prove this refers to his irritation in consequence of the dietetic restraints which she imposed or urged upon him, and to the testimony of Dr. Delafield on that subject, and then adds, " This same witness, Dr. Delafield, makes a remark quite in harmony with the facts just stated, and our views of the whole evidence. He says, that she had very little influence over him before the attack, and less afterwards." After this explicit concession by the counsel, the question of undue influence may be considered as virtually out of the case. The position upon which the able and eminent counsel relies is, that the testator was idiotic, substantially without mind or intelligence, and that his acts were dictated, and all his movements prompted, by his wife ; and the fraud and deception imputed to her, is charged as operating, not upon him, but upon the numerous intelligent witnesses who have testified to their belief in her husband's capacity. I have already stated my reasons for thinking this position untenable. It follows that, upon the evidence before the surrogate, the codicils should have been held valid, and admitted to probate.

SUTHERLAND, J., concurred with SELDEN, Ch. J.

For affirmance of the judgment of the surrogate and Supreme Court, holding the codicils to be void, DENIO, DAVIES, WRIGHT, ALLEN, SMITH, and GOULD, Justices—6.

For reversal, SELDEN and SUTHERLAND, Justices—2.

DELAFIELD v. PARISH.

NOTE.—In the report of this case in 25 *N. Y.* [11 *Smith*], 9, which has appeared while this volume is going through the press, the reporter states in a foot-note on page 29, that certain cases (*Buel* v. *McGregor*, and *Matter of the will of Ustick*) cited in the opinion of the court, do not professedly impeach the law of *Stewart* v. *Lispenard*. On page 66, at the end of the opinion of the court as delivered by DAVIES, J., the reporter also notes the concurrence of four other judges, with certain qualifications; and he adds that DENIO, J. (who was one of the four judges referred to), "did not concur in the disapproval of the decision of *Stewart* v. *Lispenard*, so far as relates to the law as enunciated in that case." The head-note also questions whether that case was really overruled.

From these statements, it might possibly be inferred that but four judges, in all, concurred in disapproving that case. The fact is otherwise, as may be seen by a careful perusal of the opinions.

The opinion of Mr. Justice DAVIES unqualifiedly condemns *Stewart* v. *Lispenard*. It is expressly stated by the reporter, at page 66, that Judges WRIGHT, ALLEN, and SMITH, concurred in the opinion rendered by Judge DAVIES. Next, the opinion of SELDEN, Ch.·J., at pages 100 to 102, declares his disapproval of *Stewart* v. *Lispenard*, in the most emphatic terms. He pronounces it legally impossible to sustain the point in that case. "No amount of authority," he says, at page 101, "can establish a rule which is self-contradictory." In this opinion, Judge SUTHERLAND concurred; page 121. It is true that Judge GOULD did not agree to overrule *Stewart* v. *Lispenard*; and the reporter also states that Judge DENIO did not. But it distinctly appears that *six* of the *eight* judges did unite in overruling it.

Again. Mr. Justice GOULD is stated to have read a "dissenting" opinion. It is obvious, however, that the result he attained was a concurrence in affirming the judgment. The opinion of Mr. Justice DAVIES was against the codicils, on the ground of total incapacity. In this, four other judges concurred, making it the judgment of the court. Mr. Justice GOULD considered that, according to the rule laid down in *Stewart* v. *Lispenard*, the decedent had testamentary capacity; but he condemned both codicils, on the ground that they had been obtained by undue influence. He concurred in the judgment, and did *not* dissent from it.

The reporter's foot-note, on page 121, at the end of the case, gives a history of resignation, illness, and temporary absences of various judges during the year in which this case was decided (1862). These are characterized as an "unfortunate concurrence of circumstances." Every one of these circumstances occurred, however, *subsequently to* the final decision of the Parish Will Case. It may reasonably be conjectured, therefore, that none of them had any influence upon that decision. All the judges were present on each argument of this cause, except Judge SELDEN, who was absent during the first argument, and who gave a dissenting opinion.

The report, at page 9, announces that the case was decided at June Term, 1862. This is a mistake. It was decided at the prior March Term, having been argued the last time in the January Term. The remittitur was sent

down from the Court of Appeals, on the 11th of April, 1862. It will be seen, by examining the reporter's own note, therefore, that the only circumstance of the class noticed by him, which really occurred in any connection with this case, is the absence of Judge SELDEN during the first argument, and he did not unite in the judgment. At page 14, the reporter states that the judges who sat in 1861, were "equally divided upon the question of fact—the testamentary capacity of Mr. Parish." There are many other varieties of opinion which might have prevented the concurrence of the number of judges required to pronounce a judgment. On the validity of the codicils, as on the authority of *Stewart* v. *Lispenard*, the opinions in this case stood as three to one.

In the preparation of this case for the present volume, it has been deemed advisable to give the points of counsel, on which the case was argued in the Court of Appeals.—REPORTER.